424-08/LJK
Freehill Hogan & Mahar, LLP
Attorneys for Defendant Sdn Bhd
Pacific Inter-Link
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

EFKO FOOD INGREDIENTS, LTD.,

                   Plaintiff,

       -against-

PACIFIC INTER-LINK SDN BHD,

                 Defendant.
-------------------------------------------------------x

**08 CV 6480 (CM)**

**DECLARATION OF KEVIN
SACH IN SUPPORT OF
VACATURE OF ATTACHMENT
AND/OR DISMISSAL**

     Kevin Sach, pursuant to 28 U.S.C. §1746 hereby declares and says the following under penalty of perjury:

     1.    I am a solicitor of the Supreme Court of England of Wales and the founding partner of Sach Solicitors of 24 Alie Street, London, E1 8DE, England. I was admitted as a solicitor in 1986, since when I have specialized in maritime litigation.

     2.    I am authorized under English law to provide opinions on English law to foreigners and do so regularly. I have reviewed the available documentation concerning the dispute between the parties.

     3.    I have been asked to provide an analysis of the dispute from the perspective of English law. I have also been asked to provide an opinion regarding the rules of FOSFA Arbitration with respect to the dispute between the parties. I am familiar

with FOSFA Arbitration and during my career have been involved in several FOSFA arbitral disputes.

4.      As an initial matter, I have reviewed the six offers made by Pacific Inter-Link Sdn Bhd ("PIL") for the sale of a quantity of palm olien and confirm that these offers are by implication subject to English law. All six offers contain the same clause, which refers to London arbitration – see clause I). Under English law, a contract that contains an express London arbitration clause is deemed by implication to be governed by English law. See, e.g., *Egon Oldendorff v. Libera Corporation [1996] 1 LLR 380*, a copy of which is annexed hereto as **Ex. 1**.

5.      Turning next to the question of whether a contract was formed between PIL and EFKO, I note that each of the six offers made by PIL contained the same express language concerning the means by which the offer could be accepted:  the offers needed to be signed and stamped by an authorized person at EFKO and returned within a specified period of time.   Under English law, when an offeror specifies a mode of acceptance of an offer to contract, no contract is formed unless the recipient of the offer makes acceptance in the form specified.  See, e.g., paragraph 2-063 of *Chitty on Contracts* Volume 1 (2004) and *Financings Ltd v Stimson [1962] 1 W.L.R. 1184*, copies of which are annexed hereto as **Ex. 2**.  Neither Bell/Pontus nor EFKO accepted PIL's offer in the manner specified in the offer nor, does it appear, in any other way.

6.      Exceptions exist with regard to this rule, such as when the offeror accepts the recipient's response even though made in another form, or when the offeror and recipient both act as though a contract had been formed. Such exceptions do not appear to exist with respect to this dispute.

7.    I can say that these exceptions do not apply, at a minimum, for the following reasons:

a)    the offeror, PIL, wrote to the recipient, extending the time for an acceptance, but otherwise insisting on the specified mode of acceptance.

b)    the recipient of the offer, Mr. Bell, wrote back in an attempt to further negotiate terms by requesting a quality on delivery term, which was rejected by PIL.

c)    EFKO wrote back to PIL, specifying alternative price terms, and signifying acceptance to some other offer made by intermediary Bell/Pontus.

8.    Under English law, it appears plain that no contract was formed between PIL and EFKO, as PIL's offers were never accepted.

9.    PIL, by a communication dated September 14, 2007, extended further the time for an acceptance up to and including September 17, 2007.  In a further communication from PIL dated September 24, 2007, PIL advised that no acceptance had been made of its offers, and that they were all withdrawn.  Such withdrawal was proper and effective under English law.  English law provides that if an offer is not accepted by the date allowed by the offeror, then the offeror may choose to extend the deadline or withdraw the offer, at its option.  See, e.g., paragraph 2-086 of *Chitty on Contracts* Volume 1 (2004), copy enclosed as **Ex. 3**.  This withdrawal of the offer was in all respects proper and effective.

10.   Once an offer is withdrawn, it is terminated and cannot be revived by the recipient.  See, e.g., paragraph 2-085 of *Chitty on Contracts* Volume 1 (2004), copy enclosed as **Ex. 4**.  At most, the recipient can attempt to renegotiate by seeking to make an offer of its own.  Here, EFKO appeared to make such an offer, but failed to include a

crucial term, the price of the palm olien to be purchased. Two prices, based on different delivery terms (FOB versus CIF) were indicated, which perhaps could be interpreted as giving PIL a choice, but in any event, PIL did not accept such an offer from EFKO. Accordingly, no contract was formed between PIL and EFKO under English law.

11.     English law also respects the concept of privity of contract. See, e.g., *Dunlop Pneumatic Tyre Co Ltd v Selfridge & Co Ltd [1915] A.C. 847*, copy annexed hereto as **Ex. 5**. Save in limited cases, which do not apply here, in the absence of privity between the parties to a contract, neither side may claim against the other for a supposed breach of contract.

12.     EFKO and PIL are not and never were in contractual privity. No contract exists or ever existed between the two entities. Indeed, EFKO's own communications indicate as much. EFKO's letter to PIL indicates that EFKO had a contract with Pontus, which was to have been an intermediary between EFKO and PIL. Since EFKO had no contract with PIL, the two were not in privity and accordingly, EFKO has no basis under English law to bring a claim for damages against PIL.

13.     Even if EFKO and PIL had contracted under the terms of PIL's offers, under English law (which would govern the contracts thus formed), such contracts would not be classed as contracts of a "maritime" nature (ie charterparties or contracts for the carriage of goods by sea, such as bills of lading); nor would such contracts fall within the Admiralty jurisdiction of the English High Court. Admiralty jurisdiction is narrowly circumscribed; claims governed by the Admiralty jurisdiction of the High Court, in relation to goods, are claims for loss of or damage to goods carried in a ship or claims arising out of any agreement relating to the carriage of goods in a ship – see ss.20(2)(g)

and (h) of the Supreme Court Act 1981, copy annexed hereto as **Ex.6**. The subject dispute plainly concerns a dispute regarding sale and purchase of a commodity which is not maritime. Indeed, EFKO's communications to PIL indicate that the problem from EFKO's perspective is the failure to provide palm olien (which I note EFKO did not purchase) pursuant to the offers made by PIL.

14.    Hence, any contracts formed (if any), would simply be sale and purchase contracts for a commodity. Even though such contracts contain a delivery term, the same does not render them "maritime" under English law, which would impute a dispute concerning carriage of goods.

15.    I note further that any formed contracts (if any, which does not appear to be the case) were not intended to be enforced by any maritime body. The offers made by PIL specify that disputes are to be resolved by FOSFA, an arbitral body formed by the federated association of oils, seeds and fats traders. This body is not a maritime specialist arbitral association. If the parties intended to arbitrate maritime disputes, they would have more likely specified arbitration before the London Maritime Arbitrators' Association.

16.    Nothing in the FOSFA Rules of arbitration, a copy of which is annexed hereto as Ex. 7, would indicate that the dispute (or EFKO's claims) is maritime in nature.

17.    In any event, even though under English law arbitrators are empowered to award legal costs to the successful party, FOSFA arbitrators as a rule do not award lawyers' fees. Accordingly, EFKO under no circumstances could expect any award of attorneys' fees, even if it were to succeed on its claims before that body.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England
     7  August 2008

By: _____
         Kevin Sach

SACH DECLARATION

EXHIBIT 1

**SACH DECLARATION**

**EXHIBIT 1**

# SACH DECLARATION

## EXHIBIT 1

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Oct. 9; Nov. 16, 1995

EGON OLDENDORFF
v.
LIBERA CORPORATION

Before Mr. Justice CLARKE

**Conflict of laws — Choice of law — Contract — Parties reached agreement for charter of two Panamax vessels with option to purchase — Whether parties agreed MOA to be subject to law of England as the country agreed as place of arbitration — Whether charter-party governed by English or Japanese law.**

The plaintiffs were a German commercial partnership with unlimited liability based in Lübeck. The defendants were a Japanese corporation based in Kure Japan.

It was common ground that in March, 1993 the parties reached an agreement which provided for the charter of two Panamax bulk carriers to be built by Sasebo Heavy Industries Corporation Co. Ltd. (Sasebo) for the defendants, and also for the plaintiffs to have an option to purchase, subject to conditions. The conditions provided inter alia:

Sub owners finally signing newbuilding contract with owners approval declarable latest 15th April 1993 cob Japan (the signing subject).

Sub further terms/conditions and C/P detail (the details subject).

On negotiations of the charter-party terms the plaintiffs preferred to use their own recent fixture of *Chemi Ocean* and a copy of that charter was sent to the defendants. The *Chemi Ocean* charter was on the New York Produce Exchange form and was amended to provide for arbitration in London. The discussions on the charter-party terms were successfully concluded by Apr. 23, 1993. There was no express reference to either cl. 17 or cl. 75 (the arbitration clauses).

Time for compliance with the signing subject was periodically extended at the defendants' request to Apr. 21, to Apr. 30, then to May 12 and finally to May 20, 1993. On May 20 the defendants reached heads of agreement subject to contract with Sasebo for the construction of the vessels, and the plaintiffs submitted that the signing subject was lifted in the light of those heads of agreement.

In the meantime negotiations had been taking place on the terms of the MOA which were based on a proforma of the Norwegian Saleform 1987 MOA. Clause 15 of that form provided inter alia:

Arbitration

If any dispute should arise in connection with . . . this contract . . . same shall be decided by arbitration in the city of[3]     . If the parties cannot agree upon the appointment of a single Arbitrator, the dispute

shall be settled by three arbitrators, each party appointing one arbitrator, the third being appointed by[4]

. . . This contract shall be subject to the law of the country agreed as place of arbitration.

Footnotes 3 and 4 provided:

(3). The place of arbitration to be inserted. If this line is not filled in it is understood that arbitration will take place in London in accordance with English law.

(4). If this line is not filled in it is understood that the third Arbitrator shall be appointed by the London Maritime Arbitrators' Association in London.

On June 1, 1993 the defendants brokers (TSL) sent to each party a recap fax of the agreed terms. The position was that there was an agreement between the parties as to the terms of the recap fax but the defendants argued that the signing subject had not been lifted and refused to treat the contract as binding.

The plaintiffs subsequently claimed to treat the defendants as in repudiatory breach of the contract and claimed damages.

The preliminary issue for decision was whether the contracts or contracts alleged by the plaintiffs in their re-amended points of claim was or were or would if concluded have been governed by Japanese or English law as the applicable law. The plaintiffs relied on art. 3 of the Rome Convention, 1980.

————Held, by Q.B. (Com. Ct.) (CLARKE, J.), that (1) in construing the MOA as a matter of English law there was no reason to disregard footnotes 3 and 4; the parties agreed that in the event of a dispute, if no settlement could be reached, it would be resolved by arbitration in London by a tribunal composed as set out in the clause with the third arbitrator to be appointed by the London Maritime Arbitrators' Association; it was therefore agreed that the MOA was to be subject to the law of England as the country agreed as the place of arbitration (see p. 384, col. 2);

(2) a purposive approach would be adopted in the interpretation of art. 3 of the Convention and it would not be construed in a narrow literal way (see p. 387, cols. 1 and 2);

(3) the party relying on art. 3 had to demonstrate with reasonable certainty that the parties had chosen a particular law as the governing or applicable law; it must be a real choice which the parties had a clear intention to make (see p. 387, col. 2);

(4) it was plain from the wording of art. 3 that the Convention contemplated an implied choice of law provided that the choice was a real choice which appeared with sufficient clarity from the terms of the contract as a whole or the circumstances of the case (see p. 388, col. 1);

(5) at common law the mere fact that a charter-party contained an arbitration clause providing for arbitration in London did not mean that English law was the proper law of the contract; however such an inference could be drawn from the presence of an arbitration clause; although the test in art. 3 of the Convention was not quite the same, the article nevertheless contemplated that the choice could be other than express so long as it

was a clear choice demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case (*see* p. 388, col. 1);

(6) on the facts of this case when set in the context of the terms of the contract as a whole and of the circumstances of the case the arbitration clause was a strong indication of the parties' intention to choose English law as the applicable law as well as the curial law; having agreed English arbitration for determination in London of disputes arising out of a well known English language form of charter which contained standard clauses with well known meanings in English law, it was to be inferred that the parties intended that law to apply (*see* p. 390, cols. 1 and 2);

(7) having agreed a "neutral forum" the reasonable inference was that they intended the forum to apply a "neutral" law i.e. English law and not either German or Japanese law (*see* p. 390, col. 2);

(8) the plaintiffs had established with reasonable certainty that the parties chose English law as the applicable law of the charter-party as well as the applicable law of the MOA (*see* p. 390, col. 2);

(9) the parties made a tacit choice of English law; they chose English law for both the charter and the MOA which was not surprising since they undoubtedly chose English law in the case of the MOA and it was an express agreement that the MOA would be attached to the charter; the answer to the preliminary issue was English law (*see* p. 390, col. 2).

---

The following questions were referred to in the judgment:

Boeghoefer G.m.b.H. & Co. K.G. v. ASA S.A., [1985] E.C.R. 2704;

CPC Consolidated Pool Carriers G.m.b.H. v. CTM Cia. Transmediterranea S.A., [1994] 1 Lloyd's Rep. 68;

Compagnie d'Armement Maritime S.A. v. Compagnie Tunisienne de Navigation S.A., (H.L.) [1970] 2 Lloyd's Rep. 99; [1971] A.C. 572;

Egon Oldendorff v. Libera Corporation, [1995] 2 Lloyd's Rep. 64;

*Hollandia* The (sub nom The *Morviken*), (H.L.) [1983] 1 Lloyd's Rep. 1; [1983] A.C. 565;

IP Metal Ltd. v. Ruote O.Z. S.p.A., [1993] 2 Lloyd's Rep. 60;

*Junior K*, The [1988] 2 Lloyd's Rep. 583;

Naamlooze Vennootschap Handels-en-Transport Maatschappij "Vulcan" v. A/C J. Ludwig Mowinckels Rederi A/S, (H.L.) (1938) 60 Ll.L.Rep. 217;

Stag Line Ltd. v. Foscolo Mango and Co. Ltd., (H.L.) (1931) 41 Ll.L.Rep. 165; [1932] A.C. 328.

---

This was a trial of a preliminary issue pursuant to an order of Mr. Justice Longmore as to whether the contract or contracts between the plaintiffs, Egon Oldendorff and the defendants Libera Corporation was were, or would if concluded have been, governed by English or Japanese law as the applicable law.

Mr. Victor Lyon (instructed by Messrs. Watson Farley & Williams) for the plaintiffs; Mr. Graham Dunning (instructed by Messrs. Holman Fenwick & Willan) for the defendants.

The further facts are stated in the judgment of Mr. Justice Clarke.

Judgment was reserved.

Thursday Nov. 16, 1995

---

## JUDGMENT

**Mr. Justice CLARKE:** This is the trial of a preliminary issue pursuant to an order of Mr. Justice Longmore dated Sept. 6, 1995. As a result of re-amendments to the points of claim, for which leave was given during the hearing, the preliminary issue has been defined as follows:

> ... whether the contract or contracts alleged by the plaintiffs in their re-amended points of claim was or were, or would if concluded have been, governed by Japanese or English law as the applicable law.

The matter previously came before Mr. Justice Mance when the defendants applied to set aside an order giving the plaintiffs leave to serve the writ out of the jurisdiction. Leave had been obtained on the ground that each contract relied upon was "by its terms, or by implication, governed by English law". It was argued by the defendants before Mr. Justice Mance inter alia that the plaintiffs had no good arguable case that the contract or contracts was or were governed by English law. That argument was however rejected for the reasons given in a judgment which is reported at [1995] 2 Lloyd's Rep. 64.

The defendants' case has been argued before me in a slightly different way from the way in which it was put before Mr. Justice Mance. However the evidence before me is the same as that which was before him and the parties are agreed that, subject to one or two additions which each suggests, it is appropriate for me to accept his findings of fact. In these circumstances the facts set out below are largely derived from his judgment. The fact that the phraseology is in many places the same is explained by the fact that he kindly lent me the disc on which his judgment was recorded in order to save me a considerable amount of time. I should however

CLARKE, J.]                    **Egon v. Libera**                    [Q.B. (Com. Ct.)

stress that it is I who am responsible for both the findings of fact and conclusions of law set out below.

I consider first the relevant facts. The plaintiffs are a German commercial partnership with unlimited liability based in Lübeck. The defendants are a Japanese corporation based in Kure, near Hiroshima. The plaintiffs claim damages for breach of a contract or contracts said to have been made for the 10 year charter by them of two Panamax bulk carriers, which (as the plaintiffs knew) were to be built for the defendants in Japan.

It is common ground that in March, 1993 the parties reached an agreement which provided for the charter of two such Panamax vessels and also for the plaintiffs to have an option to purchase each vessel. The agreement was subject to conditions. The principal issue of fact in the case is whether one of those conditions (referred to below as "the signing subject") was waived. I am not sure whether it was common ground before Mr. Justice Mance, but it is common ground now that there was no binding contract between the parties in March. The plaintiffs' case is that there was a binding contract between them on May 27, 1993. I shall refer throughout this judgment to a contract and not to two contracts because, although there may have been separate contracts in relation to each of the two vessels, nothing turns on that point.

The agreement in March was recorded in fax messages sent by brokers, Tokyo Shipbrokers Ltd. ("TSL"), to the defendants on the 19th and to the plaintiffs on Mar. 22, 1993. TSL are an English company, but the present matter was dealt with through their Japanese office by a Mr. Susumu Suzui who is a Japanese shipbroker resident in Japan with over 20 years of shipbroking experience. It is now common ground that TSL's role was solely as an intermediary. As such TSL had no authority on behalf of either party save to pass on to the other any message which the first party had actually sent. Except that some negotiations took place face to face in Japan in the English language between Mr. Henning Oldendorff of the plaintiffs and Mr. Fukada of the defendants, all the negotiations and correspondence between the parties passed through TSL. All the oral discussions between the defendants and TSL were in the Japanese language whereas all the written communications including those between TSL and the defendants and vice versa were in the English language.

The first of the two conditions in the agreement read as follows:

Sub owners finally signing newbuilding contracts with owners' board approval declarable latest 15th April 1993, cob Japan.

Like Mr. Justice Mance I shall call that "the signing condition". The agreement provided for delivery of the vessels under the charter-party at a yard in Japan and for redelivery as follows:

dlosp one safe port Japan Singapore range or passing Singapore east bound, or Skaw Passero range or passing Skaw or Passero west bound, in charterers' option . . .

The agreement continued:

Charterers to have the option to purchase the vessel(s) at anytime after 30 months from actual delivery into charter. . . . Delivery place is as per redelivery range of C/P.

Purchase price: for each ship J yen 3,200,000 . . .

MOA to be mutually agreed and attached to C/P.

. . .

Sub further terms/conditions and CP detail.

That last provision may be called "the details subject". The message passed to the defendants continued:

Re c/p and moa, charterers may consider to base on one we fixed in past for similar deal (copy is in hands of your Kashihara San) if trade/cargo exclusions, for instance, is not too restricted for 10 years t/c. I will fax one to charterers and advise of their intention whether they can use that or they wish to use their recent fixture of 6 years ("Chemi Ocean", a Panamax).

If we discuss c/p and moa details after you lifting your subs, it will be not quite advantageous for you, thus will try to start discussing details hopefully next week.

A copy of the charter proposed by TSL was faxed to the plaintiffs and was, it appears, already in the defendants' possession. It was between different owners and Scandinavian charterers. It was on the NYPE form, amended to provide inter alia for London arbitration. The plaintiffs, as TSL envisaged might be the case, preferred to use their own recent fixture of *Chemi Ocean*, and accordingly sent TSL a copy on Mar. 22, 1993. This was in turn copied to the defendants and was then used in discussions on charter-party details. The *Chemi Ocean* charter was also on the NYPE form but with the arbitration clause amended to provide for London arbitration, as follows:

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *as per Clause 75*.

75. Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers, and in case the arbitrators shall

not agree then to the decision of an umpire to be appointed by them, the award of the arbitrators or the umpire to be final and binding upon both parties.

If either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, either originally, or by way of substitution as aforesaid, for seven clear days after the other party, having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. All arbitrators are to be conversant with shipping matters.

The discussions on charter-party terms were successfully concluded by Apr. 23, 1993. There was no express reference to either cl. 17 or cl. 75 during the negotiations. But (as Mr. Justice Mance pointed out at p. 67) it is apparent, as one would expect, that there were detailed discussions on many individual clauses which raised matters of concern, both earlier and later in numbering than cll. 17 and 75. The obvious inference is not that cll. 17 and 75 were in some way overlooked, but that they were read by the defendants and found acceptable. The defendants' evidence contains no suggestion to the contrary. They do not suggest that they were either unaware of or failed to understand cll. 17 and 75.

Time for compliance with the signing subject was periodically extended at the defendants' request, to Apr. 21, to Apr. 30, then to May 12 and, finally, to May 20, 1993. The background to these extensions is evidently that there were difficult negotiations relating to the intended newbuildings. As the defendants said on May 13, 1993 (correcting some mis-spellings):

Fixture with Messrs Egon Oldendorff regret to have based on subject to the completion of the building contract thus, this fixture now is feared to be frustrated if we would fail overcome this dead rock both with the financiers and shipyard.

This is definitively not our intention after all and would do our very best to maintain both building contracts and sub charter contract with Messrs Egon Oldendorff, for which however we would have no other alternative but to ask Messrs Egon Oldendorff to reconsider the purchase option all in US dollar basis yen 120 per US dollar unit instead of yen basis as drafted on the relevant MOA, per in line with adamant order by our financiers.

Should this be kindly reconsidered and accepted, we sure we can get our financiers accept the conditions and we then would be able to continue the building contract for final fixture and rest may smooth again with Messrs Egon Oldendorff for the charter as basically mutually agreed on.

The plaintiffs agreed the suggested formula for the purchase price with the result that it was now expressed in dollars instead of yen, and on May 18, 1993 the defendants then faxed:

Ref. your fax today with owners' serious request to lift subs. Sorry to say nego with shipyard still going on as of today. But believe may finalized before long and contract will be then confirmed on May 28 or June 3, when we will surely revert with our waiver for the lift of the subject. Please kindly cooperation.

On May 20 the defendants reached heads of agreement subject to contract for the construction of the two vessels by Sasebo Heavy Industries Corporation Co. Ltd. ("Sasebo") at a total price of Yen 6250 m. Board approval had also been obtained for such contracts. The heads of agreement provided:

  6. Day of contract:   One of the following days which is decided by [the defendants] and advised to [Sasebo]: 28th May 1993 or 31st May 1993 or 3rd June 1993.

The heads of agreement make no reference to the law by which the shipbuilding contract was to be governed, but it is clear on the evidence that it would have been Japanese law. Moreover the plaintiffs would have realized that that was the case if they had thought about it.

The plaintiffs' case is that Mr. Fukada, who was at the time the defendants' managing director, agreed to the lifting of the signing subject in the light of those heads of agreement. They say that he agreed to this during a telephone conversation on May 20 with Mr. Suzui (who happened at that date to be in London), the contents of which Mr. Suzui immediately passed on to the plaintiffs. Mr. Suzui has confirmed that account in an affidavit. The defendants' case is that Mr. Fukada made no such agreement and that there must have been some confusion. They also say that Mr. Suzui had every reason to communicate a message lifting the signing subject in order to earn commission.

After his return to Japan, on May 25 Mr. Suzui sent a fax to the defendants for Mr. Fukada's attention. It included the following:

Ref. various phone conversation, just for sake of good order we lifted owners' subject on the 20th May 1993 on your behalf which was acknowledged by charterers thus the deal stands

LLOYD'S LAW REPORTS

CLARKE, J.] **Egon v. Libera** [Q.B. (Com. Ct.)

now clean and we just have to sort out MOA details technically for mutual agreement.

In the meantime discussions had been taking place on the terms of the MOA. The negotiations were based on a pro forma Norwegian Saleform, 1987 MOA which the plaintiffs had sent to the defendants at some stage before Apr. 22, on which date TSL had told the plaintiffs that the defendants were trying to work on it. Clause 15 of that form provided inter alia as follows:

15 Arbitration

If any dispute should arise in connection with the interpretation and fulfilment of this contract, *the parties shall endeavour to settle same by amicable negotiations. If no settlement can be reached,* same shall be decided by arbitration in the city of[3]    and shall be referred to a single Arbitrator to be appointed by the parties hereto. If the parties cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three Arbitrators, each party appointing one Arbitrator, the third being appointed by[4]

. . .

This contract shall be subject to the law of the country agreed as place of arbitration.

The words in italics are not in the original printed form, but were added when the MOA was negotiated between previous parties. Footnotes 3 and 4 are set out at the bottom of the printed form. They are to this effect:

(3) The place of arbitration to be inserted. If this line is not filled in, it is understood that arbitration will take place in London in accordance with English law.

(4) If this line is not filled in it is understood that the third Arbitrator shall be appointed by the London Maritime Arbitrators' Association in London.

The words "If any dispute" begin on line 134 and footnote 3 is on line 135. The last line of cl. 15 is line 150. Although Mr. Dunning submitted on behalf of the defendants that they might not have received a copy of the draft MOA with the footnotes, I am unable to accept that submission. There is no evidence that they did not receive the whole document and it seems to me to be much more likely than not that they did.

In the fax of May 25 (part of which is quoted above) TSL added some comments of their own with regard to particular terms of the MOA. They included the following:

L 134 As per MOA seems to be OK.

Cl 17 Suggest insist closing in Tokyo.

Although there is no direct evidence of how the defendants responded to those suggestions, it appears to me to be reasonably clear that they accepted them. There is evidence that the plaintiffs subsequently sent a telex in the familiar form that they accepted owners' last except in certain particular respects. There was no express reference either to line 134 or to cl. 17. The inference to be drawn is that the "owners' last" had either explicitly or implicitly accepted cl. 15 as proposed. The exchanges show that all outstanding points were resolved on May 27. They culminated in a telex from TSL to the plaintiffs which included: "So we finally wrap up the deal."

In my judgment it is plain on the evidence that at that stage the terms of the MOA were agreed between the parties and that the agreement included both an agreement to cl. 15 in the form set out above and an agreement that closing would be in Tokyo. In construing the MOA as a matter of English law I see no reason to disregard the footnotes including footnotes 3 and 4. It follows that in my judgment the parties agreed that in the event of a dispute, if no settlement could be reached, it would be resolved by arbitration in London by a tribunal composed as set out in the clause with the third arbitrator to be appointed by the London Maritime Arbitrators' Association. It follows that it was agreed that the MOA was to be subject to the law of England, as the country agreed as the place of arbitration.

I reach that conclusion without regard to subsequent events so that the conclusions set out below are not necessary to my decision. I shall however briefly refer to the terms of the recap fax. Mr. Dunning submitted that evidence of subsequent events was both irrelevant and inadmissible. I am unable to accept that submission. The evidence of the terms of the subsequent recap fax is in my judgment evidence of what had been agreed. There is as I see it no difference between this case and the ordinary case in which a written charter-party is drawn up after agreement is reached between brokers. In such a case the terms of the written charter-party are treated as evidence of the agreement which had been reached earlier.

Although (as stated above) a consideration of the terms of the recap fax is not necessary for my decision as to what was agreed, such a consideration confirms that it is correct. On June 1, 1993 TSL sent to each party a recap of the agreed terms including the following:

MOA as below to be attached to C/P

C/P as per charterers' "Chemi Ocean" CP dated 8 Sept 92 with logical amendments and the following alterations:

These were then set out without any express reference being made to cll. 17 or 75 and the recap continued:

[1996] Vol. 1 LLOYD'S LAW REPORTS 385

Egon v. Libera

MOA to be attached to charter party, as per charterers' proforma MOA with logical amendments and the following alterations:

Again these were set out, and they included the following:

L 135 After "of" add "London, English law to apply".

Cl 17 L2 "Tokyo" instead of "London".

Neither party immediately suggested to the other that that recap did not correctly set out what had been agreed. However the dollar-yen exchange rate moved unfavourably to the defendants in early June, 1993, creating unforeseen difficulties in the way of their intended contract with Sasebo, which was not as a result signed either on or by June 3, 1993. On June 8, 1993 the defendants reported to the plaintiffs (with a copy to TSL) that they had failed to overcome their difficulty with Sasebo, regretting the delay and asking the plaintiffs to be patient, saying that they were doing their best in order to fix the contract (with Sasebo) as soon as possible—

... and the contract with your esteemed company could also be well maintained as basically mutually agreed on as this is our first and final intention but no more.

Mr. Suzui's reaction to this on June 10, 1993 was to make clear his view that the defendants had lifted the signing subject and agreed the details and to suggest that they —

... confirm the recap from which we cannot turn down the deal technically.

On June 11 the defendants faxed TSL in reply as follows:

... We hereby confirm your recapitulation of C/P details and MOA all in order.

We, in the meanwhile, are in the final stage of construction nego with ... Sasebo ... and involved daily in its keen and serious discussion.

We do believe soon or later the contract could be mutually agreed and finalized between Libera and Sasebo, when our clause relating to the shipbuilding contract then automatically can be lifted.

It is a reasonable inference that that telex was sent to the plaintiffs. The position is thus that there was agreement between the parties as to the terms of the recap fax, which was consistent with the agreement which the parties had already made. The defendants however maintained the attitude set out in the last paragraph of that fax and refused to treat the contract as binding. The plaintiffs subsequently claimed to treat the defendants as in repudiatory breach of contract and commenced this action.

By par. 8 of the re-amended points of claim the plaintiffs allege that on or about May 27, or alternatively on or about June 11, there came into being a binding contract or contracts for the charter, with option to purchase, of two Panamax vessels on the terms of the *Chemi Ocean* charter-party, as amended, and the Norwegian Saleform as amended, such amended terms appearing in the fax of June 1, 1993.

It is common ground that by s. 2 of the Contracts (Applicable Law) Act, 1990, with exceptions which are not material for present purposes, the Rome Convention, 1980 ("the Convention") has the force of law in the United Kingdom. Article 8.1 of the Convention provides as follows:

The existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under this Convention if the contract or term were valid.

It follows that the question for determination is what law governs the contract assuming it to be valid. It is for that reason that the preliminary issue is defined as being whether the contract is or would if concluded have been governed by English or by Japanese law. The plaintiffs say that it is or would be governed by English law whereas the defendants say that it is or would be governed by Japanese law.

The determination of that issue depends in the first place upon the meaning and effect (as applied to the facts set out above) of art. 3 of the Convention, which is entitled "Freedom of Choice" and which provides so far as material as follows:

1. A contract shall be governed by the law chosen by the parties. The choice must be express or demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case. By their choice the parties can select the law applicable to the whole or a part only of the contract.

...

4. The existence and validity of the consent of the parties as to the choice of the applicable law shall be determined in accordance with the provisions of Articles 8, 9 and 11.

The plaintiffs say that the parties chose English law. They do not I think say that in the case of the charter-party they expressed that choice in the contract, but they say that the choice of English law is demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case. The defendants deny that the requirements of art. 3 are satisfied. They say that since art. 3 does not apply, the case falls within art. 4, which is entitled "Applicable law in the absence of choice" and which provides by art. 4.1 so far as material as follows:

LLOYD'S LAW REPORTS

| CLARKE, J.] | Egon v. Libera | [Q.B. (Com. Ct.) |

To the extent that the law has not been chosen in accordance with Article 3, the contract shall be governed by the law of the country with which it is most closely connected. . . .

Mr. Dunning submits that when the matter was argued before Mr. Justice Mance the defendants did not rely upon art. 4 or, if they did, that the Judge did not treat the case as if they had. In my judgment, whether they did or not, Mr. Justice Mance considered whether the plaintiffs had a good arguable case under art. 3 and held that they did. I now have to decide, not whether the plaintiffs have a good arguable case, but whether they bring the facts within art. 3. However before I consider that question I should mention two respects in which the case is different now from when it was before Mr. Justice Mance. The first is that the defendants now concede that whether Japanese or English law applies the London arbitration clause is incorporated in the charter-party. That was a live issue before Mr. Justice Mance and indeed he regarded it as the critical question: see p. 69. The second matter is that the defendants do not now rely upon art. 8(2) of the Convention.

I turn therefore to art. 3. The plaintiffs are right not to rely upon the first part of the article because that is concerned as I see it with express provisions of the contract. Mr. Dunning drew my attention to the French text which makes that clear. The relevant sentence reads:

Ce choix doit être exprès ou résulter de façon certaine des dispositions du contrat ou des circonstances de la cause.

The question is therefore whether the choice of English law is demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case.

The plaintiffs say that it is. Their case may be summarised as follows. The agreed form of charter-party incorporated a London arbitration clause, providing for disputes to be resolved by arbitrators conversant with shipping matters. The inference in all the circumstances is, they say, that the parties intended English law to govern. They rely upon the conclusion of Mr. Justice Mance (at p. 71) that that is the natural implication from the agreement to the English arbitration clause. They further rely on the following passage in par. A5.25 of the Giuliano-Lagarde report, which by the express terms of s. 3(3)(a) of the 1990 Act may be considered in ascertaining the meaning and effect of any provision of the Convention:

The choice of law by the parties will often be express but the Convention recognizes the possibility that the Court may, in the light of all the facts, find that the parties have made a real choice of law although this is not expressly stated

in the contract. For example, the contract may be in a standard form which is known to be governed by a particular system of law even though there is no express statement to this effect, such as a Lloyd's policy of marine insurance. In other cases a previous course of dealing between the parties under contracts containing an express choice of law may leave the court in no doubt that the contract in question is to be governed by the law previously chosen where the choice of law clause has been omitted in circumstances which do not indicate a deliberate change of policy by the parties. In some cases the choice of a particular forum may show in no uncertain manner that the parties intend the contract to be governed by the law of that forum, but this must always be subject to the other terms of the contract and all the circumstances of the case. Similarly references in a contract to specific Articles of the French Civil Code may leave the court in no doubt that the parties have deliberately chosen French law, although there is no expressly stated choice of law. Other matters that may impel the court to the conclusion that a real choice of law has been made might include an express choice of law in related transactions between the same parties, or the choice of a place where disputes are to be settled by arbitration in circumstances indicating that the arbitrator should apply the law of that place.

This Article does not permit the court to infer a choice of law that the parties might have made where they had no clear intention of making a choice. Such a situation is governed by Article 4.

The plaintiffs also rely on the discussion in Dicey & Morris on The Conflict of Laws (12th ed.) pp. 577–578 and 1225–1227 and in The European Judgments Convention by Dr. Plender at pars. 5.06 to 5.08 as supporting an inference in favour of English law in a case such as the present where the arbitration clause specifically provides for arbitration in London by persons conversant with shipping matters.

The plaintiffs add these considerations. Charter-parties normally have provisions for the resolution of disputes. Where parties reside and carry on business in countries which have different systems of law it is not uncommon for parties to agree a forum which is as between them "neutral". Having agreed a neutral forum it is highly unlikely that they would expect that tribunal to apply other than a "neutral" law. Moreover, having agreed a particular forum it is unlikely that the parties would agree that that forum would apply a law which was foreign to it, especially a law which was the law of the country of one of the parties but not of the other.

Q.B. (Com. Ct.)]     **Egon v. Libera**     [CLARKE, J.

On the facts of the instant case the plaintiffs say as follows. London is a neutral forum. It would make no sense for them to have agreed either Japanese law or German law. Moreover, having agreed arbitration in London by arbitrators conversant with shipping matters, it is equally unlikely that the parties intended not to make any choice of law. The obvious inference is that the parties intended that the arbitrators would apply English maritime law. That is especially so having regard to the fact that the parties chose an amended NYPE form of charter-party and an amended Norwegian Saleform, both of which are well known English language contracts which have been subject to settled and widely known interpretation under English law. There is no evidence that either of them has been the subject of interpretation under either German or Japanese law.

The dealings between the parties as set out above show that they were conducting their negotiations by reference to English rather than Japanese or German law. They used expressions with established meanings in English maritime law. So for example the expression "subject to details" has a well settled meaning in English law: see e.g. *The Junior K*, [1988] 2 Lloyd's Rep. 583 and *CPC Consolidated Pool Carriers G.m.b.H. v. CTM Cia. Transmediterranea S.A.*, [1994] 1 Lloyd's Rep. 68.

In the case of the MOA, which was to be attached to the charter-party, as stated above, the parties expressly agreed both English arbitration and English law. In these circumstances the only sensible inference to draw from the terms of the contract and the circumstances of the case is that the parties chose English law as the law to govern both the charter-party and the MOA. Moreover they did so with reasonable certainty.

Before considering whether those submissions should be accepted, it is appropriate to consider the parties' submissions as to the correct approach to art. 3. Mr. Dunning submits that the Court should adopt a purposive Convention based approach to the construction of the Convention. He relies upon *Stag Line Ltd. v. Foscolo Mango and Co. Ltd.*, (1931) 41 Ll.L.Rep. 165 at p. 174; [1932] A.C. 328 at p. 350 per Lord Macmillan and *The Hollandia* (sub nom *The Morviken*), [1983] 1 Lloyd's Rep. 1; [1983] A.C. 565 and upon the terms of the Convention itself. Article 3 is part of Title II, which is called "Uniform Rules". Article 18 provides as follows:

    Uniform interpretation

    In the interpretation and application of the preceding uniform rules, regard shall be had to their international character and to the desirabil-

ity of achieving uniformity in their interpretation and application.

Dicey & Morris suggest at p. 1218 that the question of interpretation should be looked at —

    ... from a broad Convention based approach, not constrained by national rules of construction.

I agree. In these circumstances I accept Mr. Dunning's submission that it is indeed appropriate to adopt a purposive approach and not to construe the Convention in a narrow literal way.

Mr. Dunning then submits that the European approach to the construction of art. 3 is to emphasize the requirement of choice and the further requirement that the consensus or intention of the parties must be established with reasonable certainty. He relies upon a number of cases in which Courts in Europe have considered jurisdiction agreements said to be within art. 17 of the Brussels, Lugano or San Sebastian Conventions. He submits that those cases show that there must be strict compliance with the requirement to show consensus. So for example he relies upon the decision of the European Court in *Boeghoefer G.b.m.H. & Co. K.G. v. ASA S.A.*, [1985] E.C.R. 2704, which is quoted by Mr. Justice Waller in *IP Metal Ltd. v. Ruote O.Z. S.p.A.*, [1993] 2 Lloyd's Rep. 60 at p. 66 and in which it held (at p. 2708) that according to settled case law the requirements of art. 17 governing the validity of jurisdiction clauses must be strictly construed since the purpose of art. 17 is to ensure that the parties have actually consented to such a clause and that their consent is clearly and precisely demonstrated. That may have been so, although since 1985 there has been a radical amendment of art. 17 and I do not think that a detailed analysis of the cases decided under that article is likely to be of assistance in the instant case because they do not seem to me to be directly relevant to the question which I have to determine, namely the application of the facts of this case to art. 3 of the Rome Convention.

It is sufficient to say that the party relying upon art. 3 must demonstrate with reasonable certainty that the parties have chosen a particular law as the governing or applicable law. I accept the submission that, as the Giuliano-Lagarde report says, it must be a real choice which the parties had a clear intention to make. In Redfern & Hunter on International Commercial Arbitration (2nd ed. at p. 123) the authors say that in the absence of an express choice the tribunal must look for a tacit choice of law, which they say may be known as an implied, inferred or implicit choice. They add that art. 3 makes it clear that a tacit choice must only be found where it is reasonably clear that it is a genuine

choice by the parties. I accept that approach. See to the same effect Jaffey in (1984) 33 I.C.L.Q. 545.

Mr. Dunning further relies upon an article in [1979] Current Legal Problems, where Professor Diamond said (at p. 160):

> The principle that the parties can choose the governing law is not intended to introduce the possibility of an implied choice of law. Where there is no choice the court is not expected to divine what law the parties would have chosen if they had thought about it. Freedom of choice operates only if there is genuine choice.

However I agree with Dr. Plender (op. cit. at par. 5.06) that it is plain from the wording of art. 3 and the Giuliano-Lagarde report that the Convention contemplates an implied choice of law provided that the choice is a real choice which appears with sufficient clarity from the terms of the contract as a whole or the circumstances of the case.

Before turning to the question whether the parties chose English law in the instant case, it is appropriate to give some consideration to the significance (if any) of an arbitration clause in this connection, both at common law and under the Convention. The position at common law can be seen from the decision of the House of Lords in *Compagnie d'Armement Maritime S.A. v. Compagnie Tunisienne de Navigation S.A.*, [1970] 2 Lloyd's Rep. 99; [1971] A.C. 572. That case is authority for the proposition that the mere fact that a charter-party contained an arbitration clause providing for arbitration in London did not mean that at common law English law was the proper law of the contract. However it contains valuable guidance as to the inferences which may be drawn from the presence of an arbitration clause. Lord Wilberforce stated the relevant common law principle as follows (quoting from the 7th ed. of Dicey & Morris) at p. 111, col. 1; p. 595:

> Where the intention of the parties to a contract with regard to the law governing the contract is not expressed in words, their intention is to be inferred from the terms and nature of the contract, and from the general circumstances of the case, and such inferred intention determines the proper law of the contract.

Mr. Dunning submits that that formulation of the test at common law is different from the test in art. 3.1 of the Convention. He emphasizes that the article provides that there must be a choice of law and that it must be expressed with reasonable certainty. I accept his submission that the test is thus not quite the same, but (as stated above) the article nevertheless contemplates that the choice can be other than express so long as it is a clear choice demonstrated with reasonable certainty by the terms of the contract or the circumstances of the

case. Lord Wilberforce thought that whether the common law test was satisfied also depended upon the terms of the contract and all the circumstances of the case. He said that they should all be considered together as elements relevant to intention, inferred or presumed: see e.g. p. 111, col. 1; p. 596A. He also expressed some views as to the inference which might be drawn from the existence of an arbitration clause. He said (at p. 111, col. 2; p. 596B to D):

> How strong, then, is the inference to be drawn from a (London) arbitration clause? That the selection of a certain place for arbitration and, by inference, of nationals or residents of that place as arbitrators, is an indication that the parties intended the law of that place to govern is a sound general rule. But it should not be treated as giving rise to a conclusive or irresistible inference, as recent pronouncements appear to suggest. One of the reasons commonly given for attributing overwhelming force to the clause is that arbitrators in London are only to be supposed to be conversant with English law . . . but I venture to think that in commercial matters, at the present time, this may give insufficient recognition to the international character of the City of London as a commercial centre — the reason, rather than any preference for English rules, for which arbitration in London is selected. In this case the arbitrators had no difficulty in finding for French law and I do not suppose they would find ascertainment of the French law as to damages any more difficult than the English law of anticipatory breach. So, unless otherwise constrained, I would regard the clause as a weighty indication, but one which may yield to others.

A little later he quoted the following passage from *Naamlooze Vennootschap Handels-en-Transport Maatschappij "Vulcan" v. A/C J. Ludwig Mowinckels Rederi A/S*, (1938) 60 Ll.L.Rep. 217 where Lord Maugham said in the House of Lords (at p. 223):

> In this case, the appellants being a Dutch company and the respondents Norwegian ship-owners, there was a good reason, if not a necessity, for selecting the law which should apply to any future disputes, and the submissions of such matters to the arbitration of two persons in London and of an umpire who in case of difference was to be nominated by the directors of the Baltic Mercantile and Shipping Exchange showed clearly that English law and procedure were to be applied.

Lord Wilberforce continued (at p. 113, col. 2; p. 599C):

> There is nothing here which requires qualification or explanation. I fully accept that, especially

where the parties are of different nationality and there is no other relevant factor, a clause providing for arbitration in a third country is a strong indication, which, because there is no other, may be called conclusive, in favour of the proper law of that country.

Finally, after rejecting the argument that there was a rigid rule that the existence of an arbitration clause raises (as Lord Justice Salmon had said in the Court of Appeal) an "irresistible inference which overrides all other factors", Lord Wilberforce said (at p. 114, col. 2; p. 600D to E):

> ... an arbitration clause must be treated as an indication, to be considered with the rest of the contract and relevant surrounding facts. Always it will be a strong indication; often, especially where there are parties of different nationality or a variety of transactions which may arise under the contract, it will be the only clear indication. But in some cases it must give way where other indications are clear.

The plaintiffs naturally rely upon those considerations and say that they are equally applicable to the question which arises under art. 3 of the Convention. They also rely upon similar statements in the speech of Lord Diplock, where he said for example (at p. 117, col. 2; p. 604H) that the fact that the parties have expressly chosen to submit their disputes to a particular arbitral forum of itself gives rise to a strong inference that they intended that their mutual rights and obligations under the contract should be determined by reference to the domestic law of the country in which the arbitration takes place. However he added that, while the presence of an arbitration clause was strongly persuasive it was not conclusive and could be negatived by the other terms of the contract. Before the passage in which he said that the inference could be negatived, he said this in another passage relied upon by the plaintiffs (at p. 118, col. 1; p. 605E to F):

> ... yet the significance of an arbitration clause has always been dealt with at the first stage, where its only role is as an indication of a choice of proper law which the parties themselves did intent to make. The language in which it has been referred to has always been that of actual intention. No doubt its significance as an indication of the actual intention of the parties has been greatly enhanced as the decisions and dicta to which I have referred have become familiar to persons engaged in international trade and their legal advisers; since they may well have drafted their contracts on the understanding that a London arbitration clause, which is a common feature of many standard forms of contract used in international trade, is of itself a sufficient manifesta-

tion of their intention to choose English law as the proper law of the contract as well as the curial law.

Lord Diplock concluded on the facts of that case that the implication that the arbitration clause was intended to operate as a choice of proper law as distinct from curial law was negatived by the presence of another clause in the contract, but he added (at p. 120, col. 2; p. 609E) that he did not want to throw any doubt on the proposition that an arbitration clause is —

> ... generally intended by the parties to operate as a choice of the proper law of the contract as well as the curial law and should be so construed unless there are compelling indications to the contrary in the other terms of the contract or the surrounding circumstances of the transaction.

Those words are strikingly similar to the words of art. 3 of the Convention. While I of course accept Mr. Dunning's submission that the House of Lords was considering the position at common law and not the position under the Convention and that the test is not the same at common law as under the Convention, it is very similar and the considerations set out by both Lord Wilberforce and Lord Diplock in the above passages seem to me to be relevant to the correct application of the test under the Convention just as they were at common law. That conclusion is I think supported both by the Giuliano-Lagarde report and by Dr. Plender at par. 5.08. It is also supported by Dicey & Morris (12th ed.) at pp. 578 and 1226, although it is there suggested that the requirement that an implied choice must be demonstrated with reasonable certainty may have led to a change of emphasis. Dicey & Morris say that whether a choice of law can be inferred from an arbitration clause will depend on the circumstances. Thus they say (at p. 1226):

> ... secondly, an arbitration clause which clearly demonstrates that the arbitration will take place in a particular country and that the arbitrators will be of that nationality or carrying on business in that country will permit an inference that the parties intended that the law of that country should be applied; thus an arbitration clause providing for arbitration in London by English maritime arbitrators, or by London brokers, or by a local association or exchange may be regarded as an implied choice of law; thirdly, the indication of an implied choice of law will be much weaker where the arbitration clause, although it specifies a place of arbitration, does not provide for a method of identifying the arbitrators except through an appointment by an international arbitral body such as the International Chamber of Commerce.

That approach seems to me to be correct. If it involves a change of emphasis from the approach by the common law it is a small one. There seems to me to be little if any difference between the approach suggested in that passage and the approach set out in the passages from the speeches of Lord Wilberforce and Lord Diplock in *Compagnie Tunisienne* which are quoted above.

Mr. Dunning accepts (as I understand it) that an arbitration clause providing for arbitration in London by LMAA arbitrators or London brokers or by a local association or exchange might be regarded as an implied choice of law, but he submits that the same is not true of an arbitration clause in the form in which it was agreed here. That is because it provides only that the arbitrators are to be conversant in shipping matters. Mr. Dunning says that in these circumstances the choice of London as the place of arbitration was not made (as the Giuliano-Lagarde report puts it) in circumstances indicating that the arbitrators should apply English law.

I am however unable to accept that submission. I accept Mr. Dunning's point that the position is different here from that which would have obtained if the arbitration clause in the charter-party had provided for arbitration by members of the LMAA. Nevertheless on all the facts of this case, when set in the context of the terms of the contract as a whole and of the circumstances of the case, the arbitration clause here is in my judgment a strong indication of the parties' intention to choose English law as the applicable law as well as the curial law. I accept Mr. Lyon's submissions in this regard which are set out above. In short, having agreed English arbitration for the determination in London of disputes arising out of a well known English language form of charter-party which contains standard clauses with well known meanings in English law, it is in my judgment to be inferred that the parties intended that law to apply. Having agreed a "neutral" forum the reasonable inference is that they intended that forum to apply a "neutral" law, namely English law and not either German or Japanese law.

On the facts of this case that fact together with the other factors relied upon by the plaintiffs which are set out above in my judgment establish with reasonable certainty that the parties chose English law as the applicable law of the charter-party as well as the applicable law of the MOA. I accept Mr. Dunning's submission that the time at which that question has to be determined is when the agreement was made. On the plaintiffs' case that was on May 27 or alternatively on June 11. The test in art. 3 is in my judgment satisfied on both those dates. The parties made a tacit choice of English law. They thus in effect chose English law for both the charter-party and the MOA, which is not surprising since they undoubtedly chose English law in the case of the MOA and it was an express term of their agreement that the MOA would be attached to the charter-party.

That conclusion makes it unnecessary for me to consider art. 4, which would only apply if art. 3 did not. I shall not therefore prolong this judgment by considering the interesting questions which would arise if art. 4 were applicable. For the reasons which I have tried to give my answer to the question posed at the outset is English law.

**S A C H   D E C L A R A T I O N**

**E X H I B I T   2**

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## TWENTY-NINTH EDITION

VOLUME I

GENERAL PRINCIPLES

LONDON
SWEET & MAXWELL
2004

(d) *Prescribed Mode of Acceptance*

**Method must generally be complied with.** An offer which requires the   **2–063**
acceptance to be expressed or communicated in a specified way can generally be
accepted only in that way. Thus if the offeror asks for the acceptance to be sent
to a particular place one sent elsewhere will not bind him[252]; nor will he be bound
by an oral acceptance if he has asked for one to be expressed in writing.[253] This
rule is particularly strict where the offer is contained in an option.[254]

**Purported acceptance as counter-offer.** It is sometimes possible for a pur-   **2–064**
ported acceptance which does not comply with the prescribed method to be
regarded as a counter-offer and for a contract to come into existence when that
counter-offer is in turn accepted.[255] Since such acceptance may be effected by
conduct,[256] the contract may be concluded without any further communication
between the parties after the original, ineffective, acceptance.

**Other equally efficacious mode.** Stipulations as to the mode of acceptance   **2–065**
are usually made by the offeror with some particular object in view, *e.g.* to obtain
a speedy acceptance, or one expressed (for the sake of certainty) in a particular
form. It seems that an acceptance which accomplishes that object just as well as,
or better than, the stipulated method may bind the offeror. For this purpose, the
court must first decide, as a matter of construction, what object it was that the
offeror had in view. For example, a requirement that the acceptance must be sent
by letter by return of post may "fix the time for acceptance and not the manner
of accepting."[257] In that case an acceptance by telex would suffice. But such an
acceptance would not be effective if the offeror's object (on the true construction
of the offer) was to have a full, accurate and signed record of the acceptance.

**Method of acceptance waived.** Even if the prescribed method of acceptance   **2–066**
is not complied with, the offeror would no doubt be bound if he had acquiesced
in a different mode of acceptance and had so waived the stipulated mode.

**Terms of offer drawn up by offeree.** The rules relating to failure to use a   **2–067**
prescribed mode of acceptance are traditionally based on two assumptions: that
the offer was drawn up by the offeror; and that stipulations as to the mode of
acceptance were made by him for his own benefit. It is, however, becoming

---

[252] *Frank v Knight* (1937) O.P.D. 113; *cf. Eliason v Henshaw* (1819) 4 Wheat. 225; *Walker v Glass*
[1979] N.I. 129.
[253] *Financings Ltd v Stimson* [1962] 1 W.L.R. 1184, 1186. Contrast *Hitchens v General Guarantee
Corp* [2001] EWCA Civ 359, *The Times*, March 13, 2001 (where there was *no* requirement that the
acceptance must be in writing).
[254] *Holwell Securities Ltd v Hughes* [1974] 1 W.L.R. 157.
[255] *Wettern Electricity Ltd v Welsh Development Agency* [1983] Q.B. 796.
[256] As in the *Wettern Electricity* case, above; provided, however, that such conduct is accompanied
by the requisite contractual intention: see *Harvela Investments Ltd v Royal Trust Co of Canada (C.I.)
Ltd* [1986] A.C. 207 and below, para.2–154; for counter-offers, see above para.2–030; below,
para.2–090.
[257] *Tinn v Hoffmann & Co* (1873) 29 L.T. 271, 278; *cf. Manchester Diocesan Council for
Education v Commercial & General Investments Ltd* [1970] 1 W.L.R. 242; *Edmund Murray v B.S.P.
International Foundations* (1994) 33 Con.L.R. 1

[Home] [Databases] [World Law] [Multidatabase Search] [Help]
[Feedback]



# England and Wales Court of Appeal (Civil Division) Decisions



**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Financings Ltd v Stimson [1962] EWCA 1 (17 July 1962)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/1962/1.html*
Cite as: [1962] 1 WLR 1184, [1962] EWCA Civ 1, [1962] 3 All ER 386

[New search] [Help]

**BAILII Citation Number: [1962] EWCA Civ 1**

From his Honour Judge. Leslie

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL**
**From his Honour Judge. Leslie**
**Willesden County Court**

Royal Court of Justice.
17th July 1962

B e f o r e :

**THE MASTER OF THE ROLLS**
**(Lord Denning)**
**LORD JUSTICE DONOVAN**
**and**
**LORD JUSTICE PEARSON**

---

**Between:**

## FINANCINGS LIMITED

**Plaintiffs**
**Appeliants**

v

## ANTHONY GEORGE STIMSON

**Defendant**
**Respondent**

---

**(Transcript from the Shorthand Notes of The Association of Official Shorthandwriters Ltd.,**
**Room 392, Royal Courts of Justice, and 2, New Square, Lincoln's Inn, London, W.C.2).**

---

MR A. D. RAWLEY **(instructed by Messrs Lawford & Co.)**
appeared as Counsel for the Appellants..
MR QUINTIN IWI **(instructed by Mr Messrs P. Iwi, Agent for Messrs Vyvyan Wells & Sons, Edgware)**

appeared as Counsel for the Respondent.

**JUDGMENT**

---

### HTML VERSION OF JUDGMENT

---

Crown Copyright ©

**THE MASTER OF THE ROLLS:** Mr Anthony George Stimson saw an Austin motor car on the premises of the Stanmore Motor Co advertised for sale at £350. On 16th March 1961, he signed a hire purchase agreement form which was produced by the Stanmore Motor Co. It was in law not an agreement, but only an offer by Mr Stimson to enter into a hire purchase agreement with a company called Financings Ltd, Finance Company. I need not go into all the details except to say at once that there was a Clause in it which made it clear that "this agreement shall become binding on the owner", that is on the Finance Company, "only upon acceptance by signature on behalf of the owner and the hiring shall be deemed to commence on such date of acceptance". Now, to go at once almost to the end of the story, the Finance Company did not sign the acceptance until the data which they put upon it, on the 25th March, 1961. The interval of time between the signing of the offer on the 19th March and the purported acceptance on the 25th March is most important because much happened in between.

Mr Stimson was not allowed to take the car away on 16th March even though he had signed the form. The reason was because he had not then got the required insurance cover for it. He produced the ordinary third-party insurance cover. This was not satisfactory because comprehensive cover was required. But on Saturday, 18th March Mr Stimson did produce a comprehensive cover note. He produced it to the Stanmore Motor Company. They telephoned Finance Company and got their assent. He paid the first instalment of £70 on the car and he was allowed to take the car away. No doubt both Mr Stimson and Finance Company thought at that time that an agreement had been concluded, but in fact it had not. Certainly a hire purchase agreement had not been concluded because, as I have said, on its wording it depended on a signature which did not take place until a week later. At all events, Mr Stimson took the car away. He had it on the Saturday and drove it on the Sunday. He was not satisfied at all with its condition and performance. In the result, on Monday, 20th March he was so dissatisfied with it that he returned it to the Stanmore Motor Company. He saw the manager and proprietor, Mr Cozens-Walker, and explained that he did not want the car after all, and, in order to settle the matter, he offered to forfeit the £70 he had paid. It is not altogether clear what Mr Cozens-Walker said to him, but it seems that he told him that the Stanmore Motor Company would get in touch with Finance Company and let him know the outcome. Also it was suggested that Mr Stimson should get in touch with Finance Company himself. However, by some oversight, the Stanmore Motor Company did not get in touch with Finance Company; nor did Mr Stimson. Nevertheless, Mr Stimson thought that, having returned the car, he had no longer any responsibility for it. Accordingly, on Thursday, 23rd March he cancelled the insurance cover note.

Then the critical event happened. On the night of 24th/25th March the Stanmore Motor Company's premises were broken into and the car was stolen. In the course of the theft the car was badly scratched and damaged. When it was recovered, it was obviously not worth the same money as it was before. The car having been recovered, Finance Company were told about it. They had the car back and sold it by auction and got some £240 for it. Now they claim in this action damages from Mr Stimson. They say he defaulted under the hire purchase agreement which he signed. Alternatively, by an amendment they seek to claim damages against him as a bailee on the terms of that hire purchase agreement.

Such is the outline of the facts. I need not at the moment go into the question of the condition and roadworthiness of the car, because it seems to me that the crucial matter in the case is whether there was ever a binding agreement between Mr Stimson and Finance Company. The document which Mr Stimson signed on 16th March was only an offer. Before it was accepted, he returned the car to the dealer and made it clear that he did not want the car any more. Was that a revocation of the offer? To my mind, that was a clear revocation provided that it was made to a person having authority to receive it. But was the dealer a person authorised to receive the revocation? Was he the agent of Finance Company for the purpose?

It was urged before the County Court Judge, on the authority of Campbell Discount Company Limited v

Gall [1961] 1 Q.B. 43) in this court. That the dealer is not the agent of Finance Company, and the County Court Judge, to his regret, felt that he was bound to hold that there was insufficient evidence to show that the dealer was the agent of Finance Company for the purpose of receiving back the motor car. I take a different view. I look on Campbell Discount Company Limited v Gall as being a very special case on its own facts. It seems to me that, in this transaction before us, as indeed in most of these hire purchase transactions, the dealer is for many purposes the agent of the Finance Company. Mr Iwi in his argument pointed out a number of matters in which it cannot be denied that the dealer is the agent of the Finance Company. The dealer holds the necessary forms; he hands them over to the hirer to sign; he forwards them to the Finance Company; he receives the deposit as agent for the Finance Company: he receives from the Finance Company information that they are willing to accept the transaction; and he is authorised to pass on that communication to the hirer. He was in this very case the agent on behalf of the Finance Company to see that the insurance cover was all in proper order. He rejected the first cover which was offered and accepted the comprehensive cover which he said was satisfactory. Most important of all, he was the agent of the Finance Company to hand over the motor car to the hirer. It seems to me that, if we take, as we should, a realistic view of the position, the dealer is in many respects and for many purposes the agent of the Finance Company. I am aware, of course, that the Finance Companies often put clauses into their forms in which they say that the dealer is not their agent. But these clauses are often not worth the paper they are written on. Nobody can make an assertion of that kind in an agreement so as to bind the courts if it is contrary to the facts of the case. We all know that people often try to put clauses in a tenancy agreement so as to say that it is a licence and not a tenancy. But the courts take no notice of it if it is contrary to the truth. So, also, if they put into one of these agreements a clause that the dealer is not their agent, it does not bind the courts if he is in fact their agent. In this case we are not troubled by any such clause, for there is none. And, on the facts, I am clearly of opinion that the dealer was ostensibly authorised to receive communications on behalf of Finance Company. Just as he was authorised to deliver the car to Mr Stimson in the first place, so he was ostensibly authorised to receive it back when it was returned. Just as he was authorised to receive the offer for Finance Company, so, also, he was ostensibly authorised to receive the revocation: and to receive the communication that the hirer had no further use for it.

I am aware that the hirer did not in terms revoke the offer, for the simple reason that he thought the agreement was concluded. But he made it clear that he did not wish to proceed with the matter and that is all that was necessary. In my judgment, therefore, the offer was revoked on 20th March and there was, for this reason, no concluded contract. Even if I am wrong on that point, there is the second point to be considered which appealed to the County Court Judge. He said: When this offer was made, it was made on the basis that the car was in good condition, or at all events in the condition in which Mr Stimson had seen it, but, before the offer was accepted (it was accepted on March 25th), on the night of Mar. 24th/25th it suffered this extra damage which cost £44 to repair, having been scratched and dented by the thieves who stole it. Can a man accept an offer when the condition of the goods has deteriorated in a material respect since the date of the offer?

It seems to me that, on the facts of this case, the offer made by Mr Stimson was a conditional offer. It was conditional on the car remaining in substantially the same condition until the moment of acceptance. Take the case put by Donovan, LJ, in the course of the argument: Suppose an offer is made to buy a Rolls-Royce car at a high price on one day and, before it is accepted, it suffers the next day severe damage. Can it be accepted and the offeror bound? My answer to that is: No, because the offer is conditional on the goods at the moment of acceptance remaining in substantially the same condition as at the time of the offer.

Mr Rawley argued that there was an express clause here saying that the goods were to be "at the risk of the hirer from the time of purchase by the owner". The time of purchase by the owner, he said, was 18th March when Finance Company told the dealer orally that they accepted the transaction. Thenceforward, he said, the goods were at the risk of Mr Stimson. This shows, says counsel, that the condition which I have suggested is inconsistent with the express terms, or, at all events, is not to be implied. In my judgment, however, this clause on which counsel relies only comes into operation when a contract is concluded and accepted. Meanwhile the offer is made on the understanding that, so long as it remains an offer, it is conditional on the goods being in substantially the same condition as at the time when the offer was made.

I agree, therefore, with the County Court Judge in thinking that, in view of the damage which occurred to this car before the acceptance was given, Finance Company were not in a position to accept the offer,

because the condition on which it was made had not been fulfilled. So on that ground also there was no contract.

In these circumstances, there is no need for me to go into the other points which were raised in the course of the argument as to the roadworthiness of the car or into the question of damages. But as to the amendment which was put in by Mr Rawley in this court suggesting that this was a bailment on the terms of the hire purchase agreement, I would only say that if the hire purchase agreement was never concluded, I cannot think that there was a bailment on the terms of it.

I would, therefore, dismiss this appeal.

**LORD JUSTICE DONOVAN**: The dealer in this case was clearly Finance Company's agent to do a variety of things: to receive an offer of hire purchase; to tell the proposed hire purchaser, Mr Stimson, that Finance Company would accept the business; to ensure that comprehensive insurance was effected by Mr Stimson; and thereafter to deliver the car to him. In the written hire purchase form of agreement there was no clause negativing agency between Finance Company and the dealer. In these circumstances, authority to receive a notice of revocation of the hire purchase offer was, in my opinion, within the dealer's authority as ostensible agent for Finance Company, and on this point I entirely agree with what has been said by the Master of the Rolls.

Then was a notice of revocation given before the offer was accepted? That acceptance must be taken to have taken place not earlier than 25th March 1961. Before then, namely, on 20th March Mr Stimson had taken the car back to the dealer, told him he did not want to go on with the transaction and offered to forfeit his deposit. The dealer said words to the effect that he would get in touch with Finance Company to see what could be arranged, and told Mr Stimson that he himself should also communicate with Finance Company, which Mr Stimson did not do. Clearly both parties were under the impression that what was in view was the rescission of an existing concluded contract, whereas at this moment there was no contract at all. But it is conceded, and I think rightly so, that, if an offeror makes it clear that he does not want to go on with the transaction, it is properly treated as a revocation of his offer, notwithstanding that the words used would be more appropriate to a case of rescission. Thus one reaches the stage that an offer here has been revoked before acceptance and the revocation communicated to the ostensible agent of the offeree. There is thus an end of the matter in favour of the respondent to this appeal.

But if this view be wrong, I would agree that the offer here was on the basis that the car remained substantially in the same condition until acceptance, and that this did not happen. I do not regard Clause 2 of the terms of the printed hire purchase agreement ("The hirer's acceptance of delivery of the goods shall be conclusive that he has examined the goods and found them to be complete and in good order and condition and in every way satisfactory to him ... ") as incorporated in the offer. Who would offer to purchase a car on terms that if it were severely damaged before the offer was accepted, he, the offeror, would pay the bill? The suggestion seems to me to be quite unreal. I think that the offer is conditioned, in a case where the documents are in the form which they take here, by the clause which the offeror signs to the effect that he has examined the goods and satisfied himself that they are in good order and condition. What is the point of this provision if, before acceptance, the goods are heavily damaged but, nevertheless, the offeror can still be compelled to buy them. The County Court Judge held that there must, therefore, be an implied a term that, until acceptance, the goods would remain in substantially the same state as at the date of the offer; and I think that this is both good sense and good law.

On either of the foregoing grounds, therefore, I think that the appeal fails, though, if I may say so, it could not have been better argued than it was by Mr Rawley.

With regard to the alternative argument which we permitted on receiving Finance Company' amendment to his pleading, to the effect that there was a separate oral contract on 18th March when the car was delivered in advance of the expected hire purchase agreement, such oral contract embodying practically all the terms of the proposed hire purchase agreement, I agree with the contention of Mr Stimson that, on the facts, this argument cannot be sustained. I think that all that happened was that Mr Stimson was allowed to possess the car in advance of the contract. He thereby became a bailee, but the bailment ceased on 20th March when the car was returned to the dealer whom, as I say, I regard as having ostensible authority to receive it back.

**LORD JUSTICE PEARSON.** This hire purchase transaction, as unhappily so often happens with hire purchase transactions, creates complicated, artificial and obscure legal relationships between the parties. I am not able, on the point of ostensible authority, to see the position in quite the same way as my brethren have seen it. It is very difficult, in my view, to assess exactly how much authority the dealer has to act, on the one side on behalf of the proposed hire purchaser, and on the other side on behalf of the Finance Company. There is a complicated relationship, because the dealer has himself his own interest in the transaction and he is a party to the three-cornered arrangements. He is going to sell the car to the Finance Company, whereupon the Finance Company will let it out on hire to the hire purchaser. Therefore, it is often very difficult to make sure to what extent the dealer is acting in any one of his three capacities, first, on his own behalf as the proposed seller, secondly, sometimes in some respects as agent for the hire purchaser, and, thirdly, sometimes in some respects as agent for the Finance Company.

Now in this case it was, or must be taken to have been, made clear to Mr Stimson that the dealer was not authorised to conclude the hire purchase agreement. The form of the hire purchase agreement was produced to him, and it was plainly set out in Condition No.13 of the proposed hire purchase agreement:

> "This agreement shall become binding on the owner only upon acceptance by
> signature on behalf of the owner and the hiring shall be deemed to commence on
> such date of acceptance."

On 16th March 1961 the proposed hire purchaser, Mr Stimson having had time to study these documents, came back with his own signature on the front page. He thereby made his offer, and he handed it to the dealer on that day for transmission to Finance Company. It was transmitted, and Finance Company seem to have received it probably on the 17th or, at any rate, not later than 20th March; almost certainly it must have been about the 17th. Then, after a telephone conversation had taken place between the dealer and Finance Company, the dealer, obviously with the authority of Finance Company, informed the proposed hire purchaser that the proposition was acceptable to Finance Company, and possession of the car was given by the dealer to the hire purchaser. At that moment the transaction was not concluded: the agreement had not yet been signed by Finance Company as owners, and, therefore, there was no hire purchase agreement in existence. But some contract has to be inferred from the conduct of the parties. On the one hand the proposed hire purchaser signed and handed in his offer. He had also, at the request of the dealer and for the benefit of Finance Company, produced a comprehensive insurance cover to show that the car was going to be properly covered. But at that moment there was only a preliminary bailment. There was delivery of the car to the hire purchaser, but no hire purchase agreement had come into force. The expectation was that, in a few days' time, there would be a signature on behalf of Finance Company as owners, which would be an acceptance of the offer and conclude the contract and there would be a hire purchase agreement. But if, for some reason, Finance Company decided they would not go on with the transaction, then the understanding must have been that, in such event, the motor car would have to be handed back by the proposed hire purchaser. That is the position on 18th March and I agree that one cannot read into the terms of that provisional bailment all the terms of the hire purchase agreement. That would not be consistent with the evident intention of the parties, which was merely to create a provisional situation in anticipation of the hire purchase agreement being concluded.

It may well be that the dealer had authority and appeared to have authority from Finance Company to do various things, in particular to hand over the car and to scrutinise the proposed insurance cover to make sure it was a satisfactory comprehensive cover, and it may be there was authority in other respects as well. But I do not see that it follows from any of the facts of this case that the dealer had authority to receive notice of revocation in the relevant sense, which would not be merely to receive it and transmit it to Finance Company on the basis that the dealer would be the authorised and proper channel of communication. The authority would have to go further in the present case. It has to be said that, at the moment when the hire purchaser gave notice to the dealer of his desire to revoke his offer, that was automatically at that moment notice to Finance Company. In my view, that is not a reasonable view of the facts. It is reasonable to say that if the hire purchaser wished to withdraw his offer, it would be right for him to inform the dealer and make the dealer his agent for the purpose of passing on the message. The dealer would be the authorised channel of communication, but it does not follow that Finance Company had made the dealer their agent to such an extent that the mere giving of a revocation notice to the dealer would then and there amount to a withdrawal of the offer. It is clear that the dealer was not authorised to

conclude the transaction, and, therefore, one may ask: why should he be authorised again on his own initiative or by his mere receipt of some notice to undo the transaction? He clearly was not authorised to rescind an agreement if an agreement had been completed, and it does not seem to me to follow from any of the facts that he was acting in such a capacity that information given to him was at once information given to Finance Company.

That view of the matter is also borne out by the evidence as to what happened on Monday, 20th March when the intending hire purchaser came to the dealer and said in effect:

> "Here is the car; I have brought it back; I do not want to go on with the transaction".

What was then said by Mr Cozens-Walker on behalf of the dealer was:

> "Very well; I will get in touch with one of the directors of the Finance Company whom I know and will see what can be done and I will let you know the outcome"

and, according to the evidence of Mr Cozens-Walker, which seems to have been accepted by the learned Judge, he also added:

> "But you, Mr Stimson, must also see if you can get in touch with the Finance Company and make the necessary arrangements yourself".

The explanation of that as a matter of history is that probably both of those parties, namely, the dealer and the proposed hire purchaser, thought that there was a concluded contract and that what had to be done was to bring about a rescission of it by agreement, because the proposed hire purchaser also added that he was willing to forfeit his deposit of £70 which he had already paid in order to secure a rescission of the proposed transaction so far as it had gone. That is consistent with assuming that there was a concluded agreement which had to be rescinded on terms rather than an offer which had to be withdrawn. I do not see how one can spell out from that conversation a receipt by the dealer of notice of revocation of the offer. It was not what they were purporting to do, and, to my mind, there is no sufficient evidence of actual or ostensible authority on the part of the dealer to receive any communication as immediately constituting notice to Finance Company. Such authority was not possessed in fact; it was not an apparent or ostensible authority; and Mr Cozens-Walker did not profess to have it. So on the first point I am unfortunately not able to agree that there was ostensible authority, nor, as I think is the more accurate way of putting it, that the mere holding of that conversation between Mr Stimson, the proposed hire purchaser, and Mr Cozens-Walker on behalf of the dealer, constituted the giving of notice to Finance Company of revocation of the offer.

However, on the second point, I do agree that the offer was conditional. It is not necessary for the purpose of this case to lay down any broad general propositions about what happens when there is a change in the condition of the goods between the date of offer and the date of acceptance, because we have important special features in this case. This was a hire purchase transaction, and the offer which was signed by the proposed hire purchaser, Mr Stimson on 16th March contained this provision:

> "In signing this agreement the hirer acknowledges that before he signed it - (c) he had examined the goods and satisfied himself that they were in good order and condition."

That is something which has to be signed by the offeror. What is the meaning of it and what have you to infer in order to give reasonable business efficacy to this transaction? The obvious intention is this, that both the proposed hire purchaser and the Finance Company will be able to rely on the condition of the car as it appears to the proposed hire purchaser when he made his offer, and it is on the basis of the car being in that condition that various figures, which one finds on the same page, must have been assessed. The cash price of the goods was £350. That is right as long as the car remains in the same condition, but if in the meantime it suffers injury so that it is depreciated by £100, that figure will be wrong and it should be altered to £250. Equally, the initial instalment of £70 having been paid, it appears to leave £280 to be

found, but that figure also would be wrong; if £100 damage had occurred in the meantime, it should be reduced to £180. The amount and number of the monthly instalments would also become wrong. Furthermore (and this is important), in the event of the hire purchaser making default in payment of the instalments, he would, under the terms of the hire purchase agreement, become liable to pay a certain figure. That figure would by that time have become much too high if £100 of damage had been incurred.

The learned Judge found in terms that this car suffered severe damage before the acceptance, and that there was substantial depreciation as the result. On that basis, it seems to me that we should by implication read into this offer, in order to give the transaction that business efficacy which the parties must have intended it to have, an implied condition that this offer is capable of acceptance only if the car remains in substantially the same condition with substantially the same value. That condition in this case was not fulfilled, because the car was severely damaged and its value was substantially depreciated. Therefore, when Finance Company purported to accept it on a date, which we must assume was 25th March it was an offer which was no longer capable of acceptance, and, therefore, no agreement was concluded.

On that ground, I agree that the appeal should be dismissed.

**Order: Appeal dismissed with no order as to the costs of the appeal.**

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/1962/1.html*

**SACH DECLARATION**

**EXHIBIT 3**

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## TWENTY-NINTH EDITION

VOLUME I

**GENERAL PRINCIPLES**

LONDON
SWEET & MAXWELL
2004

**Extent of liability.** It is generally assumed that, where a unilateral contract    **2–084** takes the form of a promise to pay money, an offeror who purports to withdraw after part performance by the offeree must either be liable in full or not be liable at all. There, is, however, also an intermediate possibility. If, for example, the offer is withdrawn after the offeree has walked half-way to York, it is arguable that, on being notified of the withdrawal, he should desist and recover damages[334] amounting to his expenses, or to the value of the chance of completing the walk, less the expenses which he would incur in that process.

### 4. TERMINATION OF THE OFFER

**Introductory.** An offer may be terminated by withdrawal, rejection, lapse of    **2–085** time, occurrence of a condition, death and supervening incapacity. These methods of termination will be discussed in the paragraphs that follow.

#### (a) *Withdrawal*

**General rule.** The general rule is that an offer may be withdrawn at any time    **2–086** before it is accepted.[335] The rule applies even though the offeror has promised to keep the offer open for a specified time,[336] for such a promise is unsupported by consideration[337] and is therefore not binding. Thus in *Routledge v Grant*[338] the defendant offered to buy a house, giving the offeree six weeks for a definite answer; and it was held that the defendant was free to withdraw at any time before acceptance even though the six weeks had not expired. Conversely, in *Dickinson v Dodds*[339] the defendant offered to sell his house to the offeree and said that the offer was to be "left over till Friday." It was held that he could nevertheless withdraw before Friday.

**Communication of withdrawal generally required.** An offer cannot be    **2–087** withdrawn merely by acting inconsistently with it: for example, an offer to sell goods to A is not withdrawn by selling them to B.[340] If A accepts the offer before

---

[334] Unless the offeree has a "substantial or legitimate interest" in completing the walk, this may be the law under the principles laid down in *White & Carter (Councils) Ltd v McGregor* [1962] A.C. 413, below, para.26–108.

[335] See, *e.g. Payne v Cave* (1789) 3 T.R. 148; *Routledge v Grant* (1828) 4 Bing. 653; *Offord v Davies* (1862) 12 C.B.(N.S.) 748; *Hebb's Case* (1867) L.R. 4 Eq. 9; *Tuck v Baker* [1990] 2 E.G.L.R. 195; *Scammel v Dicker* [2001] 1 W.L.R. 631, applying the principle to an offer to settle an action under CPR, Pt 36; *Bircham Nominees (No.2) Ltd v Worrell Holdings Ltd* [2001] EWCA Civ 775; (2001) 82 P. & C.R. 472 at [24], [35]; *cf.* Defamation Act 1996, s.2(6). For a statutory exception, see Companies Act 1985, s.82(7); see also Vienna Convention on Contracts for the International Sale of Goods (above, para.2–061), Art.16(2).

[336] It is assumed that the offer is to be open for a reasonable time if no time limit is expressed in it: see *Ramsgate Victoria Hotel Co Ltd v Montefiore* (1866) L.R. 1 Ex. 109; below, para.2–094.

[337] Below, para.3–170.

[338] (1828) 4 Bing. 653. See also *Cooke v Oxley* (1790) 3 T.R. 653.

[339] (1876) 2 Ch.D. 463.

[340] *Adams v Lindsell* (1818) 1 B, & Ald. 681; *Stevenson, Jacques & Co v Maclean* (1880) 5 Q.B.D. 346; it is submitted that contrary dicta in *Dickinson v Dodds* (1876) 2 Ch.D. 463, 472 would no longer be followed.

SACH DECLARATION

EXHIBIT 4

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

TWENTY-NINTH EDITION

VOLUME I

GENERAL PRINCIPLES

LONDON
SWEET & MAXWELL
2004

**Extent of liability.** It is generally assumed that, where a unilateral contract   2–084
takes the form of a promise to pay money, an offeror who purports to withdraw
after part performance by the offeree must either be liable in full or not be liable
at all. There, is, however, also an intermediate possibility. If, for example, the
offer is withdrawn after the offeree has walked half-way to York, it is arguable
that, on being notified of the withdrawal, he should desist and recover damages[334]
amounting to his expenses, or to the value of the chance of completing the walk,
less the expenses which he would incur in that process.

### 4. TERMINATION OF THE OFFER

**Introductory.** An offer may be terminated by withdrawal, rejection, lapse of   2–085
time, occurrence of a condition, death and supervening incapacity. These meth-
ods of termination will be discussed in the paragraphs that follow.

#### (a) *Withdrawal*

**General rule.** The general rule is that an offer may be withdrawn at any time   2–086
before it is accepted.[335] The rule applies even though the offeror has promised to
keep the offer open for a specified time,[336] for such a promise is unsupported by
consideration[337] and is therefore not binding. Thus in *Routledge v Grant*[338] the
defendant offered to buy a house, giving the offeree six weeks for a definite
answer; and it was held that the defendant was free to withdraw at any time
before acceptance even though the six weeks had not expired. Conversely, in
*Dickinson v Dodds*[339] the defendant offered to sell his house to the offeree and
said that the offer was to be "left over till Friday." It was held that he could
nevertheless withdraw before Friday.

**Communication of withdrawal generally required.** An offer cannot be   2–087
withdrawn merely by acting inconsistently with it: for example, an offer to sell
goods to A is not withdrawn by selling them to B.[340] If A accepts the offer before

---

[334] Unless the offeree has a "substantial or legitimate interest" in completing the walk, this may
be the law under the principles laid down in *White & Carter (Councils) Ltd v McGregor* [1962] A.C.
413, below, para.26–108.

[335] See, *e.g. Payne v Cave* (1789) 3 T.R. 148; *Routledge v Grant* (1828) 4 Bing. 653; *Offord v
Davies* (1862) 12 C.B.(N.S.) 748; *Hebb's Case* (1867) L.R. 4 Eq. 9; *Tuck v Baker* [1990] 2 E.G.L.R.
195; *Scammel v Dicker* [2001] 1 W.L.R. 631, applying the principle to an offer to settle an action
under CPR, Pt 36; *Bircham Nominees (No.2) Ltd v Worrell Holdings Ltd* [2001] EWCA Civ 775;
(2001) 82 P. & C.R. 472 at [24], [35]; *cf.* Defamation Act 1996, s.2(6). For a statutory exception, see
Companies Act 1985, s.82(7); see also Vienna Convention on Contracts for the International Sale of
Goods (above, para.2–061), Art.16(2).

[336] It is assumed that the offer is to be open for a reasonable time if no time limit is expressed in
it: see *Ramsgate Victoria Hotel Co Ltd v Montefiore* (1866) L.R. 1 Ex. 109; below, para.2–094.

[337] Below, para.3–170.

[338] (1828) 4 Bing. 653. See also *Cooke v Oxley* (1790) 3 T.R. 653.

[339] (1876) 2 Ch.D. 463.

[340] *Adams v Lindsell* (1818) 1 B. & Ald. 681; *Stevenson, Jacques & Co v Maclean* (1880) 5 Q.B.D.
346; it is submitted that contrary dicta in *Dickinson v Dodds* (1876) 2 Ch.D. 463, 472 would no longer
be followed.

SACH DECLARATION

EXHIBIT 5

[Home] [Databases] [World Law] [Multidatabase Search] [Help]
[Feedback]

OpenLaw

# United Kingdom House of Lords Decisions

JISC 

You are here: BAILII >> Databases >> United Kingdom House of Lords Decisions >> Dunlop Pneumatic Tyre Co Ltd v
New Garage & Motor Co Ltd [1914] UKHL 1 (01 July 1914)
URL: http://www.bailii.org/uk/cases/UKHL/1914/1.html
Cite as: [1914] UKHL 1, [1915] AC 79

[New search] [Help]

**BAILII Citation Number: [1914] UKHL 1**

## HOUSE OF LORDS

Date: 01 July 1914

**Between:**

**DUNLOP PNEUMATIC TYRE COMPANY, LIMITED**   **APPELLANTS**

**- v -**

**NEW GARAGE AND MOTOR COMPANY, LIMITED**   **RESPONDENTS**

The House took time for consideration.

July 1.

**LORD DUNEDIN.**

My Lords, the appellants, through an agent, entered into a contract with the respondents under which they supplied them with their goods, which consisted mainly of motor-tyre covers and tubes. By this contract, in respect of certain concessions as to discounts, the respondents bound themselves not to do several things, which may be shortly set forth as follows: not to tamper with the manufacturers' marks; not to sell to any private customer or co-operative society at prices less than the current price list issued by the Dunlop Company; not to supply to persons whose supplies the Dunlop Company had decided to suspend; not to exhibit or to export without the Dunlop Company's assent. Finally, the agreement concluded (clause 5), "We agree to pay to the Dunlop Pneumatic Tyre Company, Ltd. the sum of 5 *l.* for each and every tyre, cover or tube sold or offered in breach of this agreement, as and by way of liquidated damages and not as a penalty."

The appellants, having discovered that the respondents had sold covers and tubes at under the current list price, raised action and demanded damages. The case was tried and the breach in fact held proved. An inquiry was directed before the Master as to damages. The Master inquired, and assessed the damages at 250 *l.* , adding this explanation: "I find that it was left open to me to decide whether the 5 *l.* fixed in the agreement was penalty or liquidated damages. I find that it was liquidated damages."

The respondents appealed to the Court of Appeal, when the majority of that Court, Vaughan Williams and Swinfen Eady L.JJ., held, Kennedy L.J. dissenting, that the said sum of 5 *l.* was a penalty, and entered judgment for the plaintiffs for the sum of 2 *l.* as nominal damages. Appeal from that decision is now before your Lordships' House.

My Lords, we had the benefit of a full and satisfactory argument, and a citation of the very numerous cases which have been decided on this branch of the law. The matter has been handled, and at no distant date, in the Courts of highest resort. I particularly refer to the Clydebank Case[1] in your Lordships' House and the cases of Public Works Commissioner v. Hills[2] and Webster v. Bosanquet[3] in the Privy Council. In both of these cases many of the previous cases were considered. In view of that fact, and of the number of the authorities available, I do not think it advisable to attempt any detailed review of the various cases, but I shall content myself with stating succinctly the various propositions which I think are deducible from the decisions which rank as authoritative:-

1. Though the parties to a contract who use the words "penalty" or "liquidated damages" may prima facie be supposed to mean what they say, yet the expression used is not conclusive. The Court must find out whether the payment stipulated is in truth a penalty or liquidated damages. This doctrine may be said to be found passim in nearly every case.

2. The essence of a penalty is a payment of money stipulated as in terrorem of the offending party; the essence of liquidated damages is a genuine covenanted pre-estimate of damage (Clydebank Engineering and Shipbuilding Co. v. Don Jose Ramos Yzquierdo y Castaneda[1]).

3. The question whether a sum stipulated is penalty or liquidated damages is a question of construction to be decided

(1)   [1905] A. C. 6.
(2)   [1906] A. C. 368.
(3)   [1912] A. C. 394.

upon the terms and inherent circumstances of each particular contract, judged of as at the time of the making of the contract, not as at the time of the breach (Public Works Commissioner v. Hills[1] and Webster v. Bosanquet[2]).

4. To assist this task of construction various tests have been suggested, which if applicable to the case under consideration may prove helpful, or even conclusive. Such are:

( *a* ) It will be held to be penalty if the sum stipulated for is extravagant and unconscionable in amount in comparison with the greatest loss that could conceivably be proved to have followed from the breach. (Illustration given by Lord Halsbury in Clydebank Case.[3])

( *b* ) It will be held to be a penalty if the breach consists only in not paying a sum of money, and the sum stipulated is a sum greater than the sum which ought to have been paid (Kemble v. Farren[4]). This though one of the most ancient instances is truly a corollary to the last test. Whether it had its historical origin in the doctrine of the common law that when A. promised to pay B. a sum of money on a certain day and did not do so, B. could only recover the sum with, in certain cases, interest, but could never recover further damages for non-timeous payment, or whether it was a survival of the time when equity reformed unconscionable bargains merely because they were unconscionable, - a subject which much exercised Jessel M.R. in Wallis v. Smith[5] - is probably more interesting than material.

( *c* ) There is a presumption (but no more) that it is penalty when "a single lump sum is made payable by way of compensation, on the occurrence of one or more or all of several events, some of which may occasion serious and others but trifling damage" (Lord Watson in Lord Elphinstone v. Monkland Iron and Coal Co.[6]).

On the other hand:

( *d* ) It is no obstacle to the sum stipulated being a genuine pre-estimate of damage, that the consequences of the breach are such

(1)  [1906] A. C. 368.
(2)  [1912] A. C. 394.
(3)  [1905] A. C. 6.
(4)  6 Bing. 141.
(5)  21 Ch. D. 243.
(6)  11 App. Cas. 332.

as to make precise pre-estimation almost an impossibility. On the contrary, that is just the situation when it is probable that pre-estimated damage was the true bargain between the parties ( Clydebank Case, Lord Halsbury[1]; Webster v. Bosanquet, Lord Mersey[2]).

Turning now to the facts of the case, it is evident that the damage apprehended by the appellants owing to the breaking of the agreement was an indirect and not a direct damage. So long as they got their price from the respondents for each article sold, it could not matter to them directly what the respondents did with it. Indirectly it did. Accordingly, the agreement is headed "Price Maintenance Agreement," and the way in which the appellants would be damaged if prices were cut is clearly explained in evidence by Mr. Baisley, and no successful attempt is made to controvert that evidence. But though damage as a whole from such a practice would be certain, yet damage from any one sale would be impossible to forecast. It is just, therefore, one of those cases where it seems quite reasonable for parties to contract that they should estimate that damage at a certain figure, and provided that figure is not extravagant there would seem no reason to suspect that it is not truly a bargain to assess damages, but rather a penalty to be held in terrorem.

The argument of the respondents was really based on two heads. They overpressed, in my judgment, the dictum of Lord Watson in Lord Elphinstone's Case[3], reading it as if he had said that the matter was conclusive, instead of saying, as he did, that it raised a presumption, and they relied strongly on the case of Willson v. Love.[4]

Now, in the first place, I have considerable doubt whether the stipulated payment here can fairly be said to deal with breaches, "some of which" - I am quoting Lord Watson's words - "may occasion serious and others but trifling damage." As a mere matter of construction, I doubt whether clause 5 applies to anything but sales below price. But I will assume that it does. None the less the mischief, as I have already pointed out, is an indirect mischief, and I see no data on which, as a matter

(1)  [1905] A. C. at p. 11.
(2)  [1912] A. C. at p. 398.
(3)  11 App. Cas. 332, at p. 342.
(4)  [1896] 1 Q. B. 626.

of construction, I could settle in my own mind that the indirect damage from selling a cover would differ in magnitude from the indirect damage from selling a tube; or that the indirect damage from a cutting-price sale would differ from the indirect damage from supply at a full price to a hostile, because prohibited, agent. You cannot weigh such things in a chemical balance. The character of the agricultural land which was ruined by slag heaps in Elphinstone's Case[1] was not all the same, but no objection was raised by Lord Watson to applying an overhead rate per acre, the sum not being in itself unconscionable.

I think Elphinstone's Case[1], or rather the dicta in it, do go this length, that if there are various breaches to which one indiscriminate sum to be paid in breach is applied, then the strength of the chain must be taken at its weakest link. If you can clearly see that the loss on one particular breach could never amount to the stipulated sum, then you may come to the conclusion that the sum is penalty. But further than this it does not go; so, for the reasons already stated, I do not think the present case forms an instance of what I have just expressed.

As regards Willson's Case[2], I do not think it material to consider whether it was well decided on the facts. For it was decided on the view of the facts that the manurial value of straw and of hay were known

ascertainable quantities as at the time of the bargain, and radically different, so that the damage resulting from the want of one could never be the same as the damage resulting from the want of the other.

Added to that, the parties there had said "penalty," and the effort was to make out that that really meant liquidated damages; and lastly, if my view of the facts in the present case is correct, then Rigby L.J. would have agreed with me, for the last words of his judgment are as follows: "On the other hand it is stated that, when the damages caused by a breach of contract are incapable of being ascertained, the sum made by the contract payable on such a breach is to be regarded as liquidated damages. The question arises, What is meant in this statement by the expression 'incapable of being ascertained'? In their proper sense the words appear to refer to a case where no rule or measure

(1)    11 App. Cas. 332.
(2)    [1896] 1 Q. B. 626.

of damages is available for the guidance of a jury as to the amount of the damages, and a judge would have to tell them they must fix the amount as best they can." To arrive at the indirect damage in this case, supposing no sum had been stipulated, that is just what a judge would, in my opinion, have had to do.

On the whole matter, therefore, I go with the opinion of Kennedy L.J., and I move your Lordships that the appeal be allowed, and judgment given for the sum as brought out by the Master, the appellants to have their costs in this House and in the Courts below.

**LORD ATKINSON.** My Lords, the action out of which this appeal arises was brought upon a contract entered into between the appellants, through the agency of Messrs. Pellant, Limited, and the respondents, claiming, amongst other things, to recover a sum of 5 *l.* in respect of each of the breaches of this contract complained of. The sole question for decision on this appeal is whether this sum of 5 *l.* is a penalty or liquidated damages.

The appellants are extensive and well-known manufacturers of motor tyres, covers, and tubes, a trade in which there is keen competition. They have no patents protecting their manufacture. Success over their competitors depends on the reputation acquired for their products, and largely upon the efficiency of the organization of their business. Ninety-nine per cent. of their output in this class of goods is sold through what Mr. Baisley, one of their managers who was examined as a witness, described as their distributing organization. It consists in this, that they sell to motor car manufacturers, persons called factors who resell to retail agents, and retail agents themselves, and that all these latter sell to the public, the users of the goods.

The appellants produce price lists of these goods of theirs varying from time to time. They invariably sell at these prices to the members of their distributing organization under agreements similar to that sued upon, giving, however, discount and rebates at varying rates. These agreements are styled price maintenance agreements, and their main purpose, obviously, is to prevent the sale to the public, the users, either directly or indirectly, of the goods the appellants manufacture at prices less than those named in their price lists. The result of this is that, competition having reduced these prices to the lowest remunerative scale, the agent secures his remuneration by selling at the prices at which he buys. If he sells at lower prices than these the loss comes out of his discount and rebates, his own profits. Mr. Baisley, in his evidence (Appendix, pp. 111 - 116), explains elaborately the dislocation of the distributing organization of the appellants, and the injury to their trade which would ensue from the sale by one or more of their agents or factors of their goods at prices less than those named in these lists. He pointed out that if the business of one of their agents in any particular place was undercut by such sales, the agent would, owing to the diminution of his remuneration, most probably throw up his agency and become the agent of a competitor, thus leaving the field open to the rivals of the appellants; that it was essential for their trade that their wares should be obtainable all over the country at as many places as possible, and that though the consequential injury to their trade by this undercutting would, or might, be very serious, it would be very difficult to prove in evidence the precise amount of their loss in money; that considering all these things, the appellant company fixed 5 *l.* , the sum mentioned in the agreement, as a fair and reasonable sum for liquidated damages in respect of the breaches specified. This evidence was uncontradicted.

In a good deal of the argument which has been addressed to your Lordships on behalf of the respondents, the true object of this price maintenance agreement, and the nature of the consequential injury to the plaintiffs' trade flowing from the breaches of it, have been somewhat lost sight of. It has been urged that as the sum of 5 *l.* becomes payable on the sale of even one tube at a shilling less than the listed price, and as it was impossible that the appellant company should lose that sum on such a transaction, the sum fixed must be a penalty. In the sense of direct and immediate loss the appellants lose nothing by such a sale. It is the agent or dealer who loses by selling at a price less than that at which he buys, but the appellants have to look at their trade in globo, and to prevent the setting up, in reference to all their goods anywhere and everywhere, a system of injurious undercutting.

The object of the appellants in making this agreement, if the substance and reality of the thing and the real nature of the transaction be looked at, would appear to be a single one, namely, to prevent the disorganization of their trading system and the consequent injury to their trade in many directions. The means of effecting this is by keeping up their price to the public to the level of their price list, this last being secured by contracting that a sum of 5 *l.* shall be paid for every one of the three classes of articles named sold or offered for sale at prices below those named on the list. The very fact that this sum is to be paid if a tyre cover or tube be merely offered for sale, though not sold, shows that it was the consequential injury to their trade due to undercutting that they had in view. They had an obvious interest to prevent this undercutting, and on the evidence it would appear to me impossible to say that that interest was incommensurate with the sum agreed to be paid.

Their object is akin in some respects to that which a trader has in binding a former employee not to set up, or carry on, a rival business within a certain area. The trader's object is to prevent competition, and especially to prevent his old customers whom the employee knows from being enticed away from him. If one takes for example the case of a plumber, the carrying on of the trade of a plumber may mean anything from mending gas pipes for a few pence apiece up to doing all the plumbing work of a big hotel. If the employee should mend one hundred of such pipes for twenty old customers at 6 *d.* apiece, for which the employer would charge 1 *s.* apiece, could it possibly be contended that the trader's loss was only one hundred sixpences, 2 *l.* 10 *s.* ? It is, I think, quite misleading to concentrate one's attention upon the particular act or acts by which, in such cases as this, the rivalry in trade is set up, and the repute acquired by the former employee that he works cheaper and charges less than his old master, and to lose sight of the risk to the latter that old customers, once tempted to leave him, may never return to deal with him, or that business that might otherwise have come to him may be captured by his rival. The consequential injuries to the trader's business arising from each breach by the employee of his covenant cannot be measured by the direct loss in a monetary point of view on the particular transaction constituting the breach. An old customer may be as effectively enticed away from him through the medium of a 10 *s.* job done at a cheap rate as by a 50 *l.* job done at a cheap rate, or a reputation for cheap workmanship may be acquired possibly as effectively in one case as in the other.

In many cases a person may contract to do or abstain from doing an act which is a composite act, the product or result of almost numberless other acts. For instance, if one should contract with a builder to build a house of the best materials and with the most skilled workmanship, and to hand over possession of the same completed on a certain day for 1000 *l.* , 500 *l.* to be paid if the agreement was not performed; every fire grate set which on completion would be found to be of bad material, every door which would be found to have been defectively hung, every cubic foot of masonry which would be found to have been badly and improperly built, would involve a breach of the agreement, but it would be quite illegitimate to thus disintegrate the obligation to do what the parties regarded as a single whole into a number of obligations to do a number of things of varying importance, and treat the 500 *l.* as prima facie a penalty, because these individual breaches of the agreement did not cause, in many instances, any injury commensurate with that sum. This is the very ground, or one of the grounds, upon which Lord Herschell rests his judgment in Lord Elphinstone v. Monkland Iron and Coal Co.[1] He said, "The agreement does not provide for the payment of a lump sum upon the non-performance of any one of many obligations differing in importance. It has reference to a single obligation, and the sum to be paid bears a strict proportion to the extent to which that obligation is left unfulfilled."

In the present case the agreement of the parties, in effect, though possibly not in form, did little, if anything, more than impose a single obligation, namely, to sell and endeavour to sell the goods of the

appellants at the prices named in their lists,

(1)    11 App. Cas. 332, at p. 345.

though, of course, as they sold different kinds of goods, this single obligation might be violated in many ways. Much reliance was placed by the respondents on the well-known passage in the judgment of Lord Watson in the last-mentioned case, to the effect that "when a single lump sum is made payable, by way of compensation, on the occurrence of one or more or all of several events, some of which may occasion serious and others but trifling damage, the presumption is that the parties intended the sum to be penal, and subject to modification." It is quite true that, as mentioned by Swinfen Eady L.J., Lord Esher, in Willson v. Love[1], said that he thought this passage meant the same thing as if it ran "some of which may occasion serious and others less serious damage." With all respect, this alteration would mean that the damage resulting from each event should be almost uniform in amount, a construction which would mean that the stipulated compensation must presumably be a penalty in almost every conceivable case. Moreover, Lord Watson's statement of the law as it stands was approved by Lord Davey in Clydebank Engineering and Shipbuilding Co. v. Don Jose Ramos Yzquierdo y Castaneda[2] and in Webster v. Bosanquet[3] without any qualification of that kind.

In this last-mentioned case, as in the present, the contract provided that the amount specified should be paid as "liquidated damages and not as a penalty." The covenant upon which the matter in controversy turned was contained in a deed made on the dissolution of a partnership between two partners, the plaintiff and defendant, and it provided that the defendant should not during a certain period be at liberty to sell the whole or part of the tea crops of two estates named to any person other than the plaintiff without first offering to him the option of buying the same, and further provided that on breach of this covenant by the defendant he should pay to the petitioner the sum of 500 l. as "liquidated damages and not as a penalty."

Now, it will be observed that this covenant would be violated by the sale of any appreciable part, in a business point of view, of the crops of either of these estates, no matter how relatively

(1)    [1896] 1 Q. B. 626, at p. 630.
(2)    [1905] A. C. 6.
(3)    [1912] A. C. 394.

small that part might be compared with the entire crop of either. It is also clear that the object of the parties when they executed the deed was to secure to the plaintiff the option of buying the entire crops of both estates, and that when they fixed this sum of 500 l. they were thinking of the loss the plaintiff might sustain by the loss of that option. The amount of tea sold by the defendant in breach of the covenant was considerable - nearly 54,000 lbs. It was laid down that in determining whether a sum contracted to be paid is liquidated damages or a penalty, one is to consider whether the contract, whatever its language, would, at the time it was entered into, have been unconscionable and extravagant, and one which no Court ought to allow to be enforced if this sum were to be treated as liquidated damages, having regard to any possible amount of damage likely to have been in the contemplation of the parties when they made the contract. At p. 398, Lord Mersey, in delivering the judgment of the Judicial Committee, said: "When making the contract it was impossible to foresee the extent of the injury which might be sustained by the plaintiff if sales of the tea were made to third parties without his consent. That such sales might seriously affect his business was obvious, and the very uncertainty of the loss likely to arise made it most reasonable for the parties to agree beforehand as to what the damages should be. And, furthermore, it is well known that damages of this kind, though very real, may be difficult of proof, and that the proof may entail considerable expense." Those remarks are, having regard to the evidence in the present case, particularly applicable to it.

In Kemble v. Farren[1] Tindal C.J. said: "We see nothing illegal or unreasonable in the parties, by their mutual agreement, settling the amount of damages, uncertain in their nature, at any sum upon which they may agree. In many cases, such an agreement fixes that which is almost impossible to be accurately ascertained; and in all cases, it saves the expense and difficulty of bringing witnesses to that point."

Therefore, although it may be true, as laid down by Lord Watson, that a presumption is raised in favour of

a penalty

(1)   6 Bing. 141, at p. 148.

where a single lump sum is to be paid by way of compensation in respect of many different events, some occasioning serious, some trifling damage, it seems to me that that presumption is rebutted by the very fact that the damage caused by each and every one of those events, however varying in importance, may be of such an uncertain nature that it cannot be accurately ascertained. The damage has been proved to be of that nature in the present case, and the very fact that it is so renders it all the more probable that the sum of 5 *l.* was not stipulated for merely in terrorem, but was really and genuinely a pre-estimate of the appellants' probable or possible interest in the due performance of the contract.

Swinfen Eady L.J. holds that clause No. 5 of the agreement applies to the first part of clause 3, the supplying of these goods to persons on the appellants' black list, as it was styled. I confess that seems to me a very, very doubtful construction. What is prohibited by the second clause is "the sale or offering for sale of motor tyres, covers, or tubes at prices less than those in the price list." What is dealt with in clause 5 is a sale or offering for sale of these particular kinds of goods in breach of the agreement. What is dealt with in the first part of clause 3 is the supply without consent of any such goods to these blacklisted agents at any price whatever; but even if Swinfen Eady L.J. should be right in this it would not lead me to a conclusion different from that to which I have come.

The appellants, like the respondents, are most probably good business men. Neither of them contemplated, presumably, the black-listing of these agents without adequate trade reasons. Nothing was more natural than that the appellants should seek to prevent the supply of their goods indirectly to persons to whom they would not supply them directly. Considerable injury to their trade interests might obviously be done by putting such persons in a position to undercut their prices, and derange their supply organization, and nothing conceivable could be more difficult than to prove by evidence, or to estimate precisely in money, the exact amount of damages which might be caused by such an injury. The passage in the judgment of Tindal C.J., above quoted, applies directly to such state of things.

I entirely concur with Kennedy L.J. in his criticism of the agreement to be found at p. 134 of the appendix. I agree with him that on the face of it, on this point of liquidated damages, it contains nothing unreasonable, unconscionable, or extravagant. And I further think that the same may be said of the real transaction between the parties if its substance be reasonably regarded.

For these reasons I think that the judgment of Kennedy L.J. was right, that the judgment appealed from was wrong and should be reversed, and the judgment of Phillimore J. be restored, and the appeal allowed with costs.

**LORD PARKER OF WADDINGTON.** [1]My Lords, where the damages which may arise out a breach of contract are in their nature uncertain, the law permits the parties to agree beforehand the amount to be paid on such breach. Whether the parties have so agreed or whether the sum agreed to be paid on the breach is really a penalty must depend on the circumstances of each particular case. There are, however, certain general considerations which have to be borne in mind in determining the question. If, for example, the sum agreed to be paid is in excess of any actual damage which can possibly, or even probably, arise from the breach, the possibility of the parties having made a bona fide pre-estimate of damage has always been held to be excluded, and it is the same if they have stipulated for the payment of a larger sum in the event of breach of an agreement for the payment of a smaller sum.

The really difficult cases are those in which the Court has to consider what presumptions or inferences arise from the number or nature of the stipulations on breach of which the sum in question is agreed to be paid. In the case of a single stipulation, which, if broken at all, can be broken once only, and in one way only, such as a covenant not to reveal a trade secret to a rival trader, there can be no inference or presumption that the sum payable on breach is not in the nature of agreed damages, and if the parties have referred to it as agreed or liquidated damages, no reason why the Court should not treat it as such. The

(1)    Road by Lord Shaw of Dunfermline.

question is more complicated when the stipulation, though still a single stipulation, is capable of being broken more than once, and in more ways than one, such as a stipulation not to solicit the customers of a firm. A solicitation which is unsuccessful can give rise to only nominal damages, and even if it be successful, the actual damage may vary greatly according to the value of the custom which is thereby directly or indirectly lost to the firm. Still, whatever damage there is must be the same in kind for every possible breach, and the fact that it may vary in amount for each particular breach has never been held to raise any presumption or inference that the sum agreed to be paid is a penalty, at any rate in cases where the parties have referred to it as agreed or liquidated damages.

The question becomes still more complicated where a single sum is agreed to be paid on the breach of a number of stipulations of varying importance. It is said that in such a case there arises an inference or presumption against the sum in question being in the nature of agreed damages, even though the parties have referred to it as such. My Lords, in this respect I think a distinction should be drawn between cases in which the damage likely to accrue from each stipulation is the same in kind and cases in which the damage likely to accrue varies in kind with each stipulation. Cases of the former class seem to me to be completely analogous to those of a single stipulation, which can be broken in various ways and with varying damage; but probably it would be difficult for the Court to hold that the parties had pre-estimated the damage if they have referred to the sum payable as a penalty.

In cases, however, of the latter class, I am inclined to think that the prima facie presumption or inference is against the parties having pre-estimated the damage, even though the sum payable is referred to as agreed or liquidated damages. The damage likely to accrue from breaches of the various stipulations being in kind different, a separate pre-estimate in the case of each stipulation would be necessary, and it would not be very likely that the same result would be arrived at in respect of each kind of damage. In my opinion, however, any such presumption or inference would be prima facie only and capable of being displaced by other considerations. Supposing it were recited in the agreement that the parties had estimated the probable damage from a breach of one stipulation at from 5 *l.* to 15 *l.* , and the probable damage from a breach of another stipulation at from 2 *l.* to 12 *l.* , and had agreed on a sum of 8 *l.* as a reasonable sum to be paid on the breach of either stipulation, I cannot think that the Court would refuse to give effect to the bargain between the parties.

My Lords, in the present case, even accepting the construction of the contract which makes clause 5 apply not only to a sale or offer contrary to the provisions of clause 2, but also to one contrary to the provisions of clause 3, I think it is reasonably clear that the damage likely to accrue from the breach of every stipulation to which clause 5 applies is the same in kind. Such damage will in every case consist in the disturbance or derangement of the system of distribution by means of which the appellants' goods reach the ultimate consumer. The parties by their contract agree that the sum payable on breach of any such stipulation is to be paid by way of damages and not by way of penalty, and I can see nothing to justify the Court in refusing to give effect to this bargain.

**LORD PARMOOR.** My Lords, on April 7, 1911, Messrs. A. Pellant, Limited (acting as agents for the appellants), entered into a price maintenance agreement with the respondents. The question to determine is the construction of this agreement.

In the fifth clause the respondents agreed to pay to the appellants "the sum of 5 *l.* for each and every tyre, cover, or tube sold or offered in breach of this agreement, as and by way of liquidated damages, and not as a penalty." There has been difference of opinion whether the sum of 5 *l.* is applicable only to a breach of the conditions contained in paragraph 2 of the agreement or extends to a breach of other conditions not contained in this paragraph.

Paragraph 2 contains an undertaking by the respondents that they "will not sell or offer any Dunlop motor tyres, covers, or tubes to any private customers or to any co-operative society at prices below those mentioned in the price list current at the time of sale, nor give to any such customer or society any cash or other discounts, or advantages reducing the same, and will not sell or offer any Dunlop motor tyres, covers, or tubes to any other person, firm, or company at prices less than those mentioned in the said price list." I agree with the opinion of Kennedy L.J. that under the terms of the contract the sum of 5 *l.* is only payable in respect of a breach of the undertaking in paragraph 2 of the contract, and does not extend to other breaches. I further agree with the opinion expressed by the Lord Justice, that, within this limitation,

clause 5 of the contract does apply to more than one contingency, and that the case must be considered on this basis.

It was held by the Court of Appeal that although the sum of 5 *l.* was agreed between the parties to be by way of liquidated damages and not as a penalty, yet it must be regarded as a penalty; that the appellants could not recover any greater damages for breach of the agreement in the sale or offering of any tyre, cover, or tube than such damage as they could prove that they had sustained; since they could not prove that they had sustained actual damage, they were not entitled to more than nominal damages. It is against this decision that the appeal is brought to your Lordships' House.

My Lords, there is no question as to the competency of parties to agree beforehand the amount of damages, uncertain in their nature, payable on the breach of a contract. There are cases, however, in which the Courts have interfered with the free right of contract, although the parties have specified the definite sum agreed on by them to be in the nature of liquidated damages, and not of a penalty. If the Court, after looking at the language of the contract, the character of the transaction, and the circumstances under which it was entered into, comes to the conclusion that the parties have made a mistake in calling the agreed sum liquidated damages, and that such sum is not really a pactional pre-estimate of loss within the contemplation of the parties at the time when the arrangement was made, but a penal sum inserted as a punishment on the defaulter irrespective of the amount of any loss which could at the time have been in contemplation of the parties, then such sum is a penalty, and the defaulter is only liable in respect of damages which can be proved against him. It is too late to question whether such interference with the language of a contract can be justified on any rational principle.

There are two instances in which the Court has interfered when the agreed sum is referable to the breach of a single stipulation. It is important that the principle of interference should not be extended. The agreed sum, though described in the contract as liquidated damages, is held to be a penalty if it is extravagant or unconscionable in relation to any possible amount of damages that could have been within the contemplation of the parties at the time when the contract was made. No abstract rule can be laid down without reference to the special facts of the particular case, but when competent parties by free contract are purporting to agree a sum as liquidated damages there is no reason for refusing a wide limit of discretion. To justify interference there must be an extravagant disproportion between the agreed sum and the amount of any damage capable of pre-estimate. In the case of Clydebank Engineering and Shipbuilding Co. v. Don Jose Ramos Yzquierdo y Castaneda[1] Lord Halsbury gives an apt illustration of what would probably render a sum agreed by the parties unconscionable, and therefore a penalty: "For instance, if you agreed to build a house in a year, and agreed that if you did not build the house for 50 *l.* you were to pay a million of money as a penalty, the extravagance of that would be at once apparent."

In the present case the definite sum agreed by the parties is 5 *l.* , and this cannot be said to be extravagant or extortionate, having regard to the nature of the contract.

The second instance in which the Courts have sanctioned interference is in the case of a covenant for a fixed sum, or for a sum definitely ascertainable, and where a larger sum is inserted by arrangement between the parties, payable as liquidated damages in default of payment. Since the damage for the breach of covenant is in such cases by English law capable of exact definition, the substitution of a larger sum as liquidated damages is regarded, not as a pre-estimate of damage, but as a penalty in the

(1)    [1905] A. C 6.

nature of a penal payment. In the present case this limitation has no application. It cannot be said that the sum of 5 *l.* is being substituted for the payment of a smaller fixed or ascertainable sum, since from the nature of this contract any accurate pre-estimate of damage would be practically impossible. The words of Tindal C.J. in the case of Kemble v. Farren[1] are directly applicable: "We see nothing illegal or unreasonable in the parties, by their mutual agreement, settling the amount of damages, uncertain in their nature, at any sum upon which they may agree. In many cases, such an agreement fixes that which is almost impossible to be accurately ascertained; and in all cases, it saves the expense and difficulty of bringing witnesses to that point."

My Lords, the point on which the majority of the Court of Appeal decided this case against the appellants is that, where a contract contains varying stipulations, and the evidence shows that these stipulations are of varying degrees of importance, the Court exercises a wider power of interference, and a single sum made payable by the occurrence of the breach of one or more, or all of such stipulations, is prima facie a penalty and not liquidated damages. If this statement of the law is accurate without limitation, the agreed sum of 5 *l.* in the present case would be in the nature of a penalty, since that sum is fixed irrespective of the varying degrees of importance of the stipulations. I agree with Kennedy L.J., that though the fact that the agreed sum covers more than one event is an element in the case, or may constitute a presumption that it is a penalty, it is in no sense conclusive against such sum being treated as liquidated damages. There may be a greater risk of infringing the principle against extortion, or against the substitution of a larger for a smaller payment, in applying the same figure to a number of different breaches of varying importance, more especially if some occasion serious and others but trifling damage, than when it is applied to one breach; but if these tests are complied with the parties may reasonably be allowed to make their own agreement. No doubt if the agreed sum is not applied distributively, but equally to stipulations of varying importance, and in reference to any of the stipulations it

(1)   6 Bing. 141, at p. 148.

is a penalty, it is a penalty for the purpose of the whole contract, since it could not in the same contract be construed both as a penalty and as liquidated damages.

If the same agreed sum, separately allocated in different agreements to breaches of varying importance, could be properly construed as a pre-estimate of damage, it seems illogical to regard such sum as a penal payment because for convenience or economy the whole transaction is included in one agreement. The present case is an illustration in point. Having regard to the character of the contract, it would have been possible to have a series of contracts applicable to the various stipulations, and to have inserted in each of them a sum of 5 *l.* as liquidated damages to compensate a loss uncertain, and practically incapable of ascertainment, at the time when the contract was made. I can see no reason why the parties should not be allowed to contract in one document instead of several, or that in such a case the law should interfere with freedom of contract.

Swinfen Eady L.J. in the Court of Appeal largely bases his judgment on the case of Willson v. Love.[1] In that case there was a covenant by the lessees of a farm not to sell hay or straw off the premises during the last twelve months of the term, and a provision that an additional rent of 3 *l.* per ton should be payable by way of penalty for every ton of hay or straw so sold. There was a substantial difference between the manurial value of hay and that of straw, and it was held that the sum so made payable was a penalty and not liquidated damages.

It is noticeable in this case that the parties expressed the sum to be a penalty, and not liquidated damages, but in giving judgment A. L. Smith L.J. says: "Where a sum is made payable by a contract to secure the performance of several stipulations, the damages for the breach of which respectively must be substantially different, or, in other words, the performance of stipulations of varying degrees of importance, that sum is prima facie to be regarded as a penalty and not as liquidated damages." If the words "prima facie" only apply to a presumption which can be displaced, then I agree with Kennedy L.J. that the presumption is displaced in the present case, which belongs to a class in which

(1)   [1896] 1 Q. B. 626.

it is practically impossible to make an accurate pre-estimate of damage, and there is no question of extortion or of substituting a larger for a smaller sum. But if the words "prima facie" imply that the sum will be regarded as a penalty unless there are some special circumstances which could justify an opposite conclusion the statement appears to be expressed in too general terms.

In the case of Wallis v. Smith[1], tried before Fry J., and taken to the Court of Appeal, it was necessary to decide whether when a contract contained a condition for payment of a sum of money as liquidated damages for the breach of stipulations of varied importance, none of which is for payment of an ascertained sum of money, the sum named should be treated as liquidated damages or as a penalty. All the previous cases were examined in the Court of Appeal, and the Court unanimously confirmed the judgment

of Fry J., that the agreed sum was not a penalty but liquidated damages. Lindley L.J. says[2]: "When I come to look at the cases I cannot find a single case in which the larger sum has been treated as penalty where there has been no smaller sum ascertainable as the amount of damages."

Cotton L.J. says[3]: "There are a number of covenants to which clause 25 applies, and in respect of the breach of which it is said that 5000 *l.* shall be liquidated damages. Now in what cases have the Courts said that in those circumstances you shall construe the words 'liquidated damages,' not as what they mean - as a sum assessed between the parties - but only as a penal sum, leaving the real damages to be ascertained? Undoubtedly the authorities do say this, that when a stipulation applies to a breach of a number of covenants, and one of those is a covenant for the payment of a sum of money where the damage for the breach of it is according to English law capable of being actually defined, then where a sum is said to be liquidated damages the stipulation applies, not distributively to the different covenants but equally to all, and you must hold that the sum cannot be damages assessed by the parties as in the case of a particular covenant with respect to which the damages are incapable of being ascertained and are by law fixed in a different way; but

(1)    21 Ch. D. 243.
(2)    21 Ch. D. at p. 275.
(3)    21 Ch. D. at p. 268.

you must look upon it as a mere penalty, and ascertain when the breach occurs what is the damage sustained in respect of the particular breach."

In the present case there is no question of extortion or of giving a larger sum as liquidated damages for a fixed or ascertainable sum, in reference to any of the stipulations to which the agreed figure is applicable, and no ground for altering the terms of the contract as arranged by the parties. The parties adopted a wise and prudent course, having regard to the nature of the contract and the practical impossibility of an accurate ascertainment of damages.

My Lords, in my opinion this appeal should be allowed with costs.

The permission for BAILII to publish the text of this judgment
was granted by Incorporated Council of Law Reporting for England & Wales and
the electronic version of the text was privided by Justis Publishing Ltd.
Their assistance is gratefully acknowledged.

**S A C H   D E C L A R A T I O N**

**E X H I B I T   6**

SECTION 2D: ADMIRALTY: JURISDICTION AND PROCEEDINGS · SUPREME COURT ACT 1981

**2D-145**

Supreme Court Act 1981

(1981 c.54)

ARRANGEMENT OF SECTIONS

PART II

JURISDICTION

*ADMIRALTY JURISDICTION*

Sect.
20. Admiralty jurisdiction of High Court .............
21. Mode of exercise of Admiralty jurisdiction .............
22. Restrictions on entertainment of actions in personam in collision and other similar cases .............
23. High Court not to have jurisdiction in cases within Rhine Convention .............
24. Supplementary provisions as to Admiralty jurisdiction .............

*OTHER PARTICULAR FIELDS OF JURISDICTION*

* * * *

27. Prize jurisdiction of High Court .............

PART VI

MISCELLANEOUS AND SUPPLEMENTARY

*SUPPLEMENTARY*

* * * *

150. Admiralty jurisdiction: provisions as to Channel Islands, Isle of Man, colonies, etc. .............

**2D-146**

**Introductory note**

Sections 20–24 of this Act replace with amendments ss.1–8 of and Sch.1 to this Act as amended. These sections were repealed by s.152 of and Sch.7 to this Act... had been repealed by the Courts Act 1971 Sch.11. Amendments to ss.20–24 were made at various times and lastly by and consequent upon the Merchant Shipping Act 1995 which came into force on January 1, 1996.

The 1956 Act had replaced s.22 of the Judicature Act 1925 and extended Admiralty jurisdiction to give effect to much of the International Convention... to the Arrest of Seagoing Ships and the International Convention on Collisions... concerning Civil Jurisdiction in Matters of Collision both of which were signed at Brussels on May 10, 1952. See British Shipping Laws (Singh, International Maritime Law Conventions (1983)) for the texts of these conventions.

PART II

JURISDICTION

*ADMIRALTY JURISDICTION*

**2D-147**

**Admiralty jurisdiction of High Court**

20.—(1) The Admiralty jurisdiction of the High Court shall... follows, that is to say—

(a) jurisdiction to hear and determine any of the questions and claims mentioned in subsection (2);

(b) jurisdiction in relation to any of the proceedings mentioned in subsection (3);

(2) The questions and claims referred to in subsection (1)(a) are—

(a) any claim to the possession or ownership of a ship or to the ownership of any share therein;

(b) any question arising between the co-owners of a ship as to possession, employment or earnings of that ship;

(c) any claim in respect of a mortgage of or charge on a ship or any share therein;

(d) any claim for damage received by a ship;

(e) any claim for damage done by a ship;

(f) any claim for loss of life or personal injury sustained in consequence of any defect in a ship, or in her apparel or equipment, or in consequence of the wrongful act, neglect or default of—

(i) the owners, charterers or persons in possession or control of a ship; or

(ii) the master or crew of a ship, or any other person for whose wrongful acts, neglects or defaults the owners, charterers or persons in possession or control of a ship are responsible,

being an act, neglect or default in the navigation or management of the ship, or in the loading, carriage or discharge of goods on, in, or from the ship, or in the embarkation, carriage or disembarkation of persons on or from the ship;

(g) any claim for loss of or damage to goods carried in a ship;

(h) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship;

(j) any claim—

(i) under the Salvage Convention 1989;

(ii) under any contract for or in relation to salvage services; or

(iii) in the nature of salvage not falling within (i) or (ii) above,

or corresponding claim in connection with an aircraft.

(k) any claim in the nature of towage in respect of a ship or an aircraft;

(l) any claim in the nature of pilotage in respect of a ship or an aircraft;

(m) any claim in respect of goods or materials supplied to a ship for her operation or maintenance;

## SECTION 2D: ADMIRALTY JURISDICTION AND PROCEEDINGS

(n) any claim in respect of the construction, repair or equipment of a ship or dock charges or dues;

(o) any claim by a master or member of the crew of a ship for wages (including any sum allotted out of wages or adjudged by a superintendent to be due by way of wages);

(p) any claim by a master, shipper, charterer or agent in respect of disbursements made on account of a ship;

(q) any claim arising out of an act which is or is claimed to be a general average act;

(r) any claim arising out of bottomry;

(s) any claim for the forfeiture or condemnation of a ship or of goods which are being or have been carried, or have been attempted to be carried, in a ship, or for the restoration of a ship or any such goods after seizure, or for droits of Admiralty.

(3) The proceedings referred to in subsection (1)(b) are—

(a) any application to the High Court under the Merchant Shipping Act 1995;

(b) any action to enforce a claim for damage, loss of life or personal injury arising out of—

    (i) a collision between ships; or

    (ii) the carrying out of or omission to carry out a manoeuvre in the case of one or more of two or more ships; or

    (iii) non-compliance, on the part of one or more of two or more ships, with the collision regulations;

(c) any action by shipowners or other persons under the Merchant Shipping Act 1995 for the limitation of the amount of their liability in connection with a ship or other property.

(4) The jurisdiction of the High Court under subsection (2)(o) includes power to settle any account outstanding and unsettled between the parties in relation to the ship, and to direct that the ship, or any share thereof, shall be sold, and to make such other order as the court thinks fit.

(5) Subsection (2)(e) extends to—

(a) any claim in respect of a liability incurred under Chapter III of Part VI of the Merchant Shipping Act 1995; and

(b) any claim in respect of a liability falling on the International Oil Pollution Compensation Fund, or on the International Oil Pollution Compensation Fund 1992 or on the International Oil Pollution Compensation Supplementary Fund 2003, under Chapter IV, of Part VI, of the Merchant Shipping Act 1995.

(6) In subsection 2(j)—

(a) the "Salvage Convention 1989" means the International Convention on Salvage, 1989 as it has effect under section 224 of the Merchant Shipping Act 1995;

820

*Paragraph numbers marked with a "+" can be found online and on CD.*