UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

EFKO FOOD INGREDIENTS LTD.,           :

        Plaintiff,           :

    - against -           :

PACIFIC INTER-LINK SDN BHD,           :

        Defendant.           :

-------------------------------------------------------X

08 Civ. 6480 (CM)
ECF CASE

 

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT

TISDALE LAW OFFICES, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 (phone)
(212) 869-0067 (fax)

*Attorneys for Plaintiff*
*EFKO Food Ingredients Ltd.*

Lauren C. Davies, Esq.
Thomas L. Tisdale, Esq.

## INTRODUCTION

Plaintiff, EFKO Food Ingredients, Ltd., ("EFKO" or "Plaintiff") by and through its undersigned counsel, Tisdale Law Offices, LLC, respectfully submits this Memorandum of Law in Opposition to Defendant Pacific Inter-Link SDN BHD's ("PIL" or "Defendant") Motion to Vacate the maritime attachment issued pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). Defendant's Motion to Vacate should be denied because: (1) this court has subject matter jurisdiction over this claim and (2) Plaintiff has sustained its burden herein to establish that it has a maritime claim against PIL. Defendant's assertions to the contrary ignore recent case law and are unavailing. Similarly, Defendant's prayer for Rule 11 sanctions is equally baseless.

## FACTS

The facts pertaining to the instant Motion to Vacate the process of maritime attachment and garnishment as against PIL are more fully set forth in the accompanying Declarations of Lauren C. Davies dated August 20, 2008 (hereinafter "Davies Decl."), Eugeniy Lyashenko dated August 20, 2008 ("Lyashenko Decl."), Timur Bakusev dated August 20, 2008 ("Bakusev Decl."), Oleksiy Serada dated August 20, 2008 ("Serada Decl.") and Susannah Jones dated August 20, 2008 ("Jones Decl."). The facts stated in the Declarations are incorporated by reference herein. In addition, this Memorandum of Law will make reference to, and discuss as necessary the facts set forth in the Declarations.

## ARGUMENT

### POINT I

### PLAINTIFF HAS SATISFIED ITS BURDEN
### OF PROOF UNDER SUPPLEMENTAL RULES B AND E(4)(F)

It is well established that an order of maritime attachment will issue where the plaintiff has a claim against the defendant that is cognizable in admiralty, the defendant cannot be found in the district, property of the defendant can be found in the district, and there is no statutory or general maritime law prohibition to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 444-445 (2d Cir. 2006); *see also Tramp Oil & Marine Limited v. Ocean Navigation (Hellas)*, No. 03 Civ. 5265 (LAK) 2004 U.S. Dist LEXIS 7974, at *3 (S.D.N.Y. May 7, 2004) *citing* 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 21-2, at 470 (2d ed. 1994). Further, and as provided by the Second Circuit in *Aqua Stoli,* "an attachment may be vacated only in certain limited circumstances." *Id.* at 444.

Thus, the Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but is meant to determine if the technical requirements of Rule B were met. At the Rule E(4)(f) hearing, the plaintiff is required to show why the attachment should not be vacated or other relief granted consistent with these rules. Thus, as long as the plaintiff can show that it has ***alleged*** a *prima facie* maritime claim, the defendant is not present in the district, the defendant's property may be found in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *See Aqua Stoli*, 460 F.3d at 445.

In this case, the Defendant moves to vacate the instant maritime attachment alleging that Plaintiff does not have a valid maritime claim that is cognizable in admiralty. Specifically, the Defendant argues that this Court has no subject matter jurisdiction over this action because "no such contract exists" between the parties. *Defendant's Brief* at 5. To the contrary, Plaintiff has

made several good faith allegations in its Verified Complaint that these contracts were entered into and formed. Furthermore, the accompanying Declarations support these allegations. More importantly, this is an issue to be determined under English law in the ongoing London arbitration between the parties because it goes directly to the merits of the dispute between the parties and, as such, must be reserved for arbitration. *See Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.*, No. 05 Civ. 7955 (GEL) 2006 U.S. Dist. LEXIS 77033 (S.D.N.Y. 2006) and *World Reach Shipping Ltd. v. Indus. Carriers Inc.*, No. 06 Civ. 3756 (NRB) 2006 U.S. Dist. LEXIS 83224 (S.D.N.Y. 2006).

Secondly, the Defendant argues that even if the contracts do exist, that there is no maritime claim upon which a Rule B attachment may be based. This is simply not true. EFKO's maritime claims arise out PIL's breach several contracts on CFR terms which required, amongst other maritime obligations, that the Defendant arrange for and charter a vessel to carry the cargo to its destination. *See Verified Complaint attached as Exhibit 1 to Davies Decl.* As will be shown herein and in the Declarations that accompany this memorandum, the validity of the contracts between the parties must be determined in the ongoing London Arbitration and the Defendant's breach of these contracts has given rise to a maritime claim which affords the Plaintiff the right to seek a maritime attachment against the defendant.

The Plaintiff is not required to prove its case at this stage and the Court is not required to resolve the underlying dispute between the parties. *Chiquita Int'l Ltd. and Great White Fleet v. MV BOSSE, et al.*, 518 F. Supp. 2d 589, 592-93 (S.D.N.Y. 2007); *In re Murmansk Shipping Co.*, Civ. No. 00-2354 R5, 2001 U.S. Dist. LEXIS 25227, 2002 A.M.C. 2495 (E.D.La. 2001) (*citing Cashman Equip. Corp. v. Trans Carribean Trans. Co., Ltd.*, 1996 U.S. Dist. LEXIS 16307, 1996 WL 626294, *2 (E.D.La. 1996)). As a matter of fact, "the Court need not, and should not, reach

the merits of the [underlying dispute] as that is properly left to the … arbitrators to decide." *Chiquita Int'l Ltd.*, 518 F. supp 2d at 599.

As the courts of this District have continuously recognized, "[a] detailed discussion of the merits, however, has little bearing on the motion to vacate, which is decided based on whether a prima facie claim is shown and technical requirements for attachment have been met." *Chiquita Int'l Ltd.*, 518 F. Supp. 2d at 599, *quoting Aqua Stoli*, 460 F.3d at 445. *See also Finecom Shipping Ltd. v. Multin Trade Enters. AG.*, No. 05 Civ 6695, 2005 U.S. Dist. Lexis 25761, at *1-2 (S.D.N.Y. Oct. 24, 2005) (GEL), wherein the court held:

> [A] court's ability to understand the merits of a dispute at an early stage is limited, and courts should be reluctant to prejudice the merits of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery. This is particularly so when the ultimate merits will be decided not by this Court, but by an arbitration panel in another country.

The Defendant has not met its burden to prove the limited bases for vacating the attachment exist in this case and its motion should be denied.[1] The Defendant contests only that maritime jurisdiction is lacking and therefore concedes that the other technical requires of Rule B have been met. This Court's potential review of the underlying claim and whether it has been waived would require it to review the merits of the dispute which is something that should be left to the forum hearing that matter. *Finecom Shipping Ltd.*, 2005 U.S. Dist. Lexis 25761, at *1-2.

Contrary to the applicable case law, the Defendant is asking the Court to review the merits of the underlying dispute in an attempt to have the attachment against it vacated. Based on the facts presented in the accompanying Declarations, credible evidence exists to support the following:

---

[1] The Defendant does not allege that it is subject to suit in an adjacent jurisdiction, the Plaintiff can obtain jurisdiction over the Defendant where the Plaintiff is located, or that security has been otherwise provided by the Plaintiff. *See Aqua Stoli*, 463 F.3d at 445.

1.    Mr. Bell was a broker acting on behalf of Plaintiff; *Bakusev Decl.* at ¶¶ 5-13; *Lyashenko Decl.* at ¶ 5;

2.    EFKO never received the alleged revocation, *Bakusev Decl.* at ¶ 15; *Bakusev Decl.* at ¶¶ 15; *Lyashenko Decl.* at ¶ 17, and, even if they had the contract was already in place and the alleged revocation was not valid; *Lyashenko Decl.* at ¶ 18-20; *Jones Decl.* at ¶¶ 16-21;

3.    the offer from Defendant was accepted by EFKO; *See Jones Decl.* at ¶¶ 10-21; *Bakusev Decl.* at ¶¶ 9-14; *Lyashenko Decl.* at ¶¶ 8-10, 12-15; and

4.    under English law, a contract existed between Plaintiff and Defendant. *See e.g. Jones Decl.* at ¶¶16-21.

The validity of the contracts is in dispute but the resolution of this dispute is a matter of English law. *See e.g. Jones Decl.* at ¶4-9.   Thus, those issues are to be resolved in the ongoing London arbitration proceedings. *See Id.* This Court is, therefore, not the proper forum to interpret the validity of the contracts between the parties and it would be inappropriate for this Court to do so now. *See e.g., Finecom Shipping Ltd., supra,* 2005 U.S. Dist. Lexis 25761, at *1 ("courts should be reluctant to prejudice the merits of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery.").

*Aqua Stoli* makes it clear that "[t]he determination of whether a plaintiff has a valid maritime claim is a prima facie standard." *Chiquita Int'l Ltd.,* 518 F. Supp. 2d at 592-93 *citing Ronda Ship Mgmt v. Doha Asian Games Organizing Comm.,* 511 F. Supp. 2d 399 (S.D.N.Y. 2007). The Second Circuit "reject[ed] the reasoning of the more recent district court decisions that have engaged in a broader Rule E(4)(f) inquiry." *See Tide Line, Inc. v. Eastrade Commodities, Inc.,* at *11 (discussing in detail the holding of Aqua Stoli). The Plaintiff has adequately alleged in good faith that it has a maritime claim against the Defendant based upon the breaches of the contracts between the parties. This is all that is required of the Plaintiff at this stage of the proceedings. In any event, the declaration submitted in support of Defendant's

motion is contradicted by the declarations submitted in support of Plaintiffs' opposition to Defendant's motion. Even if the Court were to consider all of this information, it would not be able to resolve the factual disputes between the parties at this stage.

Therefore, because the technical requirements of the Rule have been met and the Defendant has failed to satisfy its burden under the Rules as discussed herein, the Defendant's motion should be denied.

## POINT II

## ENGLISH LAW GOVERNS THIS DISPUTE

It is unequivocal that English law governs this dispute based upon the contractual agreements between EFKO and PIL as well as the nature of this motion to vacate. Despite the fact that Rule B attachments are generally procedural in nature,[2] whether there is a contract or claim at all is a substantive matter. *See T&O v. Lydia Mar,* 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006)(stating that "the law of the contract applies to the question of whether a claim has accrued"); *see also Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. CAMILLA,* 966 F.2d 613, 615 (11th Cir. 1992)(recognizing that although the Rules are procedural, the existence of the lien under Rule C is not created by the procedural rule but by substantive maritime law); *see further Garcia v. M/V KUBBAR, et al.,* 4 F. Supp. 2d 99, 103(N.D.N.Y. 1998).

---

[2] It is well-established in this district that the attachment of funds is a procedural remedy, and federal law applies to procedural issues in admiralty cases. *See Dominion Bulk Int'l, S.A. v. Naviera Panoceanica, S.A.C.,* 2006 U.S. Dist. LEXIS 85616, * 3 (06 CV 6854 (LAP))(S.D.N.Y. Nov. 21, 2006).

Further, it is well-settled that choice of law provisions in maritime contracts are valid unless a strong showing is made that they should be set aside. *Lydia Mar,* 415 F. Supp. 2d at 314; *citing Bremen v. Zapata Off-Shore Co.* 407 U.S. 1, 10-12; 92 S. Ct. 1907, 1913-1914 (1972). Choice of law provisions are considered to be the foundation of contractual agreements; thus, exceptions to enforcement are very rare because such provisions are of "far greater strategic importance" than choice of forum provisions. *Marine Oil Trading Ltd. v. M/T Paros,* 287 F. Supp. 2d 638, 645, 2003 A.M.C. 1298, 1305 (E.D.Va. 2003). The six contracts between EFKO and PIL incorporate FOSFA No 81. *Jones Decl.* at ¶ 4. "Clause 31 of FOSFA No. 81 provides that *"the construction, validity and performance"* of these contracts shall be governed by English law." *Jones Decl.* at ¶ 4. Thus, based on the choice of law provisions contractually agreed upon between the parties, English law governs this dispute irrespective of the fact that it relates to the use of Rule B procedures. Furthermore, English law governs the dispute between the parties regarding whether the contracts were entered into in the first place. "FOSFA arbitration has been commenced, and PIL have already raised the issue of jurisdiction. It is for the FOSFA Tribunal to decide the existence of the contracts in accordance with the FOSFA Arbitration Rules and with full consideration of the witness evidence and documents." *Jones Decl.* at ¶ 7. Given this, PIL's argument that this case should be dismissed because the contracts do not exist are irrelevant and a matter for the arbitrators in London to decide.

## POINT III

### PLAINTIFF HAS A MARITIME CLAIM AGAINST PIL

The first procedural requirement of Rule B is that a plaintiff must have a maritime claim. Thus, whether or not the Plaintiff herein has a maritime claim against the defendant is a procedural question to be determined by the Federal maritime law. English law on this point is

irrelevant and does not apply. Admiralty jurisdiction is afforded this Court under 28 U.S.C.

§1333(1), which provides for original jurisdiction in "any civil case of admiralty or maritime

jurisdiction." *See Sea Transport Contractors, Ltd. v. Industries Chemiqes du Senegal,* 411 F.

Supp. 2d 386, 2006 A.M.C. 1076, 1082 (S.D.N.Y. January 24, 2006); *see also Stolt-Nielsen S.A.*

*v. Celanese AG,* 430 F. 3d 567, 572 (2d Cir. 2005). To determine the boundaries of admiralty

jurisdiction, courts turn to the purpose of the grant. *See Insurance Co. v. Dunham,* 78 U.S. 1, 1 1

Wall. 1, 24, 20 L. Ed. 90 (1871). As recently confirmed by the United States Supreme Court in

*Exxon Corp. v. Central Gulf Lines, Inc.* 500 U.S. 603, 608 (1991), "the fundamental interest

giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Id.; quoting*

*Sisson v. Ruby,* 497 U.S. 358, 367 (1990); *quoting Foremost Ins. Co. v. Richardson,* 457 U.S.

668, 674 (1982). Stated another way, where "the subject matter of the contract relates to a ship

in its use as such, ***or to commerce*** or to navigation on navigable waters, or to transportation by

sea or to maritime employment it is fairly said to constitute a maritime contract." *Ingersoll*

*Milling Mach. Co. v. M/V BODENA,* 829 F.2d 293, 302 (2d Cir. 1987). Most recently, the

Supreme Court has clarified this test even further finding that the fundamental inquiry is whether

the contract has reference to maritime service or maritime transactions. *Norfolk Southern*

*Railway Co. v. Kirby,* 543 U.S. 14, 24 (2004).

    Here, the subject matter of the dispute is immersed in the business of maritime commerce

and speaks directly to maritime services and transactions. As Defendant's brief acknowledges,

these contracts are "cost and freight" contracts under which "the seller must arrange and pay for

the transport of the cargo to the delivery port, but title and risk of loss transfer to the buyer when

the cargo is delivered on board the vessel. The seller must obtain a vessel of the type normally

used to transport the goods described in the contract." *Daewoo et al. v. Daewoo et. al.,* 2001

U.S. Dist. LEXIS 19796, *3 (S.D.N.Y. Dec. 3. 2001). Similarly, "a CIF (cost, insurance, freight) contract is one where, in consideration for the purchase price, the seller "is bound to arrange for the carriage of the goods to their agreed destination, for insurance upon them for the benefit of the buyer, and either to pay the cost of the carriage and insurance of allow it on the purchase price." *Federal Ins. Co. v. Great White Fleet (US) Ltd., et al.,* 2008 U.S. Dist. LEXIS 58461, *6 n.4 (S.D.N.Y. August 1, 2008). Here, the offer was accepted and the Defendant's next obligation was to charter the vessel, load the cargo and to have the bill of lading issued. *See Verified Complaint* ¶¶ 4-6. These duties were breached by Defendant and it is the breach of these duties which gives rise to the damages alleged by Plaintiff. Thus, a claim for breach of a contract on CFR terms is an obligation enforceable in admiralty.

Even where there is a non maritime contract with severable maritime obligations, there is subject matter jurisdiction. This is the case because cost and freight contracts, like all other contracts, must pass the same test to be maritime. In contract cases, maritime jurisdiction is conferred where, as here, the contract touches "rights and duties appertaining to commerce and navigation." *S.S. Eclipse,* 135 U.S. 599, 608 (1890). For the last century, the scope of maritime jurisdiction has expanded greatly but unevenly. Thus it is oft quoted that "our cases do not draw clean lines between maritime and non-maritime contracts." *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14 (2004). Today, according the the United States Supreme Court, the standard for determining whether a particular contract is maritime is as follows:

> To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. Nor can we simply look to the place of the contract's formation or performance. Instead, the answer depends upon ... the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions.

*Kirby,* 543 U.S. at 24 (internal citations and quotations omitted).    Notably, Defendant fails to consider or even refer to *Kirby* in its memorandum of law and ignores its expansion of maritime subject matter jurisdiction. The *Kirby* Court also reiterated the Supreme Court's test in *Exxon Corp. v. Central Gulf Lines, Inc.,* which states that the "fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Exxon,* 500 U.S. 603, 608 (1991)(internal quotations omitted).

More importantly, under the Supreme Court's recent tests in *Kirby and Exxon,* as outlined above, the contract between EFKO and PIL is a maritime contract. Specifically, it is a contract that pertains specifically to ocean transportation services, the nomination of a vessel and other maritime obligations that affect maritime transactions and services. This CFR contract is a maritime contract because it meets the United States Supreme Court's test as outlined in *Kirby* and *Exxon.* Furthermore, it has been held that where, as here, the contract pertains to maritime matters, there is subject matter jurisdiction over that maritime contract. *Rex Oil, Ltd. v. M/V JACINTH, etc., et. al.,* 873 F.2d 82 (5th Cir. 1989)(finding that where a settlement agreement contains maritime terms and, as such, pertains to maritime matters, it is maritime).

As outlined by the Second Circuit in *Folksamerica, supra,* courts are required to "make a 'threshold inquiry' into the subject matter of the *dispute* [and] '[b]efore attempting to categorize contractual rights as maritime or non-maritime, a federal court must first consider whether an issue related to maritime interests has been raised.'" *Folksamerica,* 413 F.3d at 312, (*quoting Atlantic Mutual,* 968 F.2d at 199) (internal citations omitted). In this case, it is clear that the subject matter of the *dispute* directly relates to maritime interests. The Rule B application was filed for EFKO to obtain security in aid of its then-pending arbitration in London. The

arbitration submission by EFKO seeks damages for Defendant's failure to charter the ship and load the cargo.

The relevant portions of the contract which are the focus of the arbitration and for which the Plaintiff is seeking security, give rise to admiralty jurisdiction. In *Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927), Judge Hand held that where the maritime obligations of a contract can be "separately adjudicated, there is no objection to the jurisdiction of the admiralty pro tanto. . . . The substantial question is whether the maritime obligations can be separately enforced without prejudice to the rest." *See also Hartford Fire Ins. Co. v. Orient Overseas Container Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000) ("a federal court can exercise admiralty jurisdiction over a 'mixed' contract if: (1) the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract. . . .").

*Shanghai Sinom v. Exfin*, a case heavily relied upon by the Defendant, is easily distinguishable from the instant case. *Shanghai Sinom v. Exfin*, 06 Civ. 4711 (GEL)(Oct. 5, 2006), annexed to the Declaration of Lawrence J. Kahn ("Kahn Decl.") as Exhibit 5. In *Exfin*, Judge Lynch found that the plaintiff had no maritime claim because none of the maritime portions of the sales contract were breached. In *Exfin*, the contract between the parties was, as here, a sales contract which also called for the shipment of the goods by sea. Unfortunately for the plaintiff therein, the goods were successfully transported by sea and, only afterwards was the contract breached. *See Id.* Thus, Judge Lynch found that Plaintiff's had no maritime claim only because there was no allegation that the defendant therein breached any of the maritime aspects of that contract. *See Id.* at p. 5. This is not the case here. Plaintiff has made several allegations

that the maritime portions of this contract were breached by the Defendant PIL. Thus, a different outcome is warranted here.

Recently, in *Noble Resources S.A. v. Yugtranzitservis and Silverstone,* 08 CV 3876 (LAP), Judge Preska found that "maritime transportation was integral to the [commodity purchase and sale] agreement" and found that the contract and dispute at issue fell within the Court's maritime jurisdiction. *See Judge Preska's July 23, 2008 decision attached hereto as Exhibit "A," at 2.* In addition, Judge Lynch recently wrestled with a similar contract dispute in *Noble Resources S.A. v. SARL,* 08 CV 3587 (GEL), *transcript of decision attached hereto as Exhibit "B."* Relying on *Folksamerica, supra,* Judge Lynch noted that maritime jurisdiction can exist where the claim at issue in the dispute arises from a breach of maritime obligations that are severable from the non maritime obligations; *citing Folksamerica at p. 315.* Although noting that the contracts at issue involved the sale of goods, Judge Lynch found that the failure to pay vessel demurrage fell squarely within the Court's admiralty jurisdiction. *See Lynch's August 12 Decision annexed hereto as Exhibit "B."* There, as here, the maritime portions of this commodity sales agreement were breached and maritime jurisdiction exists.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court

deny Defendants' Motion to Vacate in all respects and grant such other and further relief as the

Court deems necessary and appropriate.

Dated: August 20, 2008
      New York, NY

The Plaintiff,
EFKO FOOD INGREDIENTS LTD.,

By:_____
    Lauren C. Davies (LD 1980)
    Thomas L. Tisdale (TT 5263)
    TISDALE LAW OFFICES, LLC
    11 West 42nd Street, Suite 900
    New York, NY 10036
    (212) 354-0025 – phone
    (212) 869-0067 – fax
    ldavies@tisdale-law.com
    ttisdale@tisdale-law.com

## AFFIRMATION OF SERVICE

I hereby certify that on August 20, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____

Lauren C. Davies (LD 1980)

EXHIBIT "A"

87N6NOBC

1

87N6NOBL
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3
3    NOBLE RESOURCES,
4
4                    Plaintiff,
5
5                    v.                      08 CV 3876(LAP)
6
6    YUGTRANZITSERVIS and
6    SILVERSTONE,
7
7                    Defendants.
8
8    ------------------------------x
9                                            New York, N.Y.
9                                            July 23, 2008
10                                           9:45 a.m.
10
11   Before:
11
12                   HON. LORETTA A. PRESKA,
12
13                                           District Judge
13
14                         APPEARANCES
14
15   TISDALE LAW OFFICES, LLC
15        Attorneys for Plaintiff
16   BY:  CLAURISSE OROZCO
16
17   CHALOS & CO.
17        Attorneys for Defendants
18   BY:  GEORGE M. CHALOS
18
19
20
21
22
23
24
25

2

87N6NOBL
1               (Case called; in open court)
2
3               THE COURT:  Counsel have very graciously agreed to
4    prepare their papers quickly so that the hearing required to be
5    conducted quickly on a motion to vacate a maritime attachment
6    could take place promptly.  I am grateful to counsel for doing
7    that.
8               Defendant argues first that the contract at issue is
9    not subject to maritime jurisdiction.  We all agree to the law
10   which is that the threshold inquiry examines the subject matter
11   of dispute as opposed to the underlying contract.  To determine
12   if an issue related to maritime interests has been raised, an
13   issue will not give rise to maritime jurisdiction if the
14   subject matter of the dispute is so attenuated from the

87N6NOBC
15  business of maritime commerce that it does not implicate the
16  concerns underlying admiralty and maritime jurisdiction.
17          As the Court of Appeals acknowledged in FolksAmerica,
18  Reinsurance Co. v. Cleanwater New York, Inc., 413 F.3d 307 (2d
19  Cir. 2005) the court directed that the jurisdictional inquiry
20  be focused upon whether the nature of the transaction was
21  maritime and observed that the fundamental interest giving rise
22  to maritime jurisdiction is the protection of maritime
23  commerce.
24          Here, the contract itself makes clear that maritime
25  transportation was integral to the agreement.  For example, the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                3

87N6NOBL
1   contract provided that Plaintiff Noble would purchase a cargo
2   from YTS and the contract set out in great detail the
3   conditions for transportation and delivery.
4           The contract set out in the portion under delivery the
5   window of dates open for loading in the specified port, that
6   portion of the contract also required that the vessel nominated
7   by buyers was required to tender her notice of readiness at the
8   designated port.  It set out how the loading of the vessel was
9   to be effected.  It set out in great detail the type of vessel
10  that would be acceptable, that is, "A self-trimming bulk
11  carrier, single-decker vessel suitable for direct loading
12  (wagon-board of the vessel)."
13          The Contract also provided that the vessel could be --
14  should be confirmed or rejected by sellers in writing and, in
15  fact, here the sellers rejected the first three vessels that
16  were nominated eventually accepting the Southgate.
17          The contract further set out the preadvise that buyers
18  were to give the sellers of the vessel's ETA, name, flag,
19  dimensions, hatches and hold dimensions and alike.  It set out
20  in detail the loading instructions, the loading rate, detailed
21  the notice of readiness and the laytime and the demurrage,
22  among other provisions.  So the underlying contract certainly
23  touched upon the business of maritime commerce.
24          In addition, the dispute between the parties also
25  touches upon the maritime commerce.  As set out in plaintiff's
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                4

87N6NOBL
1   claim submissions in the arbitration, and perhaps more
2   importantly as reflected in the award, the dispute centered on
3   two issues.  First, the default by YTS in failing to provide a
4   berth for the vessel after she had tendered her notice of
5   readiness and refusal to load the vessel constituting a default
6   under the contract.  And, secondly, a request for wasted vessel
7   costs, that is, the costs incurred by the vessel following
8   tendering of her notice of readiness.
9           As set out in the award damages were awarded for both
10  these items and indeed there was a lengthy discussion in
11  Section 6 of the award about the wasted costs incurred on
12  account of the vessel's lack of use because of defendant YTS's
13  default.  The wasted vessel expenses included bunkering costs,
14  port and survey costs, and hire payments, all clearly within
15  the maritime jurisdiction.
16          For all those reasons, I find that the contract and
17  dispute at issue fall within the Court's maritime jurisdiction.
18          The question has also been presented as to whether or
19  not the guarantee by Silverstone falls within the Court's
                           Page 2

87N6NOBC
20    maritime jurisdiction.  As the Court has set out recently in C
21    Transport Panamax, Ltd. v. Kremikovtzi Trade, et al., 07 CR 893
22    (June 19, 2008 S.D.N.Y.) courts in this circuit and elsewhere
23    have long held that an agreement to act as a surety on a
24    maritime contract is not maritime in nature.  They have
25    recognized that the same is not true of an agreement to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    5

87N6NOBL
1     guarantee the performance of a maritime contract.
2              See e.g. Compagnie Francaise, DE Navigational Avapeur
3     v. Bonnase, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J).
4              Here the guarantee by Silverstone specifically states
5     "The guarantor (Silverstone) irrevocably and unconditionally,
6     A, as principal obligor guarantees to the Buyers the prompt
7     performance by (YTS) of all its obligations under the
8     Contract...."  Accordingly, the guarantee at issue here based
9     on longstanding Second Circuit law falls within the meaning of
10    maritime contracts.
11             Finally, with respect to defendant's argument that the
12    matter is not ripe, the arbitral award has ordered that the
13    payment be made and it has not yet been paid.  Accordingly, the
14    matter is ripe with respect to the guarantor.  In addition, it
15    is most frequently the case that Rule B attachments are used to
16    provide security for arbitral awards and that has been the use
17    here.  Accordingly, defendants' motion to vacate the attachment
18    is denied.
19             THE COURT:  Is there anything else today?
20             MR. CHALOS:  Yes, your Honor, two points if I may.
21             THE COURT:  Sir.
22             MR. CHALOS:  We thank the Court for hearing us on an
23    expedited basis.  We would first off like to make an
24    application to the Court to reduce the amount of security.  On
25    page 14 of the award, the panel clearly sets forth that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    6

87N6NOBL
1     plaintiff was awarded $3,362,400 and no more as the words of
2     the panel.  Here the amount of the order attachment is almost
3     double that.  It is significantly more.
4              THE COURT:  What is the story with the interest,
5     Mr. Chalos?
6              MR. CHALOS:  According to the panel, it is 7.5 percent
7     beginning August 16, 2007.  That is only one year's worth of
8     interest.  Surely this can be resolved in the next, I would
9     assume, six months or so with the upcoming appellate deadlines.
10             THE COURT:  Has anyone done the calculation of the
11    interest?
12             MS. OROZCO:  I have, your Honor.  But I would just
13    like to speak on that point.  The panel awards the amount less
14    than we had sought in our application, but it also awards
15    interest 7.5 percent from the date of the default until it is
16    paid and it also awards costs of arbitrator, not legal costs.
17             We have attached to date as outlined in my declaration
18    $4 million.  It is paragraph 34 of my declaration at page 6.
19    We have not calculated the interest out for a year.  What we
20    have done is calculated it out for three years, which is
21    normally what we undertake in anticipating appeals and that
22    sort of thing.  If we allow for three years of interest,
23    security for three years of interest, plus the costs of the
24    Gafta arbitration, the security that we would be entitled to
                                Page 3

87N6NOBC
25  would be $4,225,000.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

87N6NOBL
1   So we are at this time undersecured by 200,000.
2   However, if the Court wants us to reevaluate the interest, we
3   would be willing to do so and then release the funds
4   accordingly if that was a proper analysis.
5   THE COURT:  Counsel.
6   MR. CHALOS:  Those calculations are flawed.  Those
7   calculations are based on the principal claim of 3.9 million.
8   That is not what the panel awarded.  7.5 percent on the $3.3
9   million award is about, 21 to $210,000.
10  MS. OROZCO:  I actually calculated the three-year
11  interest on the amount awarded by the arbitrators, which was
12  $3,362,400.  And the interest from August 15th, 2007 through
13  August 15th, 2010 is $840,000.
14  MR. CHALOS:  I submit through 2010 is a bit long.  I
15  can certainly understand maybe two years, but not three.
16  Also, seeing as they are already secured from the
17  guarantor's EFTs, I renew my application and dismiss the matter
18  against YTS.  They are secured or they are not secured.  They
19  have it already attached.  There is no in rem quasi
20  jurisdiction over the party whose funds who haven't been
21  attached.
22  THE COURT:  I don't hear counsel going out and seeking
23  further attachments here.
24  MR. CHALOS:  But they would, though.  That is the
25  point if they sought to move money.  In fact, in the papers
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

87N6NOBL
1   that counsel submitted last night, they said exactly that they
2   would do that.  If they wound up -- U.S. dollar transfers on
3   behalf of Yugtranszitservis came through New York, they would
4   catch that and release monies belonging to the guarantor.
5   THE COURT:  What do you say to that, counsel?
6   MS. OROZCO:  Was that was a statement that we made.
7   That statement as made with respect to the application of the
8   New York CPLR in that case, which we didn't address and we say
9   we are not applied.  We actually have stopped serving the writ
10  of attachment in this case and we are no longing serving on any
11  of the defendants.
12  THE COURT:  First, I decline to reduce the amount.
13  Second, obviously counsel knows that plaintiff may not
14  be oversecured.  If, Mr. Chalos, you find that plaintiff is
15  attaching more than the four million two number -- is that the
16  total number?  Please remind me.
17  MS. OROZCO:  Yes.  The total number is comprised of
18  $3,362,400 of principal pursuant to the arbitration award
19  issued on July 4th, 2008, with the rate of interest calculated
20  at 7.5 percent which is also the rate awarded for three years
21  from August 15th, 2007 through August 15th, 2010.  The interest
22  on that amount is $840,501.
23  In addition, the arbitration award also allowed costs,
24  Gafta costs, to the plaintiff and the Gafta costs incurred were
25  23,000 U.S. dollars.  So the total security we would be
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

87N6NOBL

Page 4

87N6NOBC
```
 1   entitled to or we would be seeking is $4,225,901.
 2            THE COURT:  To the extent, Mr. Chalos, counsel
 3   attaches more than that, you let me know.
 4            MR. CHALOS:  Thank you, your Honor.
 5            Finally, your Honor, we would like to ask the Court to
 6   certify this for immediate appeal to the Second Circuit.
 7            THE COURT:  I will take a letter on that.
 8            How is this a complex or novel issue?
 9            MR. CHALOS:  Well, it is a novel issue in the sense
10   that the Court has for the first time found a Gafta contract to
11   be within the meaning of a maritime contract and a maritime
12   claim under Rule B.  It stands starkly in contrast to Judge
13   Daniels' decision as to Aston Agro as well as Judge Sullivan, I
14   am not sure about that, in the Tan Shan case.  These exact
15   arguments were presented there with a 180-degree different
16   result and I do believe that if we can bring this to a head
17   Second Circuit level promptly that would help provide some
18   clarity on these types of issues.
19            THE COURT:  The law is not in doubt.  It is the
20   application, right?
21            MR. CHALOS:  Well, I think the law is in doubt in a
22   sense that our position is that the Court needs to look to the
23   primarily objective of the contract.  Our argument has been
24   that the primary objective of the contract is one of sale and
25   purchase.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

87N6NOBL
```
 1            THE COURT:  I didn't see any of the Second Circuit
 2   cases talking about the primary objective of the contract.
 3            MR. CHALOS:  Well, I think we set out the argument
 4   based on the precedent of Judge Daniels' decision, which can be
 5   found for the Court's reference on page 3 of the Aston Agro
 6   decision where he writes, In this case the contracts are not
 7   maritime contracts because they are primary objective was not
 8   the transportation of goods by sea.  Instead, their primary
 9   objective was undoubtedly the sale of wheat.  That the wheat
10   was transported on a ship does not make the contracts maritime
11   contracts anymore than it would make them aviation contracts
12   had the wheat been shipped via airplane.  Nor would the
13   contracts between a seller and shipper -- that is true here.
14   the judge in that matter goes on to write, Nor can maritime
15   jurisdiction be exercised under an exception to the general
16   rule that maritime jurisdiction "Arises only when the subject
17   matter of the contract is purely or wholly maritime in nature.
18   Under the first exception, federal court can exercise --
19            THE COURT:  Counsel, do you want this taken down?  If
20   you do, you better read so the court reporter can take it down.
21            MR. CHALOS:  The Court has it before it.
22            THE COURT:  So you don't need to read it.
23            MS. OROZCO:  May I respond?
24            THE COURT:  Yes, ma'am.
25            MS. OROZCO:  The key to the quotes by defendant from
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

87N6NOBL
```
 1   the Ashon Agro case is the first line where it says, "In this
 2   case." and further or in the quote Judge Daniels says that
 3   based on the facts of that particular case they are not within
 4   the maritime jurisdiction.
 5            I would just like to point out that the Exxon case,
```
Page 5

87N6NOBC
6  500 U.S. 603, 612 reminds us -- this is the U.S. Supreme
7  Court -- reminds us that courts are required to look to the
8  subject matter of the relevant contract. And in this case the
9  relevant contract, the Noble YTS contract, provides maritime
10 jurisdiction.
11        MR. CHALOS:  Your Honor, this is the shifting sands
12 that I have been arguing again. The Court is required to look
13 to the nature of the contract, not the dispute. Twenty minutes
14 ago counsel was arguing the Court needs to look to the dispute
15 and I rejected that. The contract is a sale and purchase
16 contract, not a maritime contract. It is not maritime contract
17 with third parties. We had nothing do with it. My clients had
18 nothing to do with it. That is the dispute here. If you look
19 to the nature and substance of the contract, we are selling and
20 they are buying. Full stop. It is the sale and purchase
21 contract.
22        In fact, your Honor, that was precisely what was
23 addressed by Judge Daniels. He writes here invoking the first
24 exception, Aston contends that maritime jurisdiction exists
25 because the particular claims at issue involve only the
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                        12

87N6NOBL
1  maritime portions of the contracts, and it was rejected, which
2  is precisely the argument presented by plaintiff. Our
3  opposition is precisely the argument adopted by Judge Daniels.
4        THE COURT:  The Court denies the request for
5  certification under 28, U.S.C., Section 1292(b).  The
6  controlling law is not at all at issue in this case. Everyone
7  agrees on the cases that should be looked to for guidance. The
8  only dispute is the application of those cases to the facts of
9  this case as opposed to the facts of other cases. Accordingly
10 certification for immediate appeal is denied.
11        Anything else, counsel?
12        MR. CHALOS:  Nothing further, your Honor.
13        THE COURT:  Thank you, ladies and gentlemen.  Thank
14 you for your excellent arguments.
15                        oOo

            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

# EXHIBIT "B"

# EXHIBIT "B"

88C9NOBA

1

88C9NOBA
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  NOBLE RESOURCES SA,
3
4                 Plaintiff,
4
5         v.                          08 CV 3587 (GEL)
5
6  SARL OUEST IMPORT,
6
7                 Defendant.
7
8  ------------------------------x
8                                    New York, N.Y.
9                                    August 12, 2008
9                                    10:15 a.m.
10
10 Before:
11
11              HON. GERARD E. LYNCH,
12
12                                    District Judge
13
13              APPEARANCES
14
14 TISDALE LAW OFFICES, LLC
15      Attorney for Plaintiff
15 BY: CLAURISSE OROZCO
16
16 CICHANOWICZ, CALLAN, KEANE, VENGROW & TEXTOR, LLP
17      Attorney for Defendant
17 BY: JOSEPH F. DeMAY, JR.
18
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

88C9NOBA
1              (Case called)
2              MS. OROZCO:  Good morning, your Honor.  Claurisse
3  Orozco from Tisdale Law Offices for the plaintiff, Noble
4  Resources.
5              THE COURT:  Good morning.
6              MR. DeMAY:  Good morning.  Joseph DeMay, Jr. from
7  Cichanowicz, Callan, Keane, Vengrow & Textor for the defendant.
8              THE COURT:  Mr. DeMay, good morning.
9              Well, I think that what is technically before me is a
10 request for a hearing on a potential motion to vacate an order
11 for marine attachment.  The parties have written a number of
12 letters to the court regarding that.  It's my impression -- and
13 I think it's been confirmed by my law clerk -- that the parties
14 have fully briefed the merits of the issue and that what we're
Page 1

88C9NOBA

15    really here to do today is to have oral argument towards
16    deciding the motion to vacate the attachment.
17             Is that everybody's understanding, or does anybody
18    think we need more of anything?
19             MS. OROZCO:  No.  That's my understanding, your Honor.
20             MR. DeMAY:  Oral argument, your Honor.
21             THE COURT:  Very good.
22             So, I think what I'd really like to hear -- I suppose
23    starting with the defendant as the movant -- is an account from
24    each side of what they think is at issue in the arbitration in
25    this case; that is, what are the factual issues and legal
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

3

88C9NOBA
 1    issues that the arbitrators had to decide.
 2             Mr. DeMay.
 3             MR. DeMAY:  Your Honor, I'll confess that I was not
 4    fully briefed on the arbitral aspect of it.  Our application
 5    and our retention as attorneys was directed solely toward the
 6    propriety of the maritime attachment.  For that purpose, we
 7    have assumed, for argument's sake only, the validity of the
 8    arbitration award, and the accurate and true condition of the
 9    contracts of sale that the plaintiff has already provided.
10             THE COURT:  Yes.  I'm not so much concerned with the
11    merits of the arbitration.  But, as I understood it, your
12    argument is that this is really not a maritime case.
13             MR. DeMAY:  Yes, your Honor.
14             THE COURT:  And on reading the arbitration award, it
15    seemed to me that what the arbitrators were concerned with was
16    what, as a nonadmiralty lawyer you'll forgive me for calling,
17    boaty things; assumed to be about what happened to the ship and
18    why it was late and things of that sort.
19             And I wanted to give everyone a chance to address that
20    in case I misperceived what was the -- what is the real dispute
21    between the parties because it sounded to me, in my landlubber
22    way, to be a maritime kind of dispute.
23             MR. DeMAY:  Your Honor, my understanding is that what
24    we're talking about here are essentially pricing terms.  The
25    sales contract were just that.  They were contracts for the
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

4

88C9NOBA
 1    sale of sugar.
 2             Under like the contracts in Judge Preska's case, which
 3    has already been provided to you, these particular contracts
 4    made reference to the ship.
 5             They made reference to the fact that the buyer, our
 6    client, would be responsible for certain discharging costs, and
 7    they provided references to the charter party by which those
 8    costs would be calculated.
 9             My understanding, however, is that unlike the typical
10    maritime case, our client did not assume any direct obligation
11    toward the operation or navigation of the ship.  In other
12    words, the contract for the sale of the sugar made reference to
13    the operation of the ship, made reference to things like
14    demurrage.  But I think the case law is fairly clear that
15    simply making reference to those things do not give rise to a
16    maritime obligation.  The maritime obligation arises when you
17    assume an obligation that directly relates to the operation and
18    navigation of a ship in commerce on the high seas.
19             THE COURT:  Well, I mean it seems to me that there
                              Page 2

20  are, as I've understood the case law, two different kinds of
21  ways in which a contract can give rise to admiralty
22  jurisdiction.  The one is, as you say, where the contract
23  itself is predominantly about maritime issues.  And I'd have to
24  agree with you, this looks more like, for example, the case
25  that I have that the parties cited in that it's really a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                      5

1   contract for the sale of goods that says:  Well, but by the
2   way, it's going to be going by ship.
3            But then there is a separate issue where the claim at
4   issue arises from a breach of the maritime obligations that are
5   part of the contract.  And it seemed to me that what the
6   parties were actually fighting about here was the maritime part
7   of the contract.  In other words, they were concerned about
8   what the demurrage costs were going to be based on what
9   happened at sea.
10           Am I wrong about that?
11           MR. DeMAY:  No, your Honor.  To the extent that this
12  is a demurrage claim, that's absolutely correct.  And the
13  contract does make provision for our client to reimburse the
14  seller for all demurrage costs that they incur.
15           But demurrage is primarily an obligation that's
16  incurred by the charterer, in this case the seller, to the
17  vessel owner.  Our client, the buyer, is neither the charterer
18  nor the vessel owner.
19           What they did, in effect, was to say that:  We, the
20  buyer, will indemnify or compensate you, the seller, for
21  whatever demurrage costs that you incur during the performance
22  of the charter party.
23           And think the case law is clear that unlike a
24  situation where somebody, say a guarantor, assumes the direct
25  performance and obligation to the vessel owner, where you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                      6

1   merely take or undertake to indemnify or compensate somebody
2   for a maritime obligation that they have incurred, that
3   obligation to pay, to indemnify, is not itself a maritime
4   obligation.
5            It is inevitable if you've undertaken to compensate or
6   indemnify somebody for a maritime obligation that the dispute
7   will necessarily center on the details of that maritime
8   obligation.  But, here the maritime obligation was not our
9   client's maritime obligation.  It was first and foremost the
10  seller/charterer's obligation, and our client was merely called
11  upon to indemnify, which meant that inevitably that the details
12  of the charter party of the performance would have to be
13  raised.  But that's not the same thing as saying that our
14  client undertook a maritime obligation, undertook to compensate
15  the charterer for its maritime obligations.
16           THE COURT:  I see.  So you're saying even if the
17  dispute was in substance about the facts of what occurred at
18  sea, that your obligation here was purely to pay whatever the
19  chartering party had to pay in demurrage costs?
20           MR. DeMAY:  Exactly.  The contract for sale set out
21  the way in which that compensation would be calculated.  But
22  that is essentially the case.
23           THE COURT:  Again, when you say the contract for sale
24  set out the way in which it would be calculated, what did the
                              Page 3

88C9NOBA
25    contract of sale say?

7

88C9NOBA
1         Again, it seems to me that your argument works best if
2    the contract simply says whatever the -- am I using the right
3    terminology -- the chartering party has to pay in demurrage
4    costs, you will reimburse, not us.  And we don't care
5    whether -- what the rights and wrongs are of that charge.
6    Whatever he gets charged, you will pay.
7         And in that event, you would not have a dispute about
8    whether the charges were correct or about anything maritime at
9    all.  It would simply be:  Here's the bill that we were
10   presented and you better pay it.
11        MR. DeMAY:  That would be the cleanest way of doing
12   it.  But in commerce, it is not unusual that the parties
13   bargained for whatever advantage they can get.  And it was
14   certainly open to the parties in this case, in our case the
15   buyer, to negotiate with the seller that, yes, it would be
16   responsible for demurrage but only within certain parameters
17   and on certain conditions.
18        So that the mere fact that they tried to cut
19   themselves a better deal than the seller/charterer might have
20   had with the vessel owner, I don't think changes the essential
21   fact that they're not assuming a maritime obligation.  They are
22   assuming a payment obligation.
23        THE COURT:  But the obligation then is very similar to
24   the payment obligation that would occur if the contract simply
25   said we're responsible for getting the ship to port and if you

8

88C9NOBA
1    don't get there you pay demurrage, right?
2         I mean it winds up being the same thing.  Once you
3    incorporate the maritime issues into what has to be paid,
4    you're essentially talking about a very maritime kind of set of
5    issues, aren't you?
6         MR. DeMAY:  Yes.  The issues can be maritime.  I don't
7    think that's determinative.
8         THE COURT:  I see.
9         MR. DeMAY:  The question is:  Are the obligations
10   maritime?  And, of course, if, as I said before, you're talking
11   about having the buyer, having to compensate the seller, for
12   money incurred in the performance of maritime obligations,
13   unless the seller has somehow undertaken to directly assume an
14   obligation to the shipowner, I don't see that it's a maritime
15   obligation; it's simply a payment obligation that has reference
16   to maritime issues.
17        THE COURT:  I see.  And that further explains why you
18   would take the position that I really shouldn't worry very much
19   about what the arbitrators had to do?  I should just look at
20   the contract itself to decide what the nature of the obligation
21   is that the parties are disputing?
22        MR. DeMAY:  Yes, your Honor.
23        THE COURT:  Okay.  That's very helpful.  Thank you.
24        Ms. Orozco, what's your view?
25        MS. OROZCO:  Well, clearly, I disagree with Mr. DeMay.

9

88C9NOBA

Page 4

88C9NOBA

```
 1  I think that the dispute here is clearly a maritime dispute.
 2  And I think that the case law requires us and directs us to
 3  look at the nature of the dispute of this particular contract.
 4  That's what the Second Circuit has directed in Folksamerica.
 5          And I believe that the very dispute in this case,
 6  which is admitted by both parties, is identified in the
 7  arbitration award.  And I think that the arbitration award is
 8  important because it outlines and indicates what the parties'
 9  understandings were and what their rights and obligations were
10  under the contract.  So, I think that the arbitration is
11  important.
12          But before getting to the arbitration award, the
13  contract itself has very specific maritime provisions.  Each of
14  the six contracts are generally the same.  The only differences
15  being the date, the quantity of goods to be shipped, and the
16  vessels.
17          THE COURT:  Can you point me to where in the
18  voluminous materials I will most easily find the contracts so I
19  can follow?
20          MS. OROZCO:  They are -- to my letter dated July 8,
21  they are Exhibits 1 through 6.  They are all generally the
22  same.
23          THE COURT:  Okay.  Got it.
24          MS. OROZCO:  If you go to the fourth page of the
25  contract under discharging conditions --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

88C9NOBA

```
 1          THE COURT:  Okay.
 2          MS. OROZCO:  -- it specifically identifies and
 3  specifically states that all of the discharging costs are for
 4  the buyer's account, in this case the defendant.
 5          So, there is no secret or no hidden agenda.  It's
 6  basically any discharging costs, discharging, port expenses,
 7  demurrage incurred, any other vessel-related costs that would
 8  be incurred are for the buyer's account.
 9          More importantly, in this particular contract -- each
10  contract identifies the vessel, as well.  So, the buyer's
11  already aware of the discharging terms, the conditions, the
12  payments they are going to incur, the vessel that is going to
13  be nominated, And I think what's very important is the very
14  last sentence says, "All of the other conditions to be in
15  accordance with the amended version of the Sugar Charter Party
16  Form 1999."
17          The arbitrators, when they were reviewing their award,
18  made a note at page 4 of the arbitration award, which is your
19  Exhibit 7, in paragraph 6.  They stated and they recognized
20  that at the oral argument hearing during the arbitration both
21  parties agreed in accordance with clause 22 of the standard
22  sugar charter party 1999, which was incorporated into each of
23  the six contracts, gross weight, rather than net weight, was
24  relevant.
25          This statement was made for the purposes of
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

88C9NOBA

```
 1  calculating the demurrage rate.  But what's, I find -- I think
 2  is very important in this particular case is that the charter
 3  parties were incorporated.  And to the extent that the
 4  discharging conditions in the standard form were different than
 5  this particular contract, this particular contract would
```

Page 5

88C9NOBA

```
 6    govern.  But otherwise, all of the standard terms of the sugar
 7    charter party were incorporated.
 8         In addition --
 9         THE COURT:  So, looking back at the contract for a
10    moment, the contract doesn't, in your view, simply say that
11    there's going to be reimbursement of costs; instead, you're
12    saying that the contract provides specifically for terms about,
13    for example, how the vessel is going to be discharged?
14         MS. OROZCO:  Yes.
15         THE COURT:  And those are provisions between these
16    parties, not involving the shipowner.  They are between these
17    parties.  And they are agreeing as to how the vessel is going
18    to be discharged and what -- when lay time is going to count
19    and when it's not going to count; and how the demurrage is
20    going to be settled; and what the water draft is at the port of
21    discharge.  These are all obligations that the buyer is
22    guaranteeing, not something that the buyer is just going to pay
23    costs that somebody else incurs?
24         MS. OROZCO:  Yes.  I believe -- my position would be,
25    your Honor, that this is not at all an indemnity provision.  If
```

12

88C9NOBA

```
 1    it was an indemnity provision, I think it would say it was an
 2    indemnity provision.
 3         In the case of Aston Agro v. Star Grain, which the
 4    defendant had cited in one of their letters, which is a case of
 5    Judge Daniels, it was a sales contract, and I believe it was
 6    for the sale of wheat, I don't recall off the top of my head.
 7         But, in that particular case, the issue before the
 8    court and what the court stated was with respect to the
 9    demurrage obligations in that case, it was not clear under the
10    contract which party would pay for or incur demurrage.
11         In that case, Judge Daniels found that it may very
12    well just have been an indemnity provision.  But the demurrage
13    clause in that contract just said demurrage to be calculated in
14    accordance with the charter party.  So at the time of entering
15    into the contracts in this case, the defendant was very much
16    aware that it was obligating itself to pay demurrage.
17         In addition, the arbitration decision --
18         THE COURT:  Now, again, just to go back to this.
19         MS. OROZCO:  Yes.
20         THE COURT:  I cited a moment ago various provisions in
21    the contract that seemed to be of a maritime nature, but it's
22    not clear to me -- I suspect it's the other way -- it's not
23    clear to me that those were -- the ones I cited are the -- what
24    the dispute was about.  No one was fighting about whether there
25    was lay time on a Thursday afternoon, I take it.
```

13

88C9NOBA

```
 1         So, what exactly -- well maybe they were.  There's a
 2    lay time allowance being calculated.  There is an effective
 3    demurrage -- on demurrage of rain periods during the discharge.
 4         What contract provisions do those disputes fall under?
 5         MS. OROZCO:  Those disputes fall under the discharge
 6    conditions.  And to the extent that they are not outlined
 7    within the discharging conditions of the particular contracts,
 8    then the sugar charter party form would come into play.
 9         And at page 2 of the arbitration award in the overview
10    paragraph, it's clearly stated that Noble, the plaintiff in
```

Page 6

88C9NOBA
11    this case, their claims are for demurrage which were incurred.
12    And Ouest Import, the defendant, admitted that the demurrage
13    costs were incurred.  But, the dispute was the defendant had
14    counterclaims for dead freight and for dispatch -- I'm sorry,
15    not dead freight -- dispatch and discharge port fines.
16          So, it wasn't a question of:  Do we owe demurrage or
17    not?  It was a question of how demurrage is calculated, and how
18    do we treat lay time periods, how do we treat rain delays, how
19    do we treat lack of bills of lading at the discharge port.
20    Those were the disputes.
21          Just two more important points.  If it was an
22    indemnity contract, perhaps the issue would be:  You paid the
23    charterer -- Noble, you paid the owner too much money and we
24    don't think we should indemnify you.  But, it's not.  It's a
25    dispute of how to calculate, when does lay time run.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  14

88C9NOBA
1           More importantly, on page 9 at paragraph 25 and page
2     10 at paragraph 27 in the arbitration award, the defendant in
3     this case relied on charter party case law in London to support
4     its positions.  So I don't think that it's -- I think that the
5     parties were very much aware of the maritime nature of the
6     obligations with this particular dispute.
7           And I think that this case is very similar to the
8     Noble v. YTS case that I submitted to your Honor, recently
9     decided by Judge Preska.  I think that these are clearly
10    maritime obligations.
11          THE COURT:  Okay.
12          Mr. DeMay, any last words?
13          MR. DeMAY:  Yes, your Honor.
14          Number one, I disagree that this case is on all fours
15    with Judge Preska's decision.  If you look at Judge Preska's
16    decision, I think on the second page she outlines a number of
17    details that were present in those contracts that are not
18    present in these contracts.
19          Number two, I believe only four of the six contracts
20    actually named the vessel.  Two of them do not.
21          Number three, I take issue with the notion that the
22    charter party was incorporated.  What it says is that, "All of
23    the other conditions to be in accordance with the amended
24    version of the sugar charter party."  And "conditions" in that
25    sense has to refer to the caption, which is discharge
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  15

88C9NOBA
1     conditions.
2           So, once again, all the parties have done is to refer
3     to another document as a standard by which they determine their
4     own obligations.
5           The notion that the buyer guarantees the minimum water
6     draft, again, that's fine if the guarantee is being made
7     directly to the vessel owner, where it certainly then would be
8     a maritime obligation.  But as between two businessmen, a buyer
9     and seller of sugar, that means something else.  It simply
10    means that the buyer says:  If the water draft is not 99 feet,
11    we'll compensate you for damages suffered as a result of that.
12    And the notion that if this were intended to be an indemnity
13    provision, they would have said so.
14          This is a businessman's contract.  And I think it's
15    unreasonable to assume that businessmen would necessarily
                            Page 7

88C9NOBA
```
16  phrase their obligations as would an attorney.
17          THE COURT:  I understand.  I think I'm prepared to
18  rule.
19          As I said, what's before the court is effectively a
20  motion by the defendant to vacate an order for the process of
21  maritime attachment.  The underlying dispute concerns a series
22  of agreements between the plaintiff and defendant for the sale
23  of sugar.  A dispute arose between the parties regarding the
24  performance of those contracts, and following arbitration a
25  panel awarded the plaintiff $674,558 in outstanding demurrage
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

88C9NOBA
```
 1  charges owed by the defendant.
 2          The plaintiff then sought this order of maritime
 3  attachment in an attempt to satisfy that judgment which remains
 4  unsatisfied.
 5          The defendant contests the existence of federal
 6  admiralty jurisdiction, which is of course a prerequisite to
 7  the applicability of the rules governing maritime attachments.
 8          After hearing argument and reviewing the papers
 9  submitted by the parties, for the following reasons the court
10  denies the defendant's motion to vacate the order for maritime
11  attachment.
12          Traditionally, the rule was that a federal court could
13  exercise admiralty jurisdiction only over "contracts, claims,
14  and services, purely maritime," in nature.  That's Rea v. The
15  Eclipse, 135 U.S. 599, 608 (1890).  However, that rule has
16  loosened considerably and today mixed contracts, those
17  containing both maritime and nonmaritime provisions, can be
18  subject to admiralty jurisdiction in two situations.  As set
19  forth by the Second Circuit in Folksamerica Reinsurance Company
20  v. Clean Water of New York, Incorporated, 413 F.3d 307, (Second
21  Circuit 2005), those situations are, first, where "the
22  principal objective of a contract is maritime commerce," and
23  second, where the claim at issue in the dispute, "arises from a
24  breach of maritime obligations that are severable from the
25  nonmaritime obligations of the contract."  And that quotation
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

88C9NOBA
```
 1  is from page 315 of the opinion.
 2          It's clear that the first situation does not apply
 3  here.  The contracts in this case deal primarily with the sale
 4  of goods.  Each is styled as a "Confirmation of Sale."  See
 5  Exhibits 1 to 6 of the plaintiff's letter of July 7, 2008.
 6          Each of the contracts sets forth the standard terms
 7  one expects to see in a contract for a sale of goods, including
 8  a buyer, a seller, a price, quantity, and quality.
 9          The contracts also set forth the terms of payment.
10          The contracts do, however, specify some details about
11  shipment.  Some indicate shipment dates and others the actual
12  ships to be used.  The contracts specify that "discharging
13  costs" are to be borne by the buyer.  See, for example, Exhibit
14  1 to the plaintiff's letter of July 7, 2008.
15          But, the contracts are not themselves contracts for
16  the carriage of goods and they clearly contemplate separate
17  bills of lading to be negotiated between the seller and a third
18  party carrier.
19          Materially similar contracts were found not to have
20  maritime commerce as their principal objective in Aston
```
Page 8

88C9NOBA
21    Agro-Industrial AG v. Star Grain Limited, 2006 U.S. District
22    Court, LEXIS 91636, (Southern District of New York,
23    December 20, 2006).  Star Grain considered contracts for the
24    sale of wheat that contained some details about the shipment of
25    the wheat such as, "the conditions under which the shipment and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                      18

88C9NOBA
 1    unloading of the wheat should occur," and how demurrage costs
 2    were to be calculated.  See pages 1 to 2 of this opinion.  The
 3    court held that despite these details, the contracts' "primary
 4    objective was undoubtedly the sale of wheat," not "the
 5    transportation of goods at sea," at page 9.
 6              Similarly, in Shanghai Sinom Import and Export v.
 7    Exfin (India) Mineral Ore Company, 2006 A.M.C. 2950, (Southern
 8    District of New York 2006), an oral opinion, this court, that
 9    is I, considered a contract for the sale of iron ore that also
10    included maritime provisions "requiring the ore to be shipped
11    by sea and specifying certain requirements regarding the
12    conditions for such shipment." 2006 A.M.C. at 2950.  Noting the
13    dangers of interpreting federal maritime jurisdiction too
14    broadly, this court decided it did not have jurisdiction
15    because the contract was "essentially a land-based contract for
16    the sale of goods," at page 2954.
17              Although the contracts here clearly contemplate
18    shipping, the bulk of the contracts are devoted to defining
19    terms of sale rather than terms of transport.  The fact that
20    the movement of the goods over sea is essential to the
21    performance of the contract does not by itself make a contract
22    maritime.  If that were so, then any contract for the sale of
23    goods between countries on different continents would become
24    maritime law.  The court does not find support for so broad an
25    interpretation of its maritime jurisdiction.  For similar
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                      19

88C9NOBA
 1    reasons, that the contracts for sale of goods incidentally
 2    specify some terms of transport does not make their principal
 3    objective a maritime one.
 4              The second basis for admiralty jurisdiction, however,
 5    is where the dispute "arises from a breach of maritime
 6    obligations that are severable from the nonmaritime obligations
 7    of the contract."  That is to say, to the extent that the
 8    contracts here are mixed contracts, if the dispute concerns
 9    those parts of the contracts that are maritime in nature, then
10    this court has jurisdiction.  Because the dispute does concern
11    those parts of the contract that are maritime in nature, this
12    provides a basis for the court's jurisdiction.
13              The dispute here centers on the payment of demurrage
14    that resulted from delays in the discharge of ships' cargoes at
15    their destination ports.  Resolution of the competing claims
16    required the arbitration panel to analyze a number of
17    obligations under the contracts.  These included provisions
18    relating to the assignment of discharging costs, conditions for
19    the commencement of discharge, the calculation of demurrage
20    rates, and the parties' obligations under related bills of
21    lading, letters of credit, and a charter party.  See, for
22    example, the interim final arbitration award, Exhibit 7 to the
23    plaintiff's letter of July 7, 2008 at pages 7, 17, 19, 24, 33,
24    and many other places.
25              Such obligations fall squarely within the court's
                              Page 9

88C9NOBA
1  admiralty jurisdiction.  In deciding whether obligations are
2  maritime in nature, the test is, "whether the subject matter of
3  the dispute is so attenuated from the business of maritime
4  commerce that it does not implicate the concerns underlying
5  admiralty and maritime jurisdiction."  That is from Atlantic
6  Mutual Insurance Company v. Balfour Maclaine International
7  Limited, 968 F.2d 196, page 200, (Second Circuit 1992).
8       Far from being attenuated from the business of
9  maritime commerce, discharge of cargo, calculation of
10 demurrage, bills of lading, and letters of credit are subjects
11 intimately connected to the business of maritime commerce.
12 Federal adjudication of disputes over such matters serves the
13 goals of admiralty jurisdiction in providing "a neutral federal
14 forum and a uniform body of law to adjudicate rights and
15 liabilities as they relate to the trafficking of sea-faring
16 vessels," from the same place in the Atlantic Mutual case.
17 Consequently, admiralty jurisdiction is warranted over disputes
18 between the parties arising out of these obligations.
19      Reference to the contract at Exhibit 1 clearly
20 provides for a variety of obligations that the buyer in this
21 case undertook, which are not simply obligations to pay but are
22 obligations to see to certain performance, and that performance
23 relates to things like how the vessel should discharge, how lay
24 time should be treated, even what the water draft should be at
25 the port of discharge, and furthermore, the parties then

88C9NOBA
1  incorporate additional provisions from an underlying charter
2  party.
3       Mr. DeMay argues, as a very well made argument,
4  indeed, that these are simply conditions of payment.  But, of
5  course, all conditions between commercial parties, maritime and
6  otherwise, boil down to agreements to pay if the conditions
7  that are established are not satisfied.  And these are no
8  different in that regard from any other provision that
9  specifically requires that vessels be discharged in particular
10 ways.  All such provisions boil down to an agreement to pay
11 damages or pay costs in some way if those conditions are not
12 met.
13      The question is:  What are you paying for?  And here,
14 it seems clear, that what the buyer is agreeing to do is to pay
15 certain specifically maritime obligations are not met, or to
16 pay for particular shipping costs, to be calculated in ways
17 that, quite understandably, are referred to arbitrators with
18 expertise in admiralty matters, who then proceed to decide the
19 case by reference to various maritime commercial concepts.
20      Anyone who reads the arbitration agreement, it seems
21 to me, is forced to the conclusion that what these parties are
22 disputing in this case is nothing related to the sale of sugar
23 but is everything related to the proper conduct of the vessel
24 with respect to discharging the conduct.
25      Now, the parties have cited a number of district court

88C9NOBA
1  cases.  And, of course, it's worth remembering that none of

88C9NOBA

```
 2   these cases, whoever cites them and whichever side they seem to
 3   fall on, are binding authority in this court.  Nevertheless,
 4   the court respects the value of consistency and the importance
 5   of considering those cases and specifically respects the
 6   expertise of the judges who decided them.
 7            So, I have considered those cases.  And it seems to me
 8   that the holding in Star Grain, the principal case on which the
 9   defendant relies, is not really to the contrary.  That case was
10   similar to this one insofar as the claim there was also for the
11   payment of demurrage.  However, as I read the case, the claim
12   in Star Grain arose not out of a specific obligation in the
13   contract with regard to demurrage but ultimately from a
14   standard contract term that assigned the risk of loss of goods
15   during transit to the buyer.  See page 14 of 2006 U.S. District
16   Court LEXIS 91636.
17            Because the demurrage was the result of damage to the
18   goods during transit, the dispute centered on this standard
19   nonmaritime contract term and not on parts of the contract that
20   were, "uniquely maritime," quoting from page 12 of the opinion.
21            Now, it's not entirely clear to me that the uniquely
22   maritime standard applied in Star Grain is exactly consistent
23   with the standard laid down by the Second Circuit in Atlantic
24   Mutual Insurance, which seems to me to put the burden to some
25   degree -- the presumption in the other direction saying that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

88C9NOBA

```
 1   the provisions are not maritime if they are so attenuated from
 2   maritime commerce as opposed to that they are only to be
 3   considered maritime if they are uniquely maritime.
 4            It may be that the court in Star Grain applied a
 5   narrower rule of maritime jurisdiction than the Second Circuit
 6   law justifies.
 7            But this case is sufficiently different from Star
 8   Grain that I don't have to decide in any way whether I would
 9   decide Star Grain the same way as Judge Daniels did.  This case
10   concerns obligations that are common and instrumental features
11   of maritime contracts and not terms that are typical features
12   of contracts for the sale of goods generally.
13            Accordingly, it's hereby ordered that the defendant's
14   motion to vacate this court's April 15, 2008 ex parte order for
15   process of maritime attachment is denied.
16            Now, Ms. Orozco, one of the things I always wonder
17   about with these maritime attachment cases is when do they end?
18   What typically happens, it seems to me -- and again, I'm hardly
19   an expert in this stuff -- is that a plaintiff brings an action
20   in this court and seeks maritime attachment by way of gaining
21   security, and then doesn't really have any intention of
22   following up the case.  Here, the case is decided in some other
23   forum, usually an arbitral forum.  And in this case if I have
24   the timing right, the arbitration actually happened in the
25   first place and then this was sought in aid of execution of the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

88C9NOBA

```
 1   judgment.
 2            Is this a tempest in a teapot?  Do you have money?
 3   And if so, how much do you have?  And what happens by way of --
 4            MS. OROZCO:  Procedurally, we actually have not
 5   captured any funds yet.  But what the intention would be, would
 6   be that in the event we capture funds, we would move to confirm
```

Page 11

88C9NOBA

```
 7    the award in this court.  And once the award is confirmed,
 8    which we have no reason to believe it would not be confirmed,
 9    it's a London arbitrating, then we would move to secure any
10    security to satisfy that New York judgment.
11         THE COURT:  But how long does this go on?  I don't
12    know -- I gather from the fact that Mr. DeMay is here, that the
13    defendant exists and has ongoing business and can afford to
14    retain a lawyer to engage in this dispute.  So maybe some day
15    some money will show up in this district.
16         But, one thing that has concerned me, both from a
17    very, perhaps, pedantic concern for the court's docket, to a
18    more substantive concern about the nature of these attachments,
19    is that it's one thing to attach property that's here, even if
20    that is intangible property.  It's another thing to have a sort
21    of open-ended order that will attach something someday if it
22    should appear when there is no particular reason, other than
23    the fact that a lot of money comes through New York, to assume
24    that it's ever going to.
25         Now, I've had to deal with this issue in other cases
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

88C9NOBA

```
 1    and it seems to me the Second Circuit law is clear that these
 2    prospective attachments are valid.  It seems to me that the
 3    underlying Second Circuit cases are ones precisely in which the
 4    district court issued an order saying you could attach some
 5    money transfer when nobody actually was aware of a particular
 6    transfer being there.  So, the validity of this I take as
 7    established by circuit case law, but I don't think, as far as I
 8    know, that the circuit has addressed:  Is this open-ended
 9    forever, or at what point is it perfect for a court to say:
10    But there ain't no property to attach, and there never has
11    been, and it's unclear when, if ever, there will be, and why
12    don't we just close this up.
13         Now, this one hasn't been pending for very long and I
14    don't know that we're close to any point of whatever it might
15    be of closing it down.  But, do you have any thought or
16    suggestion as to when this just becomes ridiculous?
17         MS. OROZCO:  I do, your Honor.  Actually it's an issue
18    that we deal with.  Our general rule of thumb, if we have not
19    caught any funds after about six to eight months -- depending
20    upon what type of information we can find that confirms that
21    the defendant is still in business or that they are not in
22    business or that there are eight other attachments -- if we
23    haven't caught funds after about the six-to-eight-month period,
24    we generally recommend to our client that we dismiss without
25    prejudice.  In the future if you have information; you discover
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

88C9NOBA

```
 1    they are trading, they are liquid, we can revisit, perhaps
 2    reopening the file.  But that is our general recommendation for
 3    the same reason of it's overwhelming the courts.  It's
 4    overwhelming to us, and it's daily service -- it's throwing
 5    money -- the client spends money for daily service and they are
 6    getting nowhere.  And if the company is really not trading,
 7    there's really no point.  The attachment is there.
 8         It can be -- we've had cases where we've dismissed the
 9    attachment and then we've gotten information and refiled and
10    we've caught money within 30 days, but it's generally -- we do
11    put an end to it.  We go back to our clients and say, look,
```

Page 12

88C9NOBA

12    this is -- you know.
13        THE COURT:  Well, of course, that's what you do and
14    you're free to do as you like.  The question is --
15        MS. OROZCO:  As are you?
16        THE COURT:  Well, that's the question.  Am I?  Is this
17    solely a matter for my discretion, or are there any rules that
18    ought to apply here?
19        Now, at this point -- I just said the date, now I'm
20    forgetting.  It was April --
21        MS. OROZCO:  April 12 it was issued.  I believe we
22    started serving April 15.
23        THE COURT:  So, it's been four months and nothing has
24    turned up yet.  Certainly six months sounds like to me
25    relatively an outside period unless there is some evidence that
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          27

88C9NOBA

1     something is likely to happen now.
2         Again, I suppose it's possible that a party could try
3     to simply avoid New York for a period and then if something
4     gets vacated resume normal business practices.  I doubt that
5     would be easy to do, but maybe it's possible.
6         And I suppose, further, that absent the process of
7     daily service and having an open order, you would never really
8     have any way of knowing whether that's resumed.
9         At any rate, it seems to me that come October this is
10    going to be vacated anyway if there is not some success in
11    attaching something.  And I don't know any way of dealing with
12    this kind of problem other than by rule of thumb of that sort.
13        Mr. DeMay, do you have a thought or -- this is a
14    different issue than what you all came here to talk about,
15    but --
16        MR. DeMAY:  Your honor, I've been on both sides of the
17    transaction.  I take it as a given that no Rule B case would be
18    allowed to remain open-ended.
19        THE COURT:  I should think not.
20        MR. DeMAY:  My understanding is that under Rule 4,
21    there's a 120-day limit for service of process.  If the
22    defendant is one on whom service of process can be made in the
23    United States, I think that 120-day rule probably would apply
24    absent good cause.  If the defendant is located overseas, my
25    understanding is the 120-day rule does not strictly apply.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          28

88C9NOBA

1     It's up to the court's discretion; may be applicable in a case
2     where the defendant is located in a western nation where
3     service can easily be made.
4         But my understanding is that Rule B is essentially
5     equitable in nature.  It's subject to the court's discretion.
6     The court can limit the attachment; it can vacate an
7     attachment.  So I would read into that, that the court has
8     inherent power, after a passage of time that the court deems to
9     be reasonable, to decide that there is no point in continuing,
10    that the case would have to be dismissed without prejudice.
11        THE COURT:  Well, that sounds about right to me.  I
12    think what I've done in the past -- and I don't know whether
13    there's ever been a particular time -- but once I started
14    seeing these things piling up on the docket, I did a little
15    project of just issuing orders saying tell me what's going on.
16    And it turned out that most of the plaintiffs had attached
                        Page 13

88C9NOBA

17  something during that period and we just didn't know about it.
18  So, they weren't totally dormant. But it seems to me that some
19  sort of time limit is appropriate.
20      And I guess it sounds as if the practice at the bar so
21  far has been not to include such a time period, an expiration
22  date in the order of attachment itself. And that makes some
23  sense. It may be that leaving this to case-by-case issues and
24  allowing the plaintiff an opportunity to explain why they
25  think, if they do, that the order should be extended after some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

88C9NOBA

1   period of time, is the best way to go.
2       But at any rate, what I'm indicating is you can expect
3   that come October either this will be vacated outright or I'll
4   be at least asking the plaintiff for some account of is there
5   any reason they can think of why this should go on. Of course,
6   it's my expectation that the defendant will say no, it
7   shouldn't. And barring some new news, this dispute is resolved
8   now only for the next two months and it may well be that
9   today's order is largely academic.
10      All right. Thank you very much.
11      MS. OROZCO:  Thank you, your Honor.
12      MR. DeMAY:  Thank you, your Honor.
13      (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300