UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

EFKO FOOD INGREDIENTS LTD.,               :

               Plaintiff,                :

                                     08 Civ. 6480 (CM)

    - against -                :    ECF CASE

PACIFIC INTER-LINK SDN BHD,               :

              Defendant.                :

---------------------------------------------------------X

Susannah Jones hereby declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. §1746, that the following is true and correct:

    1.    I am a barrister and member of the Chambers of Iain Milligan QC, 20 Essex Street, London WC2R 3AL. I was called to the Bar of England and Wales in 1999. I have practiced from 20 Essex Street since 2000, specializing in maritime and commodities litigation.

    2.    As a barrister, my role is to provide advice to solicitors and their lay clients on English law and to represent the lay client before the English Courts. I have very extensive experience of advising on the English law of arbitration, conflicts of laws, commodities and the formation and terms of contracts generally.

    3.    I make this Declaration on behalf of EFKO in support of its attachment, pursuant to Rule B of the Supplemental Rules of the Federal Rules of Civil Procedure for Certain Admiralty and Maritime Claims and in opposition to the motion to vacate filed by defendant Pacific Inter-Link SDN BHD ("PIL"). I have been asked to analyse this dispute from the point of view of English law and to address the points made by Mr Sach in his declaration dated 7 August 2008.

1

## English Law & The London Arbitration Clause

4.     English law governs the question of whether PIL and EFKO entered into the contracts. This is because PIL's six contract documents incorporate FOSFA No 81. Clause 31 of FOSFA No 81 provides that *"the construction, validity and performance"* of these contracts shall be governed by English law. A copy of FOSFA No 81 is annexed hereto as **EX1**.

5.     Under English law, contracts are governed by the law chosen by the parties (Article 3(1) of the Rome Convention, given force of law by The Contracts (Applicable Law) Act 1990 §2(1)) **(EX2)**. There is an express choice of English law made by these parties, and I do not understand why Mr Sach has ignored that express choice at §4 of his opinion.

6.     This is not the proper forum for final resolution of the question of whether there are valid contracts between the parties. That is an issue which the parties have agreed to submit to the FOSFA Tribunal (Clause 31 of FOSFA No 81).

7.     FOSFA arbitration has been commenced, and PIL have already raised the issue of jurisdiction. It is for the FOSFA Tribunal to decide the existence of the contracts in accordance with the FOSFA Arbitration Rules and with full consideration of the witness evidence and documents. Clause 5(a) of the FOSFA Rules provides that *"The arbitrators may rule on their own jurisdiction as to whether there is a valid arbitration agreement"*. The FOSFA Rules are attached at **EX 3**.

8.     For completeness, English law in any event provides that arbitral tribunals have power to rule on their own substantive jurisdiction i.e., in this case, to rule on whether there is a valid arbitration agreement (s30(1)(a) Arbitration Act 1996) **(EX 4)**.

9.     PIL's ambitious motion attempts to persuade this Court that - as a matter of English law - EFKO's US$5.7 million claims in London are so "frivolous" that the

2

attachment can be struck out. That is a very high hurdle to overcome. I certainly do not agree with Mr Sach's conclusion that, as a matter of English law no contracts ever existed between PIL and EFKO. For the reasons I set out in the next section, there is significant contemporaneous evidence that contracts were concluded on 7 September and witness evidence in support of that conclusion.

## Did PIL And EFKO Reach An Agreement?

10.    It is helpful to start with the basic English law principles, as summarised in the leading practitioners' text, *Chitty on Contracts* (29th Edition) the relevant sections of which are annexed hereto as **EX5**:

10.1  English law applies an objective test to determine whether an offer has been made (§2-002) and whether it has been accepted (§2-025).

10.2  Because it is an objective test, an offeror may be bound if his words or conduct are such as to induce a reasonable person to believe he intends to be bound, even if he actually has no such intention (§2-002).

10.3  Once an offer is accepted, it binds the offeror. In particular, the binding force of an oral contract is not affected or altered merely by the fact that, after its conclusion, one party sends to the other a document containing terms significantly different from those which had been orally agreed (§2-027).

10.4  Documents sent after the making of the contract will not affect its existence. Nor will the terms of such documents form part of the contract unless they are, in turn, accepted as variations of the contract, either expressly or by conduct (§2-036).

3

11.  In his consideration of the facts, Mr Sach entirely ignores the central allegation of EFKO's Claim Submissions: the contracts were concluded during a telephone call between Mr Bell and Mr Rastogi. Mr Bell's statements of 31 January 2008 and Declaration in these proceedings state that agreement was reached and the contracts concluded on the telephone on about Friday 7 September. Mr Rastogi himself agrees that they reached an "understanding" during this call (at §4).

12.  In fact, early the next week, Mr Rastogi sent contract documents to Mr Bell (Rastogi, Ex 1). The covering emails say (emphasis added, see Rastogi Ex 4 & 5):

"Please find enclosed **our sales contracts** for the 1500 X 3 MT RBD Palm Olein **sold to EFKO on 07.09.07** ... "

13.  The language used by Mr Rastogi strongly suggests that, on 11 September 2007, he believed that binding contracts had been concluded on 7 September.

14.  When the terms of the documents sent by Mr Rastogi are considered, the picture becomes even clearer. The six documents all begin:

"We are pleased to confirm having sold to you the following subject to our general terms and conditions of sale and as per hereunder ... "

15.  Each of the contracts ends with Mr Rastogi's signature for PIL. They then purport to grant PIL a right "to cancel the contract". Cancellation would not be relevant if no contract had been agreed. Note also, that:

15.1  When Mr Rastogi wrote to Mr Bell on 14 September (Rastogi Ex 4) he said that he wanted EFKO to sign the contracts for PIL's "internal control" reasons, not because, without signatures, there was no binding contract.

15.2  When Mr Rastogi wrote to EFKO on 24 September (Rastogi Ex 5) he did not "withdraw the offer" but instead wrote to exercise his option to *"treat the contracts as cancelled and null and void ... Please note that we shall no longer be responsible for these contracts and related obligations"*. Again, as at 24 September, Mr Rastogi plainly thought that contracts had been agreed, but believed that PIL had a right to cancel them.

16.  In my view, EFKO have good evidence, just from PIL's own documents, that the contracts were agreed on 7 September 2007. That was the date upon which EFKO / PIL made an offer which was accepted by the other party, forming a binding contract. Mr Rastogi's contemporaneous statements contradict the assertion made at §4 of his statement that he and Mr Bell had an understanding, from the 7 September conversation, that the contracts would not become valid or effective without signature. Mr Bell's declaration also contradicts Mr Rastogi's suggestion.

17.  If the contract was agreed orally, what then, is the status, under English law, of Mr Rastogi's contract documents sent on 11 September? As set out above, English law recognises that documents sent after the making of an oral contract will not necessarily alter or affect that contract, unless they are accepted as variations to it (see §10.3 & §10.4 above). These documents would therefore have no effect, save where they record the terms of the oral agreement between the parties or where the new terms were agreed as variations.

18.  In this case, Mr Bell replied on 11 September (Rastogi Ex. 3) accepting the terms *"with the exception of missing quality guarantee at disport and the final sentence regarding signature/non-signature"*. EFKO will therefore argue that there was never any agreement on PIL's proposed right to cancel the contracts. This term simply did not form part of the agreement between EFKO and PIL. Thus, PIL had no right to cancel the contracts on 24 September (Rastogi Ex 5).

5

19.    Alternatively, even if it was agreed that PIL had a right to cancel the contracts (whether during the telephone call or in writing), the right to cancel expressly had to be exercised *"by close of working hours"* on 11 September (Rastogi Ex 1).

20.    PIL elected not to exercise that right. PIL were entitled to either cancel the contract on 11 September, or choose to keep the contract alive. Those alternative rights were inconsistent with one other. PIL plainly decided to keep the contract alive. As such, under English law, they elected to waive their right to cancel and, as at 24 September no longer had that right. Waiver by election is a very well established doctrine in English law, see for example *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India (The Kachenjunga)* [1990] 1 Lloyd's Rep 391 annexed hereto at **EX 6**.

21.    PIL themselves recognized that, by 14 September, they no longer had the right to cancel, see Rastogi Ex 4 & 5. Those emails are just chasing execution by EFKO.

**Jurisdiction**

22.    I note that PIL challenge jurisdiction because (1) this is not an admiralty or maritime claim within the meaning of Rule 9(h) or 28 U.S.C. §1333 and (2) there is no agreement to arbitrate so the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §203 does not apply.

23.    I cannot comment on whether, as a matter of US procedural law, this is an admiralty/maritime claim. That is a question exclusively for the US Courts to be decided under US law. The Admiralty jurisdiction of the English High Court is completely irrelevant and I cannot understand why Mr Sach refers to it. English conflicts of laws rules provide that questions of procedure are exclusively for the lex fori - the law of the forum (see the leading textbook, *Dicey, Morris & Collins, The Conflict of Laws,* 14th Edition at Rule 17, annexed hereto as **EX7**).

24.   I do not agree with Mr Sach's comment at §14 that the contracts are simply sale and purchase contracts for a commodity. The contracts are on a CFR Port of Ilyichevsk basis. They are agreements to sell goods at an inclusive price covering their cost and freight to the agreed destination. They therefore oblige PIL to ship the goods to the Ukraine or to procure their shipment there.

25.   Secondly, English law recognises the concept of severability of arbitration agreements (s7 Arbitration Act 1996, annexed hereto at **EX 8**). Therefore, an arbitration agreement will survive termination or revocation of the main contract. If this Court accepts that the PIL documents were contract confirmations rather than mere offers, then an arbitration agreement was made, and that survives any revocation. As a consequence, on PIL's own case, there is jurisdiction under the New York Convention.

**Quantum**

26.   Finally, in relation to Mr Sach's §17, he is correct that the FOSFA Tribunal has the power to award legal costs to the successful party. There is no part of the FOSFA Rules which states that the Tribunal will never make an award of costs. Some trade bodies' London arbitration rules do contain such rules, for example the Grain and Feed Trade Association. In FOSFA arbitrations awards can be made at the Tribunal's discretion, so I do not agree with Mr Sach's statement that "under no circumstances" can EFKO expect to receive an award of costs.

27.   I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated:       20 August 2008
             London, England

Susannah Jones

7

# Declaration of Susannah Jones

# EX1

# FEDERATION OF OILS, SEEDS AND FATS ASSOCIATIONS LIMITED
## FOSFA INTERNATIONAL

**ISSUED AND APPROVED JOINTLY WITH THE PALM OIL REFINERS ASSOCIATION OF MALAYSIA (PORAM)
AND THE MALAYAN EDIBLE OIL MANUFACTURERS' ASSOCIATION (MEOMA)
CONTRACT FOR PALM AND PALM KERNEL OIL PRODUCTS IN BULK**

**CIF TERMS**

# 81

Revised and Effective
from 1st October 2006

| | Reference Nos |
|---|---|
| | |

SELLERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

BUYERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

BROKERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Date: . . . . . . . . . . . . . . . . . . . . . . . . . .

*An asterisk denotes alternative wording, and should be matter of agreement between the parties.

Sellers have agreed to sell and Buyers have agreed to buy:                                                                                          1

| Contract No: | | Date: | |
|---|---|---|---|
| Product: | | | |
| Origin: | | | |
| Quantity in metric tons | Shipment Period | Discharge Port | Contract Price CIF |
| | | | |

Special Conditions

Payment in                                                                                                                                            2

* (i)    in accordance with the provisions of paragraph (a) of the Payment Clause;                                                                   3
  (ii)    in accordance with the provisions of paragraph (b) of the Payment Clause;                                                            4

  (iii)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

Discharge in accordance with the provisions of the Discharge Clause and at an average rate of minimum . . . . . . . . . . . . . . . . . .    7
metric tons per hour, Sundays and holidays included.                                                                                           8

Domicile and Arbitration in . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . as per Domicile and Arbitration Clauses.    9

**1.  TOLERANCE:**   Sellers have the option of shipping 5% more or less of the mean contract quantity. In the event of more than one shipment being made each    10
shipment is to be considered as a separate contract but the tolerance on the mean contract quantity is not to be affected thereby.    11

**2.  QUALITY AND SPECIFICATIONS:**   Minimum flash point of 250°F (121°C).    12
Free Fatty Acid content shall be expressed as follows:    13

For Palm Oil Products – as Palmitic acid calculated on a molecular weight of 256. For Palm Kernel Oil Products – as Lauric acid calculated on a molecular weight of 200.    14

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

At time and place of shipment, the oil shall be of good merchantable quality of the agreed description and specifications.    17
It shall not contain substances of non oil-palm origin or materials used in its processing and not customarily found in oil of the contract description.    18
If the oil is loaded in more than one tank of the same ship, the analysis details of the oil in each separate tank shall conform with the above.    19
The specifications shall be those established by the Palm Oil Refiners Association of Malaysia (PORAM) for Palm Oil Products and by the Malayan Edible Oil    20
Manufacturers' Association (MEOMA) for Palm Kernel Oil Products as standard for the export of these products and in force at the date of contract and always    21
provided they are not in contradiction with the above.    22
Where the specification refers to Malaysian Standards, Sellers warrant that the oil will be produced from crude palm oil complying with the relative Standards and    23
Industrial Research Institute of Malaysia (SIRIM) Standards and will in all respects conform to the requirements and restrictions of the Palm Oil Industry (Quality    24
Control) Regulations 1983 and any amendment or extension thereto and/or other relevant Malaysian Government standards/regulations in force at the date of the    25
contract.    26
However, should the analysis relating to the oil in any tank/s fall outside the contract specifications -    27
  (a) as to palm oil/olein/stearin and/or palm kernel oil/olein/stearin by no more than one unit in respect of iodine value;    28
  (b) as to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate by no more than 2% in respect of total fatty matter and/or free    29
    fatty acids;    30
The oil is not to be rejected provided always that the analysis of the composite sample representing the full quantity loaded complies with the contract specifications    31
and provided that the oil so loaded and analysed emanates from the same Seller and is tendered to the same Buyer.    32
Where the contract refers to bleached deodorised palm oil/olein/stearin and/or bleached deodorised Palm kernel Oil/Olein/Stearin, the quality and specifications as    33
ascertained on samples taken from ship's tanks after loading shall be final and the provisions of the Arrival Quality-Adjustment Clause and the Sampling and    34
Analysis Clause paragraph (d) shall not apply.    35

**3. ARRIVAL QUALITY-ADJUSTMENT:** Where this contract refers to neutralised palm oil or to neutralised palm kernel oil or to crude palm liquid 36
fraction/palm solid fraction or to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate the price shall be subject to adjustment based on 37
the arrival analysis ascertained in accordance with the provisions of the Sampling and Analysis Clause paragraph (d) and specifically as follows: 38
(i) Unless otherwise stipulated, in the case of neutralised palm oil the basis shall be 0.25% FFA (as palmitic); and in the case of neutralised palm kernel oil the 39
basis shall be 0.25% (as lauric). Should the FFA on arrival be less than 0.25% Buyers shall pay to Sellers a premium of 0.5% of the contract price for each 40
0.05% below 0.25%, fractions in proportion; should the FFA on arrival be greater than 0.25% Sellers shall pay to Buyers an allowance of 1% of the contract 41
price for each 0.05% above 0.25% up to and including 0.5% and 2% of the contract price for each 0.05% above 0.5%, all fractions in proportion. 42
(ii) In the case of crude palm liquid fraction/palm solid fraction the basis shall be 5% FFA (as palmitic); should the FFA on arrival be less than 5% Buyers shall 43
pay to Sellers a premium of 1% of the contract price for each 1% below 5% and should the FFA on arrival be greater than 5% Sellers shall pay to Buyers an 44
allowance of 1% of the contract price for each 1% above 5%, all fractions in proportion. 45
(iii) In the case of palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate the total fatty matter/total saponifiable matter shall be 95% 46
minimum at time of shipment and the basis shall be 97% at time of arrival; Buyers shall pay to Sellers a premium of 1% of the contract price for each 1% 47
above 97% and Sellers shall pay to Buyers and allowance of 1% of the contract price for each 1% below 97%, all fractions in proportion. 48

**4. DECLARATION OF DESTINATION:** The goods are sold for shipment to . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

but Buyers have the option to declare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

as the port/s of destination with a minimum of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . metric tons to any one port. 51

To exercise this option Buyers shall declare the port/s of destination to Sellers by any means of rapid written communication (E-mail excluded) not later than 16.00 52

hours on . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
The Notices Clause and the 'Non-Business Days Clause shall not apply to such declaration. 54

**5. SHIPMENT AND CLASSIFICATION:** Shipment in good condition in ship/s which comply with the FOSFA Qualifications and Operational Procedures for 55
Ships Engaged in the Carriage of Oils and Fats in Bulk for Edible and Oleo-Chemical Use in force at the date of the Bill of Lading. The oil is to be shipped on a 56
ship which, after loading in one or more origin ports, will proceed directly or indirectly, on a geographically normal route from the port/s of shipment to the 57
port/s of destination. 58
For the purposes of this contract the words 'ship' or 'ships' shall mean any full-powered engine-driven ship. 59
Transhipment shall only be allowed under a through Bill of Lading and shall be restricted to the area of origin and/or customary transhipment ports in the area of 60
destination for the goods specified in the contract, provided that transhipment at origin is completed within the original contract shipment period and/or agreed 61
extension period. 62
In case of transhipment at origin, shipping documents shall include FOSFA Certificate of Compliance, Cleanliness and Suitability of Ship's Tank and a FOSFA 63
Combined Master's Certificate in respect of the ocean carrier. In the event of such transhipment at origin the Declaration of Shipment shall include the name of the 64
ocean carrier and transhipment location. Nothing in this clause shall affect the Master's rights or Ship's obligations under Maritime Law. 65

**6. INSURANCE:** Insurance in accordance with the Institute/FOSFA Trades Clauses (A) and the Institute War and Strikes Clauses (FOSFA Trades) - including 66
risk of contamination irrespective of percentage on each or on the whole - to be effected at Sellers' option with first class underwriters or companies but for whose 67
solvency the Sellers shall not be responsible. Claims to be payable in the currency of the contract. Policies and/or certificates and/or Letters of Insurance required 68
under this contract shall be for not less than 5% over the invoice amount including freight. 69
Buyers shall accept insurance including Exclusion Clauses on the FOSFA Insurance Exclusion Clause List. 70
In the event that Buyers receive an allowance under the Quality and Specifications Clause, Buyers to return the insurance policy to Sellers in order that they may 71
make any recovery thereunder. Any benefit under the insurance in respect of loss in weight shall be for Sellers' account. 72

**7. WAR RISKS INSURANCE:** War risks insurance shall be effected on the terms and conditions in force and approved at the time of shipment by the Institute 73
of London Underwriters (Institute War Clauses [FOSFA Trades]). Any expense for covering war risks insurance in excess of ½ % shall be for account of Buyers. 74
The rate of such insurance shall not exceed the rate ruling in London at the time of shipment or date of ship's sailing whichever may be adopted by underwriters. 75
Notice of extra expense to be borne by Buyers shall be given by Sellers at the time of declaration under this contract or not later than 3 business days after the rate 76
has been agreed with the underwriters whichever is the later. Failure to give such notice shall invalidate the Sellers' claim unless in the opinion of the arbitrators 77
the delay is justifiable. 78

**8. DECLARATION OF SHIPMENT:** Notice stating ship's name, date of Bill/s of Lading and approximate quantity shipped shall be despatched by first 79
Sellers to their Buyers not later than 10 days after the date of the Bill/s of Lading. Notices by intermediate Sellers shall be accepted by their Buyers although 80
received by them after such time, if from the 10th day after the date of the Bill/s of Lading such notices have been passed on with due despatch. 81
The date of the "on board" Bill/s of Lading shall be considered proof of the date of shipment in the absence of conclusive evidence to the contrary. 82
Notices shall be deemed to be under reserve for errors and/or delays in transmission. Any slight variation in the ship's name shall not invalidate the declaration. A 83
valid declaration cannot be withdrawn except with the Buyers' consent. 84
Should the ship arrive before receipt of declaration of shipment and extra expenses be incurred, such expenses are to be paid by Sellers. 85
Should extra lighterage expenses be incurred owing to Sellers tendering less than 50 tons for a contract of a greater quantity, the extra costs to be borne by Buyers 86
and Sellers equally. The provisions of this clause to be inoperative if the goods have been sold afloat. Presentation of documents does not constitute a notice under 87
the terms of this clause. 88

**9. SUPERINTENDENTS:** Reference in the contract to superintendents, surveyors or representatives shall mean member superintendents of FOSFA 89
International. 90
The use of member superintendents shall be mandatory except where:- 91
(i) the contract or national laws or regulations require the use of Governmental or other agencies not recognised by FOSFA International/PORAM; 92
(ii) no member superintendent/s is/are available or proximate to the port/s concerned. 93

**10. ANALYSTS:** Reference in the contract to analysts shall mean analysts who are members of FOSFA International and represented in the Oils and Fats 94
Section. The use of member analysts shall be mandatory except where the contract or national laws or regulations require the use of Governmental or other analysts. 95

**11. PAYMENT AND SHIPPING DOCUMENTS:** Payment shall be made at the above-named place as stipulated in the Preamble for 99% of Sellers' 96
provisional invoice (or for 100% in the case where shipped weights are final) against a complete set of shipping documents:- 97
*(a) by irrevocable and confirmed letter of credit unrestricted for negotiation established in Sellers' favour through a recognised bank for 105% of the 98
mean contract quantity. Unless otherwise agreed between the parties such credit shall be advised and available to Sellers not later than 10 days from 99
date of contract or the business day prior to commencement of loading, whichever shall first arise. Should the credit be opened on terms inconsistent 100
with the contract, Sellers may demand amendment which shall be arranged by Buyers and notified to Sellers within 7 days of the demand being 101
received but in no case later than the business day prior to commencement of loading. The negotiating bank may claim reimbursement by telex/cable 102
from the credit-opening bank upon confirmation that all documents conform to the credit requirements; 103
*(b) by cash on presentation; 104
*(c) as stated in the Preamble: 105
If Sellers choose to present documents to Buyers through the intermediary of a bank/s all bank charges incurred including those raised by Buyers bank shall be for 106
Sellers' account unless Buyers demand presentation through a bank of their choice in which case those bank charges shall be for Buyers account. 107
Any charges for telegraphic remittance of funds to Sellers shall be for Buyers' account. 108
Shipping document shall consist of - 109
(1) Commercial invoice; 110
(2) Full set of clean "on board" Bill/s of Lading and/or Ship's Delivery Order/s and/or other Delivery Order/s in negotiable and transferable form, such other 111
Delivery Order/s guaranteed by a recognised bank if required by Buyers; 112
(i) In the absence of evidence that the freight has been paid the amount of freight shall be deducted from the provisional invoice and paid by Buyers on 113
Sellers' behalf. Buyers to send copy of the freight note to Sellers for final invoicing purposes. If freight is to be paid in a currency other than the currency 114
of this contract, the conversion in the final invoice shall be made at the rate of exchange on the day of actual freight payment; 115
(ii) If the Bill/s of Lading refers to a Charter Party and/or any other documents relating to the freight booking, Sellers shall be responsible for any 116
detrimental consequences from clauses of such documents being contrary to the terms of this contract. If such Bill/s of Lading is/are signed by parties 117
other than the Master then the Bill/s of Lading shall be accompanied by photostat copy of written authority from shipowner or Master authorising the 118
signatory to the Bill/s of Lading; 119
(iii) The Bill/s of Lading must identify the ship's tank/s into which the oil is loaded but should the oil be commingled with other parcels the Bill/s of Lading 120
must indicate the total commingled quantity; 121
(iv) Delivery Order/s shall be accompanied by non-negotiable or photostat copy of the relative Bill/s of Lading if required by Buyers. 122
(3) Policy/ies and/or Insurance Certificate/s and/or Letter/s of Insurance in the currency of the contract and identifying the parcel insured. Letter/s of Insurance 123
shall specify the insurance company/ies and/or policy number/s and shall be guaranteed by a recognised bank if required by Buyers. After 124
payment Letter/s of Insurance shall be substituted by policy/ies and/or certificate/s on request; 125
(4) FOSFA Certificate of Compliance, Cleanliness and Suitability of Ship's Tank from superintendents in the form in force at the date of the Bill/s of Lading; 126
(5) Certificate of Analysis, based on independently sealed samples taken from the relevant ship's tank/s at time of loading, and issued by an independent certified 127
analyst; 128
(6) A Certificate of Origin and/or other documents as per the Duties, Taxes, Etc., Clause of the contract where applicable; 129

(7)   A FOSFA Combined Master/s Certificate in the form in force at the date of the Bill/s of Lading; 130
(8)   A copy of the notice to the Master instructing him to follow the PORAM Heating Instructions, and 131
(9)   Certificate/s from superintendents certifying: 132
    (a)   the shipped weight ascertained at port of loading and specifying at what point the weight was ascertained; 133
    (b)   particulars of the time and place of loading, sampling and establishment of shipped weight; 134
    (c)   that pre-shipment and contractual loading samples were drawn in accordance with the Sampling and Analysis Clause and quoting details of the seals 135
        applied. 136

In relation to items (4) and (7), the immediate previous cargo in the tank/s receiving the oils or fats shall not have been a product appearing on the FOSFA List of 137
Banned Immediate Previous Cargoes in force at the date of the Bill/s of Lading. The Restrictions beyond the Immediate Previous Cargo on the FOSFA List of 138
Banned Immediate Previous Cargoes shall apply. 139
Buyers are to accept photostat or certified copy/ies of items (4), (5), (7) and (9) relating to the whole parcel/s. 140
Buyers agree to accept Bill/s of Lading containing the Chamber of Shipping War Risk Clause and/or any other recognised War Risk Clause. 141
Should documents be presented with incomplete set/s of Bill/s of Lading, payment shall be made provided that delivery of such Bill/s of Lading be guaranteed, 142
such guarantee to be signed, if required by Buyers, by a first class bank. Acceptance of this guarantee shall not prejudice Buyers' rights under this contract. 143
Should Sellers have failed to present shipping documents on arrival of the ship at destination, Buyers shall take delivery under a guarantee acceptable to the 144
shipowners to be provided by the Buyers, such guarantee to be signed by a first class bank if required by the shipowners. Buyers shall pay for the documents when 145
presented. Any reasonable extra expenses, including costs of such guarantee or extra handling charges incurred by reason of the failure of Sellers to provide such 146
documents, shall be borne by Sellers and allowed for in the final invoice. In the event that Buyers take delivery as above and Sellers fail to provide shipping 147
documents and if the guarantee provided by Buyers as above is rescinded by the shipowners, Sellers shall be responsible for all damages, costs and consequences 148
arising from their failure to present documents. Buyers shall inform Sellers immediately there is a claim against the guarantee and Sellers shall have the right to 149
be joined in any legal action arising therefrom. 150
Payment shall not be deemed to have been effected before receipt of cleared funds by the payee or his bank. If payment is agreed to be by bank transfer, the party 151
shall effect payment to the payee's bank on or before the due date for payment and payment instructions shall specify a value date not later than the second bank 152
working day after the day of payment. 153
Any monies due by either party to the contract to the other for final invoices and/or accounts for items on shipments fulfilling this contract shall be settled by either 154
party not later than 21 days from the date of the invoice, except as otherwise provided under awards of arbitration or appeal as governed by the other provisions 155
in the contract), and if not settled a dispute shall be deemed to have arisen which may be referred to arbitration. 156

**12. INTEREST:**   If any payment is not paid on or before the due date for payment, interest shall be payable. 157
If there is no due date for payment, interest shall be payable if there has been unreasonable delay in payment. Interest payable shall be appropriate to the currency 158
involved. If the amount of interest is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration in accordance with the Arbitration 159
Clause. 160
Nothing in this clause shall affect a party's rights to invoke the provisions of the Default Clause in a case where a failure to effect timely payment could give rise 161
to a claim under that clause. 162

**13. CHARTER PARTY:**   If the Bill/s of Lading refer/s to a Charter Party, then, if required by Buyers, Sellers shall provide a copy of the Charter Party. 163

**14. WAR DEVIATION:**   Buyers agree to accept Bill of Lading containing the Chamber of Shipping War Deviation Clause and/or any other recognised official 164
War Deviation Clause. 165
Any extra charges, duties and taxes incurred by reason of such deviation or detention are for Buyers' account and cost. 166

**15. UNASCERTAINED GOODS:**   In every instance where a parcel of goods paid for under this contract forms an unidentified part of a larger identified 167
quantity of goods of the same description, whether in packages or in bulk, no separation or distinction shall be necessary and, until separation and identification 168
of the parcel paid for hereby from the larger quantity has taken place the Buyer of the parcel is a pro rata owner of the whole of the larger quantity in common 169
with Seller/s and Buyer/s of other parts of the larger quantity. 170

**16. DISCHARGE:**   The oil shall be discharged at the port of destination at a berth suitable for the discharge of oils or, if practicable and mutually agreed, and 171
provided the ship is willing to and can safely berth, at Buyers' own or appointed premises within harbour limits. Buyers shall take delivery with customary quick 172
despatch after notice of readiness has been given by the shipowner or representative/s in accordance with the Bill/s of Lading, Charter Party or Contract of 173
Affreightment. 174
Where FOSFA International/PORAM Standard Fixture Terms apply, Buyers shall take delivery at the rate per hour stipulated in the Preamble or where no such 175
rate is stated at an average rate of 150 metric tons per hour Sundays and Holidays included (except gazetted port holidays) or the rate stipulated in the Charter Party 176
or Contract of Affreightment whichever is the lower. Otherwise Buyers to be liable to pay demurrage at the rate stipulated in the Charter party or Contract of 177
Affreightment. 178
Sellers are responsible for all expenses for pumping out and for connecting to ship's outlet/s and for sweepings and/or puddling but discharging expenses arising 179
after the oil has passed the ship's rail shall be for Buyers' account. Any loose collected remaining in the ship's tank/s to be discharged by the Sellers and delivered 180
to the Buyers at the discharging berth in packages to be provided by the Buyers. 181
If the packages are supplied by the Buyers but the residue is not delivered, such residue or unpumpable oil shall not be included in the delivered weight. 182

**17. WEIGHTS:   At loading:**   The shipping weight shall be ascertained by a superintendent appointed by Sellers at their expense by gauging either in officially 183
calibrated land tank/s or tank barge/s from which the oil is delivered or by delivery via certified weigh scales or from tank cars which, if not calibrated, shall be 184
weighed before and after loading by single weighing only (front and back axle weighing not allowed). If none of these is possible then the shipping weight to be 185
ascertained by the most practicable alternative means. 186
For goods sold for shipment to and/or discharged at USA/Canadian port/s: In the event that the oil shipped under this contract or this and other contracts with the 187
same Buyer is loaded in separate tank/s not commingled with other parcel/s, Sellers shall declare Bill of Lading weights final and shall ensure that the insurance 188
policy/certificate included with the documents covers Buyers against any difference between certified shipped and certified landed weights in excess of ½% and 189
the provisions of the Adjustment of Outturn Clause as to price adjustment shall be based on the Bill of Lading weights. 190
**At discharge:** Buyers' superintendents shall ascertain the weight at Buyers' expense conjointly with Sellers' superintendents, if in attendance, by gauging either in 191
officially calibrated tank/s or tank barge/s in which the oil is received or by overside delivery to certified weigh scales, or in rail/road tank cars which, if not 192
calibrated, shall be weighed before and after loading by single weighing only (front and back axle weighing not allowed). If none of these methods is possible 193
then the discharged weight to be ascertained by the most practicable alternative means. In the event of disagreement between Buyers' and Sellers' superintendents 194
on the question of mass per volume (litre weight in air), sealed samples shall be submitted to an analyst whose decision shall be final. 195
If establishment of weights is not completed within 5 working days after discharge Sellers may submit an interim invoice which shall become due and payable 196
based on Bill of Lading weights. Weights shall then be established as soon as it is deemed practicable by the superintendents representing the parties and a final 197
invoice shall be issued accordingly. 198

**18. ADJUSTMENT OF OUTTURN:**   Any excess over or deficit under the mean contract quantity arrived at without taking into consideration the margin of 199
5% more or less, and the quantity delivery, is to be settled up to and including the first 2% variation from contract quantity at contract price and the variation 200
above 2% of the contract quantity at the price fixed by the appropriate Price Settlement Committee appointed by FOSFA International/PORAM/MEOMA, and 201
published by the Federation or, if no price is fixed by the Price Settlement Committee then at the market price to be mutually agreed or fixed by arbitration for the 202
day of arrival of the last ship to arrive at the berth/place where the contracted goods are to be discharged at the port of destination. 203

**19. COMMINGLING:**   Sellers may load the oil commingled with other parcel/s provided that: 204
(a) the oil is of the same description, origin, grade and contractual quality specifications; and 205
(b) the oil emanates from the same shipper (which in this contract shall be deemed to mean the party responsible for freight). 206
The provisions of paragraphs (a) and (b) shall not apply:- 207
(i)   where this contract refers to palm acid oil/fatty acid distillate and/or palm kernel acid oil/fatty acid distillate; 208
(ii)  where the oil is sold for shipment to optional ports and the final destination/s is/are not declared to Sellers within one month prior to the commencement of 209
the shipment period. 210

**20. SAMPLING AND ANALYSIS:** 211
**(a) General:**   Sampling shall be done in accordance with the method in the FOSFA International/PORAM/MPOB/Processed Palm Oil Storage, 212
Transportation, Sampling and Survey Guide. 213
Should either party fail to appoint a superintendent then the samples drawn by the superintendent present shall be the valid samples for the purposes of 214
analysis and/or arbitration. 215
The analyses shall be carried out in accordance with the methods laid down in the FOSFA International/PORAM Standard Contractual Methods List. 216
The certificate/s shall bear the FOSFA International official seal except where the contract or national laws or regulations require the use of 217
Governmental or other analysts. 218
Details of seals and labels shall be given on both loading and discharge survey reports and analysis certificate/s. 219
All samples drawn under the terms of this contract when delivered to FOSFA International or to the analyst/s to become and be their absolute property. 220
**(b) Pre-shipment Samples:** To ensure samples are available in the event of a contamination claim not less than 5 pre-shipment samples of the oil loaded 221
shall be taken at the ship's rail or the nearest practicable point prior to loading. These samples are to remain sealed with Sellers' superintendents at origin 222
but be available on demand to any receiver in the event of a contamination claim. Samples to be kept for 3 months from date of Bill of Lading. 223

(c) **At loading:** Not less than 5 samples representative of the oil to be drawn from each ship's tank/s and sealed by superintendent for analysis. Two sets 224
of these samples shall be handed to the Master with instructions to hand over to the receivers at port of discharge or their superintendents. Tests to be 225
made from a set of sample/s by an analyst in the country of shipment (in the case of Malaysia by an independent licensed analyst registered with the 226
Malaysian Palm Oil Board), who shall issue the appropriate certificate. The remaining sets of samples to be retained by the 227
superintendent at the port of loading. 228

(d) **At discharge:** Buyers' and Sellers' superintendents shall conjointly draw 5 representative samples during discharge at the ship's rail or the nearest 229
practicable point thereafter. These to be conjointly sealed for analysis and/or arbitration purposes. Any unpumpable and/or off-quality oil discharged 230
and stored separately shall be analysed separately. 231
Buyers or their representatives shall retain 3 sealed samples and, if requested, with due despatch send 1 sealed sample for analysis to an analyst 232
represented in the Oils and Fats Section. The remaining 2 sealed samples shall be retained by Sellers or their representatives. If Buyers fail to send a 233
sample for analysis Sellers have the right to submit a sample and the results of this analysis shall stand as the first analysis. The analysis fee shall be 234
equally divided between Sellers and Buyers. 235
Buyers and Sellers have the right to claim at their own expense a second and/or third analysis for any one or more individual specification. The party 236
requesting such analysis shall, within 5 business days after receipt of the preceding analysis, notify the other party, arrange for a sealed sample to be 237
sent to another analyst represented in the Oils and Fats Section, and give the necessary instructions to the analyst. If 2 analyses are made the mean of 238
the 2 results, and if 3 analyses are made, the mean of the 2 results closest to each other, as the case may be, shall be binding and form the basis of final 239
settlement. Where the results of the 3 analyses are such that the above formula does not apply, the mean of the 3 shall be taken as final. 240
Parties shall pass on certificates of analysis with due despatch. 241

**21. DUTIES, TAXES, ETC:**   All export duties, taxes, levies, etc., present or future in country of origin/port of shipment shall be for Sellers' account. All import 242
duties, taxes, levies, etc., present or future in port of discharge/country of destination shall be for Buyers' account. Where the goods are entitled to free entry into 243
or preferential duty in the port of destination named in this contract, Sellers shall furnish together with the shipping documents a Certificate of Origin and/or 244
necessary documents in the form valid at the time of shipment, otherwise Sellers shall be responsible for any extra duty incurred by Buyers through the non- 245
production of such Certificate and/or document/s. 246
At Buyers' request and cost, Sellers shall endeavour to supply any alternative or additional certificate of origin and/or documents but payment shall not be 247
withheld for any delay incurred in complying with such request. 248

**22. NOTICES:**   Notices to be despatched by any means of rapid written communication (E-mail excluded). All notices shall be under reserve for errors in 249
transmission. Notices shall be passed on with due despatch by intermediate Buyers and Sellers. Any notices received after 16.00 hours on a business day shall be 250
deemed to have been received on the following business day. Notice from a broker shall be a valid notice under this contract. 251

**23. NON-BUSINESS DAYS:**   Should the time limit for doing any act or giving any notice expire on a Saturday, Sunday or any public holiday in the country 252
where the party required to do the act or give the notice resides or carries on business or in the country where the act has to be done or the notice has to be received 253
or on any day which the Federation of Oils, Seeds and Fats Associations Ltd and the Palm Oil Refiners Association of Malaysia and the Malayan Edible Oil 254
Manufacturers Association shall declare to be a non-business day the time so limited shall be extended until the first business day thereafter. All business days shall 255
be deemed to end at 16.00 hours Mondays to Fridays inclusive. The contract shipment period not to be affected by this clause. 256

**24. ODD DAYS:**   In any month containing an odd number of days the middle day shall be reckoned as belonging to both halves of the month. 257

**25. FORCE MAJEURE:**   Should shipment of the goods or any part thereof be prevented at any time during the last 30 days of the contract shipment period by 258
reason of Act of God, strikes, lockouts, riots, civil commotions, fires or any other cause comprehended by the term Force Majeure at port/s of loading or elsewhere 259
preventing transport of the goods to such port/s, the time allowed for shipment shall be extended to 30 days beyond the termination of such cause, but should the 260
contract shipment period be less than 30 days such extension shall be limited to the number of days allowed for shipment under the contract shipment period. 261
Should such cause exist for a period of 60 days beyond the contract shipment period the contract or any unfulfilled part thereof so affected shall be cancelled. 262
Sellers invoking this clause shall notify Buyers with due despatch. 263
When goods of a specific origin are sold with the option of shipment from alternative ports and shipment from all alternative ports is not prevented Sellers may 264
only invoke this clause with regard to the specific port/s provided that the port/s has/have been notified to Buyers as the intended port/s of loading prior to or within 265
7 days of the occurrence but if the occurrence commences within the last 7 days of the contract shipment period the port/s of loading to be notified not later than 266
the first business day following the contract shipment period. Shipment after the contract shipment period shall be limited to the port/s so nominated. Buyers have 267
no claim against Sellers for delay in shipment or cancellation under this clause provided that Sellers shall have supplied to their Buyers, if required, satisfactory 268
evidence justifying delay or non-fulfilment to establish any claim for extension or cancellation under this clause. 269
In case of default after extension the default date shall be similarly deferred. 270

**26. PROHIBITION:**   In the event, during the contract shipment period, of prohibition of export or any other executive or legislative act by or on behalf of the 271
Government of the country of origin or of the territory where the port/s of shipment named herein is/are situate, or of blockade or hostilities, restricting export, 272
whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to 273
prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be extended by 274
30 days. 275
In the event of shipment during the extended period still proving impossible by reason, of any of the causes mentioned in this clause the contract or any unfulfilled part thereof 276
shall be cancelled. Sellers invoking this clause shall advise Buyers with due despatch. If required, Sellers must produce proof to justify their claim for extension 277
or cancellation under this clause. 278

**27. BANKRUPTCY/INSOLVENCY:**   If before the fulfilment of this contract, either party shall suspend payment, notify any of his creditors that he is unable 279
to meet his debts or that he has suspended payment or that he is about to suspend payment of his debts, convene, call or hold a meeting of his creditors, propose a 280
voluntary arrangement, apply for an official moratorium, have an administration order made, have a winding up order made, have a receiver or manager appointed, 281
convene, call or hold a meeting to go into liquidation (other than for reconstruction or amalgamation), become subject to an Interim Order under Section 252 of 282
the Insolvency Act 1986 or have a Bankruptcy Petition presented against him, the contract shall forthwith be closed, either at the actual or estimated market price 283
then current for similar goods or, at the option of the other party, at a price to be ascertained by re-purchase or re-sale and the difference between the contract price 284
and such closing-out price shall be the amount which the other party of result be entitled to claim or shall be liable to account for under this contract. Should either 285
party be dissatisfied with the price ascertained by re-purchase or re-sale then the matter shall be referred to arbitration. If no re-purchase or re-sale takes place, and 286
if the parties cannot agree to a closing-out price, then on application of either party, the closing-out price shall be fixed by a sole arbitrator appointed by the 287
Federation subject to the right of appeal under the Federation's Rules of Arbitration and Appeal. 288

**28. CIRCLE:**   Where a Seller repurchases from his Buyer, or from any subsequent Buyer, the same goods or part thereof, a circle shall be considered to exist 289
as regards the particular goods so repurchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause, the same goods shall mean 290
goods of the same description, of the same country of origin, of the same quality and where applicable, of the same analysis warranty, for shipment to the same 291
port/s of destination during the same period of shipment.) Different currencies shall not invalidate the circle. If the goods are not declared or, having been declared, 292
documents are not presented as a result of a circle having been established, invoices based on the mean contract quantity shall be settled between each Buyer and 293
his Seller in the circle by payment by each Buyer to his Seller of the excess of the Seller's invoice amount over the lowest invoice amount in the circle. Where the 294
circle includes contract/s expressed in different currencies, the lowest invoice amount shall be replaced by the market price on the first business day for contractual 295
shipment and invoices shall be settled between each Buyer and his Seller in the circle by payment of the difference between the market price and the relevant 296
contract price in the currency of the contract. Failing amicable agreement the market price shall be that declared by a Price Settlement Committee of the Federation 297
appointed for that purpose on application of either party. 298
Such settlement shall be due for payment not later than 15 consecutive days after the last day for declaration or, should the circle not be established before the 299
expiry of this time, then settlement shall be due for payment not later than 7 days after the circle is established. No circle shall be considered to exist if its existence 300
is not established within 45 days after the last day of shipment. 301
All Sellers and Buyers shall give every assistance to the establishment of the circle and where a circle shall have been established same shall be binding on all 302
parties to the circle. Should any party in the circle commit prior to the due date for payment any act comprehended in the Bankruptcy/Insolvency Clause, the invoice 303
amount for the goods calculated at the closing-out price as provided for in the Bankruptcy/Insolvency Clause, shall be taken as the basis for settlement instead of 304
the lowest invoice amount in the circle, and in this event each Buyer shall make payment to his Seller or each Seller shall make payment to his Buyer of the 305
difference between the closing-out price and the contract price, as the case may be. 306
In the event of a claim under the Prohibition Clause or the Force Majeure Clause the date for settlement shall be deferred until the expiry of the extended shipment 307
period. Thereafter, if the contract is cancelled under the terms of the Prohibition Clause or the Force Majeure Clause, this clause is not applicable. 308

**29. DEFAULT:**   In default of fulfilment of this contract by either party the other party at his discretion shall, after giving notice, have the right either to cancel 309
the contract, or the right to sell or purchase, as the case may be, against the defaulter who shall on demand make good the loss, if any, on such sale or purchase. If 310
the party liable to pay shall be dissatisfied with the price of such sale or purchase, or if neither of the above rights is exercised, the damages, if any, shall, failing 311
amicable settlement, be determined by arbitration. The damages awarded against the defaulter shall be limited to the difference between the contract price and the 312
actual or estimated market price on the day of default. Damages to be computed on the mean contract quantity. 313
If the arbitrators consider the circumstances of the default justify it they may, at their absolute discretion, award damages on a different quantity and/or award 314
additional damages. 315
Prior to the last day for making a declaration of shipment a Seller may notify his inability to ship but the date of such notice shall not become the 316
default date without the agreement of the Buyer. If, for any other reason, either party fails to fulfil his contract and is declared to be in default by the other party 317
and default is either agreed between the parties or subsequently found by arbitrators to have occurred, then the day of the default shall, failing amicable settlement, 318
be decided by arbitration. 319

**30. INTERNATIONAL CONVENTIONS:**   The following shall not apply to this contract:-   320
   (a)  the Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967;   321
   (b)  the United Nations Convention on Contracts for the International Sale of Goods of 1980;   322
   (c)  the United Nations Convention on the Limitation Period in the International Sale of Goods of 1974 and the amending Protocol of 1980.   323

**31. DOMICILE:**   Where both parties at or subsequent to the date of the contract agree, the contract shall be deemed to have been made in Malaysia and the   324
construction, validity and performance thereof shall be governed in all respects by Malaysian law.   325
Otherwise this contract shall be deemed to have been made in England and the construction, validity and performance thereof shall be governed in all respects by   326
English law.   327

**32. ARBITRATION:**   Where both parties at or subsequent to the date of the contract agree, any dispute arising out of or in connection with this contract shall be   328
submitted to arbitration in Malaysia in accordance with the Arbitration Act of Malaysia 1952 (as revised in 1972) and in accordance with the PORAM Rules of   329
Arbitration and Appeal in force at the date of the contract.   330
In all other cases, any dispute arising out of the contract, including any question of law arising in connection therewith, shall be referred to arbitration in London   331
(or elsewhere if so agreed) in accordance with the Rules of Arbitration and Appeal of the Federation of Oils, Seeds and Fats Associations Limited, in force at the   332
date of this contract and of which both parties hereto shall be deemed to be cognizant.   333
Neither party hereto, nor any persons claiming under either of them, shall bring any action or other legal proceedings against the other of them in respect of any   334
such dispute until such dispute shall first have been heard and determined by the arbitrators, umpire or Board of Appeal (as the case may be), in accordance with   335
the Rules of Arbitration and Appeal governing the dispute, and it is hereby expressly agreed and declared that the obtaining of an Award from the arbitrators, umpire   336
or Board of Appeal (as the case may be), shall be a condition precedent to the right of either party hereto or of any person claiming under either of them to bring   337
any action or other legal proceedings against the other of them in respect of any such dispute.   338

**SPECIAL CONDITIONS FOR PALM AND PALM KERNEL OIL PRODUCTS OF MALAYSIAN OR INDONESIAN ORIGIN:**   339
**EXTENSION OF SHIPMENT/CONTINUOUS LOADING:**Where the contract shipment period does not exceed 31 days the period of shipment shall, at the   340
request of Sellers, be extended by an additional period not exceeding 8 days provided notice is given to Buyers of their intention to invoke the continuous loading   341
provisions or claim such extension not later than the first business day following the last day of the original contract shipment period. Successive Sellers must pass   342
on this notification with due despatch. Sellers shall at the same time nominate the ship they intend to load and shall provide, together with shipping documents,   343
satisfactory evidence that the ship was originally booked with lay days/cancelling within the original contract shipment period.   344
No allowance shall be payable provided the ship commenced loading at the loadport from which the goods appropriated under this contract are shipped during the   345
contract shipment period and provided loading of the goods appropriated under this contract is completed within 5 days of the end of the original contract shipment   346
period. If loading did not so commence or, having commenced, did not complete within the said 5 days, Sellers shall make an allowance to their Buyers, on the   347
quantity not loaded, to be deducted in the invoice from the contract price, as follows:   348
   ½% for 1, 2, 3 or 4 days   349
   1% for 5 or 6 days   350
   1½% for 7 or 8 days.   351
If Sellers invoke the continuous loading provisions or claim an extension and fail to ship within the 8 days, the original contract shipment period shall be considered   352
to have been extended by 8 days and the contract price reduced by 1½%.   353
Should Sellers not claim the above extension and fail to ship within the contract period any penalty whether arrived at by amicable settlement or arbitration shall   354
not be related to the allowances of this clause.   355
Where the conditions of this clause are invoked Sellers undertake not to load on the same ship similar goods sold for the then current shipment period, without the   356
prior consent of Buyers.   357

© FOSFA Copyright 2006

**Declaration of Susannah Jones**

**EX2**

**Amendments Pending**

s. 1(e): added (date to be announced) by SI 2000/1825 art. 3

---

### 2.— Conventions to have force of law.

(1)  Subject to subsections (2) and (3) below, the Conventions shall have the force of law in the United Kingdom.

[ (1A)  The internal law for the purposes of Article 1(3) of the Rome Convention is the provisions of the regulations for the time being in force under section 424(3) of the Financial Services and Markets Act 2000. ][2]

(2)  Articles 7(1) and 10(1)(e) of the Rome Convention shall not have the force of law in the United Kingdom.

(3)  Notwithstanding Article 19(2) of the Rome Convention, the Conventions shall apply in the case of conflicts between the laws of different parts of the United Kingdom.

(4)  For ease of reference there are set out in Schedules 1, 2, 3 and 3A to this Act respectively the English texts of—
   (a)  the Rome Convention;
   (b)  the Luxembourg Convention;
   (c)  the Brussels Protocol; and
   (d)  the Funchal Convention.

**Commencement**

s. 2(1):  April 1, 1991 for the purpose specified in SI 1991/707 art.2; March 1, 2005 for the purpose specified in SI 2004/3448 art.2(a)  (SI 1991/707 art. 2; SI 2004/3448 art. 2(a))

s. 2(2)-(4)(c):  April 1, 1991  (SI 1991/707 art. 2)

**Amendments Pending**

s. 2(4):  words substituted (date to be announced) by SI 2000/1825 art. 4(a)

s. 2(4)(d):  s.2(4)(d)-(e) substituted for s.2(4)(d) (date to be announced) by SI 2000/1825 art. 4(b)

---

### 3.— Interpretation of Conventions.

(1)  Any question as to the meaning or effect of any provision of the Conventions shall, if not referred to the European Court in accordance with the Brussels Protocol, be determined in accordance with the principles laid down by, and any relevant decision of, the European Court.

(2)  Judicial notice shall be taken of any decision of, or expression of opinion by, the European Court on any such question.

---

[2] substituted by Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001/3649 Pt 8 art. 320

# Declaration of Susannah Jones

# EX3

Revised and Effective
from 1 October 2005

FEDERATION OF OILS, SEEDS AND FATS ASSOCIATIONS LTD

FOSFA INTERNATIONAL

# RULES OF ARBITRATION
# AND
# APPEAL

**20 ST DUNSTAN'S HILL, LONDON EC3R 8NQ**

## RULES OF ARBITRATION AND APPEAL

Any dispute arising out of a contract or contracts subject to these Rules, including any questions of law arising in connection therewith, shall be referred to arbitration in London (or without prejudice to the juridical seat elsewhere if so agreed) in accordance with the Arbitration Act 1996 and any statutory modification or re-enactment thereof for the time being in force.

The juridical seat of the arbitration shall be, and is hereby designated pursuant to Section 3 of the Arbitration Act 1996 as, England.

Each party engaging in an arbitration or an appeal pursuant to these Rules, whether or not a Member of the Federation, is deemed therefore to abide by these Rules and to agree with the Federation to be liable to the Federation (jointly and severally with the other parties to the arbitration or appeal) for all fees and expenses incurred in connection with the arbitration or appeal, which said fees and expenses shall, upon notification by the Federation under the provisions of Rules 1(b), 1(f), 6(b) and 9, be and become a debt due to the Federation.

### 1. APPOINTMENT OF ARBITRATORS/UMPIRE
   (a) Each party shall appoint an arbitrator who shall have accepted the appointment. However the two parties may by agreement appoint a sole arbitrator who shall have accepted the appointment. Any reference to arbitrators in these Rules shall also be taken to refer to a sole arbitrator. Each party shall advise the Federation promptly of the name of any arbitrator which that party has appointed.
   (b) If two arbitrators have been appointed they shall, if and when they disagree, appoint an umpire. If the arbitrators fail to agree on the appointment of an umpire, they shall notify the Federation which shall appoint an umpire. The Federation shall charge a fee, to be fixed by the Council from time to time, on such appointment.
   (c) Only Trading, Full Broker and Full Non-Trading Members or their nominated representative/s to the Federation shall have the right to act as arbitrators or umpires subject to retirement at age 75, if still active in the trade, or two years after retirement, whichever comes first. No person wholly or principally engaged in legal practice shall be eligible to act as an arbitrator or umpire. No person shall be eligible to act who, or whose company or firm has any direct or indirect interest in the transaction in the dispute. No person shall be eligible to proceed as an arbitrator or umpire who is already proceeding as an arbitrator or umpire in 10 disputes, excluding arbitrations on quality and/or condition stayed by Order of the Court. Any arbitration other than on quality and/or condition that is being held as between the first Seller and the last Buyer in a string shall be counted as a single dispute.
   (d) If the party claiming arbitration has notified the other party and the Federation in accordance with Rule 2(a) or 2(b) and that party fails to appoint an arbitrator within the time specified, or in the event that an arbitrator refuses to act, becomes incapable of acting or ineligible to act, or delays unduly, and the party who made the appointment omits to appoint a substitute, then the other party may apply to the Federation in accordance with Rule 1(f) for the appointment of an arbitrator to act on behalf of the party who failed to appoint an arbitrator or substitute as the case may be.
   (e) Any application to the Federation as mentioned under Rule 1(b) and 1(d) shall be accompanied by a copy of the notice of claim for arbitration together with a copy of the contract.
   (f) The Federation on receiving an application to appoint under Rule 1(d) shall charge the appropriate fee fixed by the Council from time to time. The Federation will notify the party who has failed to make an appointment or a substitution of its arbitrator, as the case may be, that the Federation intends to make such an appointment unless that party makes its own appointment within 14 consecutive days of notice being dispatched to it by the Federation. In the absence of an appointment being notified to the Federation within the stipulated period the Federation shall make such an appointment.

### 2. PROCEDURE FOR CLAIMING ARBITRATION AND TIME LIMITS
   (a) Claims on quality and/or condition:
       (i) If the claim is not to be supported by certificate/s of contractual analysis/ses, the party claiming arbitration shall despatch the notice of claim with the name of his appointed arbitrator to the other party within 21 consecutive days from the date of completion of discharge of the goods and shall at the same time notify the Federation and despatch sealed sample/s to the office of the Federation, where such sample/s shall be held at the disposal of the arbitrators and/or umpire. The other party shall nominate an arbitrator and notify his name to the Federation within 7 consecutive days from receipt of such notice. Notwithstanding this above, if the claimant requires a supporting analysis then a further sample shall have been dispatched to the analyst within 21 consecutive days from the date of completion of discharge of the goods.
           For FOB, ex tank, ex mill and ex store contracts under 2(a) the word 'delivery' shall be read in place of 'discharge'.
       (ii) If the claim is to be supported by certificate/s of contractual analysis/ses, the notice under 2(a)(i) shall be dispatched and the Federation notified within 14 consecutive days from the date of the final analysis certificate. The other party shall nominate an arbitrator and notify his name to the Federation within 7 consecutive days from the receipt of such notice.
       (iii) If the claim relates to goods sold as fair average quality and the contract provides for a standard average for the month of shipment being made, the notice shall be dispatched and the Federation notified within 14 consecutive days of the publication in the trade lists that the standard has been or will not be made. The other party shall nominate an arbitrator and notify his name to the Federation within 7 consecutive days from the receipt of such notice.
       If the arbitration is not proceeded with within 14 consecutive days of the appointment of the arbitrator acting for the respondent, then either party may apply to the Federation in accordance with Rule 1(d) for the appointment of a substitute.
   (b) Claims other than on quality and/or condition shall be notified by the claimant with the name of an arbitrator to the other party and to the Federation within the time limits stipulated in this Rule:
       (i) For goods sold
           (1) On CIF, CIFFO, C&F and similar contract terms: not later than 120 consecutive days after the expiry of the contract period of shipment or of the date of completion of final discharge of the goods whichever period shall last expire. The other party shall nominate an arbitrator and notify his name to the Federation within 30 consecutive days from receipt of such notice.
           (2) On FOB terms: not later than 120 consecutive days after the expiry of the contract period of shipment. The other party shall nominate an arbitrator and notify his name to the Federation within 30 consecutive days from receipt of such notice.
           (3) On any other terms: not later than 120 consecutive days after the last day of the contractual delivery period. The other party shall nominate an arbitrator and notify his name to the Federation within 30 consecutive days from receipt of such notice.
       (ii) In respect of any monies due by one party to the other, not later than 60 consecutive days after the dispute has arisen. The other party shall nominate an arbitrator and notify his name to the Federation within 30 consecutive days from receipt of such notice.
   (c) Claims for arbitration shall be made by any means of rapid written communication (e-mails excluded). All notices shall be under reserve for errors in transmission. Notices shall be passed on with due despatch by intermediate Buyers and Sellers. Any notice received after 16.00 hours on a business day shall be deemed to have been received on the following business day. Notice from a broker shall be a valid notice under these Rules.
       Should the time limit for doing any act or giving any notice expire on a Saturday, Sunday or any public holiday in the country where the party required to do the act or give the notice resides or carries on business or in the country where the act has to be done or the notice has to be received or on any day which the Federation shall declare to be a non-business day the time so limited shall be extended until the first business day thereafter. All business days shall be deemed to end at 16.00 hours Mondays to Fridays inclusive.
   (d) In the event of non-compliance with any of the preceding provisions of this Rule, and of such non-compliance being raised by the respondents as a defence, such default shall be deemed to be waived and absolutely barred unless the arbitrators, umpire or Board of Appeal referred to in these Rules, shall, in their absolute discretion, otherwise determine. Either party has a right of appeal against the arbitrators'/umpire's decision, in which case the Board of Appeal have the same rights as the arbitrators under this clause.
   (e) Failure to notify the Federation as required by Rule 1(a), 2(a) or 2(b) shall not in itself debar a claim for arbitration nor prevent an arbitration proceeding but shall be taken into account by arbitrators, umpire or Board of Appeal in exercising their discretion under Rule 2(d).

3.  **LAPSE OF CLAIM**

If neither the claimant nor the respondent submits any documentary evidence or submissions to the arbitrator appointed by or for him with the copy to the other party within the period of one year from the date of appointment of the first named arbitrator, then the claim to arbitration shall be deemed to have lapsed on expiry of the said period of one year unless before that date the claim is renewed by a further claim for arbitration to be made by either party notifying the other before the expiry date. Any such renewal shall be for a period of one year from the date of the giving of notice of renewal when it shall lapse again unless renewed in the like manner as the first renewal or unless by then documentary evidence or submissions have been submitted by either the claimant or the respondent. In the event of failure to renew a claim as provided in this Rule such claim shall be deemed to have been withdrawn and abandoned unless the arbitrator/s shall in his/their absolute discretion otherwise determine upon such terms as he/they may think fit.

4.  **PROCEDURE FOR ARBITRATIONS**

All submissions, interlocutory applications and related correspondence referred to under this Rule shall be dispatched within any of the specified time limits to: one copy to each of the appointed arbitrators; one copy to the other party; one copy to the Federation.

(a)  Claims under Rule 2(a) (quality and/or condition):
  (i)  The party claiming arbitration shall dispatch in writing his submission together with supporting documents within 10 consecutive days of the claim for arbitration.
  (ii)  If the party against whom a claim is made wishes to reply to the claimants submission, such reply together with supporting documents shall be dispatched in writing within 14 consecutive days of the receipt thereof. Failing receipt of such reply, the arbitrators shall proceed with the arbitration without delay.
  (iii)  In arbitration under Rule 2(a)(i) and 2(a)(iii), the Award of the arbitrator/s or umpire shall be dispatched to FOSFA International for typing within 28 consecutive days from the date of the claim or the date of the publication of the standard.

(b)  Claims under 2(b) (other than on quality and/or condition):
  (i)  The party claiming arbitration shall despatch in writing his submission together with supporting documents without delay.
  (ii)  If the party against whom a claim is made wishes to reply, such reply together with supporting documents shall be dispatched in writing without delay. Failing receipt of such reply, the arbitrators shall proceed with the arbitration without delay.

(c)  When arbitrators appoint an umpire they shall also notify the Federation.

(d)  A sole arbitrator or the arbitrators, by mutual agreement, or the umpire, or the Board of Appeal, as the case may be, shall have discretion to extend the time limits under Rule 4(a).

(e)  If one party has submitted any document to the arbitrator/s which has not been submitted to the other party, then a copy thereof shall be supplied to that party by the arbitrator/s prior to the hearing.

(f)  The arbitrator/s or the umpire, as the case may be, shall have the power to request further information or documents from either of the parties, to hear oral submissions or evidence if they or he so desire and to make such directions relating to the conduct of the arbitration as they or he think fit. The parties shall be entitled to a reasonable period within which to comply with any such request but the arbitrators or the umpire, as the case may be, having given reasonable notice, may make an Award if such requests have not been complied with.

(g)  If either party has expressed a wish to be present, the arbitrators or the umpire shall give reasonable notice to the parties of the date, time and place when any oral evidence or additional submissions may be heard and both parties to the arbitration or their authorised representatives may attend any such hearing but may not have present or be represented by counsel, solicitor or any member of the legal profession wholly or principally engaged in legal practice.

(h)  The arbitrator/s or the umpire at their absolute discretion may require the claimant to lodge a deposit with the Federation on account of the fees, costs and expenses of the arbitration before proceeding. If after the expiration of 14 consecutive days after the notification to the claimant of the deposit required the claimant not having paid such deposit, the arbitration shall be stayed until such time as the deposit is paid. In the event that the deposit is not paid within 28 consecutive days the arbitration shall be deemed to be permanently stayed unless the arbitrator/s or umpire in the exercise of their absolute discretion decide to continue the arbitration.

(i)  If any party to an arbitration considers that either arbitrator or the umpire is failing to exercise all reasonable despatch in entering on or proceeding with the arbitration then that party may notify the Federation accordingly in writing with full details. Upon receipt of such notice the Federation shall call upon the arbitrator or umpire to explain the reasons for the delay. The arbitrator or umpire must furnish the Federation with such an explanation within 7 days of the Federation's request for such an explanation. If the Federation is not satisfied with the arbitrators' or umpire's explanation the Federation shall fix a 7 day period in which the arbitrator or umpire is to take the next step required to be done in proceeding with the arbitration. Should the arbitrator or umpire fail to respond to the Federation's request for an explanation or fail to take the next step required to be done in proceeding with the arbitration, within the 7 day period then the Federation shall have the right to require the arbitrator or umpire to resign his position as arbitrator or umpire in that particular arbitration. The arbitrator or umpire shall be deemed to have resigned his position 14 consecutive days after despatch to him of the Federation's written requirement that he resigns his appointment unless otherwise decided by the Federation.

An arbitrator or umpire who is called upon to resign his position as arbitrator or umpire under this provision shall not be entitled to receive any remuneration in respect of his services provided in the particular arbitration in question unless otherwise decided by the Federation. Where an arbitrator resigns his position under this provision then the party who appointed the arbitrator shall appoint another duly qualified arbitrator in his place within 14 days of the notice being dispatched in accordance with the provisions of Rule 1. If that party does not so appoint then the Federation shall make such an appointment and shall charge the defaulting party the appropriate fee fixed by the Council from time to time being in force.

Where an umpire resigns his position under this provision then the two arbitrators who have appointed him shall appoint another umpire in his place, within 7 days of being notified of the resignation of the umpire. If the arbitrators do not so appoint then the Federation shall make such an appointment in accordance with its powers under Rule 1(b).

In circumstances where an arbitrator or umpire is removed from an arbitration by the Federation as provided for above, the Federation may, by a decision of the Council, also suspend or remove that person's right to act as an arbitrator or umpire and to serve on the Appeal Panel.

5.  **JURISDICTION**

(a)  The arbitrators may rule on their own jurisdiction as to whether there is a valid arbitration agreement.

(b)  If arbitrators agree that they have jurisdiction, they shall proceed with the arbitration without delay.

(c)  If arbitrators agree that they have no jurisdiction they shall draw up an award in accordance with Rules 6(a) and 6(b).

(d)  If the arbitrators cannot agree that they have jurisdiction they shall appoint an umpire under Rule 1(b) who shall first determine the question of jurisdiction.

(e)  If the umpire decides that he has jurisdiction he shall proceed with the arbitration without delay.

(f)  If the umpire decides that he has no jurisdiction he shall draw up an award in accordance with Rules 6(a) and 6(b).

(g)  A right of appeal to the Federation shall apply to Rules 5(c) and 5(f).

6.  **PROCEDURE FOR ARBITRATION AWARDS**

(a)  Awards, which shall incorporate the reasons therefore, shall be in writing on the official form of the Federation and the arbitrators or the umpire shall have the power to assess and award their fees and award by whom these and other fees and expenses of the arbitration shall be paid. The Federation's fees shall be those in force as prescribed by the Council of the Federation.

(b) When an Award has been signed it shall be the duty of the arbitrators or the umpire to lodge the original and one copy with the Federation who shall date them and give notice to the parties named in the award that the award is at their disposal upon payment of the fees and expenses of the arbitration. Such payment must be received by the Federation within 42 days of the date of the award or the parties shall forfeit their right to appeal against the award under Rule 7. On receipt of payment, the Federation shall immediately send the original award to the party who has paid and send a copy to the other party. Until payment has been made, the contents of the award shall under no circumstances be divulged.

(c) Should the contract form part of a string of contracts which are in all material points identical in terms, except as to the date and price, then:

    (i) In any arbitration for quality and/or condition, as mentioned in Rule 2(a), the arbitration shall be held as between the first Seller and the last Buyer in the string as though they were contracting parties.

    Any Award so made (in these Rules called the String Award) shall, subject to the right of appeal as provided in these Rules, be binding on all the intermediate parties in the string, and may be enforced by any intermediate party against his immediate contracting party as though a separate award has been made under each contract.

    (ii) In other cases arbitration shall only be held as between the first Seller and the last Buyer in a string as though they were contracting parties if all parties in the string agree in writing and provided each intermediate party shall have submitted his contract and all relevant information to the arbitrators. A separate Award shall be made in respect of each contract.

## 7. PROCEDURE FOR CLAIMING APPEAL AND TIME LIMITS

(a) Any party to an award of arbitration shall have the right to appeal to the Appeal Panel of the Federation provided that payment of the fees and expenses of the arbitration was made to the Federation within 42 days of the date of the award as per Rule 6(b) and that notice of appeal is received by the Federation not later than 12.00 hours on the 28th consecutive day after the date on which the award is sent to the parties, in accordance with Rule 6(b).

(b) The appellant when giving notice of appeal to the Federation shall at the same time send a copy to the other principal to the contract and arrange to pay to the Federation a deposit as prescribed by the Council of the Federation on account of fees, costs and expenses of the appeal, which is to be received by the Federation not later than 7 consecutive days after receipt of the notice of appeal.

    If due to currency regulations payment of the deposit is not possible within the 7 day time limit an extension of 14 consecutive days shall be granted for the payment of the deposit provided that the appellant has produced satisfactory evidence from a bank that the application for the transfer of the deposit has been made.

(c) Every notice given to a party to any string Award shall be passed on with due despatch by that party and such passing on, provided it is done with due despatch shall be deemed to be in compliance with the procedure for claiming appeal.

(d) The appellant shall within 21 days of lodging the appeal, provide the Federation and the other party with an outline of the reasons for appeal.

(e) Should it not be possible to perform any of the foregoing acts within the time limits stipulated, application may be made to the Federation for an extension of the time limit, which extension may be granted at the absolute discretion of the Federation.

## 8. PROCEDURE FOR APPOINTMENT OF BOARDS OF APPEAL

(a) The appeal shall be determined by a Board of Appeal consisting of five members appropriately appointed by the Federation from the Appeal Panel. No member of the Panel who, or whose company or firm, has any direct or indirect interest in the transaction in dispute or who has acted as arbitrator or umpire in the case, nor any member of the same company or firm to which either of the arbitrators or the umpire belong, shall be entitled to be appointed a member of the Board of Appeal.

(b) In the case of illness or death, or refusal, or incapacity, or inability to act, of any member appointed to serve on a Board of Appeal, the Federation shall appoint a substitute from the Appeal Panel in his place. Nevertheless if only four members of the Board are able to serve on the day of the substantive hearing, they may, subject to the agreement of the parties or of their duly authorised representatives, exercise all the powers of the Board of Appeal.

(c) In the event of appeals lodged by more than one party in relation to the same Award, the Federation shall consolidate such appeals for hearing by the same Board of Appeal.

## 9. PROCEDURE AT APPEALS

(a) Each party may state their case orally and/or in writing and may appear either personally or be represented by a listed representative in the appropriate section of a Trading, Full Broker or Full Non-Trading member of the Federation and duly appointed in writing, but shall not be represented by or have present at the hearing of such appeal, Counsel or Solicitor, or any member of the legal profession wholly or principally engaged in legal practice, unless, at the sole discretion of the Board of Appeal, the case is of special importance, and in such cases the other party shall have the same rights.

(b) The Board of Appeal shall issue a reasoned Award signed by the Chairman on behalf of the Board and counter signed by the Secretary to the Board of Appeal after confirmation that the majority agree the Award, and when so signed shall be the Award of the Board of Appeal which shall be final and binding.

(c) In respect of any String Award made by a Board of Appeal such String Award shall be binding on the first Sellers, the last Buyers, and all the intermediate parties in the string and may be enforced by any intermediate party against his immediate contracting party as though a separate award had been made under each contract.

(d) The Board of Appeal shall have the power to require from time to time a further deposit/s to be made by either party and shall award the payment of appeal fees, costs and expenses of, and incidental to, the appeal. If an Award is remitted to a Board of Appeal by Order of the Court the Board shall have the power to require a deposit to be made by the party/ies that made application to the Court on account of the fees, costs and expenses of any hearing by the Board of submissions by the parties or of any meeting of the Board occasioned by such remission. No interest shall be payable on any deposit or further deposit made by any party to an appeal under the provisions either of this Rule or Rule 7.

(e) If the appellant, on receiving from the Board of Appeal notice of the date fixed for the hearing of the appeal, requests a postponement of more than 14 days or at the first or any subsequent hearing of the appeal requests an adjournment, then in such events the Board of Appeal may at their absolute discretion direct that as a condition of granting a postponement or an adjournment all or any part of the money required by the terms of the award of arbitration to be paid by either party to the other shall be deposited in a bank (either in England or abroad) as the Board of Appeal may direct. Such money shall be held by such bank in an account in the name of the Federation and otherwise in such terms as the Board of Appeal directs.

    The Board of Appeal shall, where such money has been deposited, in their Award direct how and to which of the parties the amount so held shall be paid out. Provided that, if in the opinion of the Board of Appeal after hearing the parties, the appellant shall have delayed unduly the proceedings of his appeal, he shall after due warning and if the Board of Appeal so decides, be deemed to have withdrawn his appeal in which case the money on deposit (with interest, if any, less tax) shall immediately become due and payable to the party or parties entitled thereto under the terms of the Award of Arbitration.

## 10. WITHDRAWAL OF APPEALS

(a) An appellant shall have the right at any time before the hearing of the appeal to withdraw his appeal subject to payment of such costs, if any, as the Federation or the Board of Appeal may determine:

    (i) On notice being received from the appellant at least 24 hours before the appointment of the Board of Appeal half of the deposit shall be returned.

    (ii) On notice being received at least 72 hours before the time fixed for the hearing by the Board of Appeal one quarter shall be returned.

    (iii) If such notice of withdrawal is received after that time no part of the deposit shall be returned.

    (iv) When an appeal is withdrawn before any action has been taken by the Federation the deposit shall be refunded.

(b) In the event of such withdrawal as aforesaid any other party to an Award of Arbitration shall have a right of appeal against that award to the Appeal Panel of the Federation in accordance with the provisions of Rule 6 save that the time limit for giving notice of appeal laid down in Rule 7(a) shall be 12.00 hours on the 21st consecutive day after the date of the Federation's notice to that party of the aforesaid withdrawal.

## 11. GENERAL

(a) (i)  Any objection to the membership of a Board of Appeal on the ground that a member of the Board of Appeal was not eligible to serve must be made in writing and established to the satisfaction of the Council of the Federation before the hearing of the substantive case has commenced.

   (ii)  If such objection is made the Federation in its absolute discretion shall have the power to appoint a substitute member or members of a Board of Appeal from the Appeal Panel up to the beginning of the hearing of the substantive case.

   (iii)  No Award of a Board of Appeal shall be questioned or invalidated on the ground of any irregularity in the appointment of the Board of Appeal or any of its members or on the ground that any member of the Board of Appeal was not eligible to serve.

(b)  Any notice may be delivered personally or left at the place where the party to whom it is to be delivered is carrying on business or (by reason of the provisions of the contract) is to be considered to be carrying on business. A copy shall be delivered to the Federation.

(c)  If an Arbitration or an Appeal Award is not taken up by any of the parties to the dispute within 28 consecutive days after the date of the Award, the Federation shall call upon the claimant and the respondent or the appellant and the respondent, as the case may be, to take up the Award. If the claimant and the respondent or the appellant and the respondent fail to take up the Award, the Council of the Federation may post on the Federation's notice board and/or circularise to members in any way thought fit a notification to that effect. The parties to any such arbitration or appeal held under these Rules shall be deemed to have consented to the Council taking such action.

(d)  In the event of any party to an arbitration or appeal held under these Rules neglecting or refusing to carry out or abide by an Award of arbitrators or umpire or Board of Appeal made under these Rules, the Council of the Federation may post on the Federation's Notice Board and/or circularise to members in any way thought fit a notification to that effect. The parties to any such arbitration or appeal shall be deemed to have consented to have the Council taking such action.

© FOSFA Copyright 2005

# Declaration of Susannah Jones

# EX4

# ARBITRATION ACT 1996

BY

## ROBERT MERKIN, LLB, LLM

*Lloyd's Law Reports Professor of Commercial Law*
*Southampton University*

*Consultant*
*BARLOW LYDE & GILBERT*

Consultant Editor

**LOUIS FLANNERY, LLB, FCI Arb**

*Solicitor Advocate*

## |L|L|P|

LONDON   SINGAPORE

2005

The section also reflects the common use of exclusion clauses in agreements between arbitrators and the parties, whereby the arbitrators exclude liability for errors.

The section seemingly does not operate to give the arbitrator immunity from a costs order made against him in successful proceedings brought by one party for his removal.[1]

One question which has given rise to difficulty, but not yet to judicial proceedings, is whether an arbitration institution which has acted negligently in its appointment of the arbitrators or has otherwise failed to exercise its supervisory or other powers with reasonable care is liable in contract or tort to the parties. This issue was sidestepped by the 1995 Bill, but section 74 of the Act extends the immunity conferred upon arbitrators to such institutions.

### *Jurisdiction of the Arbitral Tribunal*

## Competence of tribunal to rule on its own jurisdiction

30.—(1) Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as to—

    (a) whether there is a valid arbitration agreement,
    (b) whether the tribunal is properly constituted, and
    (c) what matters have been submitted to arbitration in accordance with the arbitration agreement.

(2) Any such ruling may be challenged by any available arbitral process of appeal or review or in accordance with the provisions of this Part.

NOTES

The decision of the Court of Appeal in *Harbour Assurance Co Ltd v. Kansa General International Insurance Co Ltd*[2] was to the effect that the main contract and the obligation to arbitrate are distinct agreements, and that providing that the arbitration clause is sufficiently widely worded the arbitrators in principle have the jurisdiction to determine whether the main agreement is valid. They may thus decide whether the agreement is void, illegal or voidable. *Harbour* did not go as far as saying that all matters affecting the arbitrators' jurisdiction may be decided by them, although that proposition may be taken to flow from the reasoning in *Harbour*. All of this has been put beyond doubt by the Arbitration Act 1996. Section 7 of the Act sets out the principle of the separability of the main contract and the arbitration clause,[3] and section 30 confers upon the arbitrators the ability, subject to contrary agreement, to determine their own jurisdiction (recognised on the Continent as the principle of "Kompetenz-Kompetenz"). In so providing the section has adopted in a modified form the principles contained in art. 16 of the Model Law, with the difference that section 30 is not mandatory and can be contracted out of by the parties.[4] The provisions of section 30 are new, but they do reflect the common law principle of waiver of rights by submission. The advantage of Kompetenz-Kompetenz is that the scope for one party to delay the proceedings by claiming want of jurisdiction and taking the matter to the courts is considerably reduced.

1 *Wicketts and Sterndale v. Brine Builders* [2001] CILL 1805, although the point was not there argued.
2 [1993] 1 Lloyd's Rep 455, applied in *Fletamentos Maritimos SA v. Effjohn International BV (No 2)* [1996] 2 Lloyd's Rep 304.
3 See above.
4 DAC Report, para. 138.

negative sense: an arbitration clause which contemplates that it may be incorporated from contract A into contract B will not operate to effect incorporation into contract B as this is a matter for contract B itself,[1] although if contract B does purport to incorporate the arbitration clause then the wording of the arbitration clause may prevent its incorporation where it makes no sense in contract B unless it can be "manipulated" to be given effect.

The existence and validity of the arbitration agreement are, subject to contrary agreement, matters for the arbitrators to determine in the first instance.[2]

## Separability of arbitration agreement

7. Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.

### NOTES

As a matter of practice, an agreement to arbitrate may take the form of an arbitration clause within a main agreement, or an entirely distinct contract contained in separate documentation.[3] Whether or not the arbitration agreement is physically distinct, section 7 provides that the agreement to arbitrate is as a matter of law severable from the main obligation and stands or falls in its own right, reflecting the position ultimately reached by the common law and embodied in art. 16(1) of the Model Law. It follows that the main agreement is not an arbitration agreement and need not itself be in writing, a point which was clarified in Committee in the House of Lords by the addition of the words "whether or not in writing" following a recommendation of the DAC's Report, para. 358.[4]

The concept of severability was not fully recognised in England until the 1993 decision of the Court of Appeal in *Harbour Assurance Co (UK) Ltd v. Kansa General International Insurance Co Ltd*,[5] a landmark judgment of Steyn J which presented the pragmatic and intellectual justifications of severability, e.g. the need to bring England into line with other jurisdictions, the need to give full effect to an arbitration clause in line with business expectations, and the need to avoid the prospect of a party avoiding an obligation to arbitrate by the mere assertion that the underlying agreement was void. Prior to that decision, the main barrier to the ability of the arbitrators to rule on the validity of the main contract had been the House of Lords ruling in *Heyman v. Darwins Ltd*,[6] in which it had been said that an argument that the main agreement was itself void or for some other reason unenforceable would prevent reliance on the arbitration clause, as the clause formed part of the agreement and could not survive independently of it. *Heyman* itself had taken the first tentative steps towards the concept of severability, by rejecting an argument originally accepted by Viscount Haldane LC in *Jureidini v. National British and Irish Millers Insurance Co*[7] that a breach of contract which led to the termination of that contract precluded reliance on the arbitration

---

1 The authorities were discussed in *Sibori KIS v. BP France SA* [2003] 2 Lloyd's Rep 364, distinguishing *The Merak* [1964] 2 Lloyd's Rep 527 and applying *The Federal Bulker* [1989] 1 Lloyd's Rep 103 and *The Varenna* [1983] 2 Lloyd's Rep 692.

2 Sections 30 to 32. See below.

3 The July 1995 Bill stated expressly that an arbitration agreement could be in the form of a distinct contract, wording which did not find its way into the 1996 Act.

4 Noted in the DAC Supplementary Report, January 1997, para. 20.

5 [1993] 1 Lloyd's Rep 455.

6 [1942] AC 356.

7 [1915] AC 499.

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT          s.7

clause.[1] Having established that an arbitration clause is capable of surviving termination, the courts gradually moved to a full concept of separability by a series of decisions which held that an arbitration clause could, if appropriately worded, apply to questions of voidability,[2] frustration,[3] voidness[4] and, ultimately, illegality.[5] These decisions plainly hold good under the 1996 Act, the only question being whether the wording of the clause is sufficiently wide to cover the issue: if the clause is confined to disputes arising under the contract then the arbitrators can consider only construction and related issues, whereas if the clause refers to all disputes or disputes arising out of a contract then the necessary wider jurisdiction is conferred. Thus in *Vee Networks Ltd v. Econet Wireless International Ltd*[6] Colman J applied section 7 and held that it empowered the arbitrator to decide whether or not a contract of supply was void for being *ultra vires* the customer. Issues as to the variation[7] and rectification[8] of the main agreement may on the same basis be determined by the arbitrators.

This section is not mandatory and, in accordance with the opening words of section 7, is subject to contrary agreement in writing. This form of expression is perhaps misleading, as the whole point of severability is that the arbitration clause is capable of surviving the alleged termination or voidness of the agreement only where its wording is sufficiently wide. Narrow terminology will deprive the clause of independent effect, and thus section 7 of any real impact.

There is an important modification of the separability principle as regards contracts which plainly have no effect. In *Harbour* the Court of Appeal noted that there were categories of illegality which rendered contracts void, with the result that there could be nothing to arbitrate. In *Soleimany v. Soleimany*[9] Waller LJ repeated this proposition as regards contracts which were palpably illegal or contrary to public policy—such as an agreement between criminals to divide the proceeds of their activities—and accordingly arbitration provisions relating to such agreements would themselves be void. These *dicta* were relied upon by the Court of Appeal in *O'Callaghan v. Coral Racing Ltd*,[10] in which it was held that a wagering contract rendered illegal[11] or void[12] by the Gaming Act 1845 was simply non-existent and the arbitration clause in it was itself of no effect. The Court of Appeal approved the earlier decision in *Joe Lee Ltd v. Lord Dalmeny.*[13] The result of the qualification is that there is a distinction—yet to be clearly drawn—between contracts under which arbitrators have the

---

1 This aspect of *Jureidini* was laid to rest by the Privy Council in *Super Chem Products Ltd v. American Life and General Insurance Co Ltd* [2004] Lloyd's Rep IR 446.

2 *Overseas Union Inc v. AA Mutual International Ltd* [1988] 2 Lloyd's Rep 53, although see the doubts expressed as late as 1988 in *Ashville Investments Ltd v. Elmer Contractors Ltd* [1988] 2 All ER 577.

3 *Government of Gibraltar v. Kenney* [1956] 2 QB 410, rejecting the earlier view in *Hirji Mulji v. Cheong Yue Steamship Co Ltd* [1926] AC 497.

4 *Harbour Assurance Co (UK) Ltd v. Kansa General International Insurance Co Ltd* [1992] 1 Lloyd's Rep 81, a landmark judgment of Steyn J which presented the pragmatic and intellectual justifications of severability, e.g. the need to bring England into line with other jurisdictions, the need to give full effect to an arbitration clause in line with business expectations, and the need to avoid the prospect of a party avoiding an obligation to arbitrate by the mere assertion that the underlying agreement was void.

5 *Harbour Assurance Co (UK) Ltd v. Kansa General International Insurance Co Ltd* [1993] 1 Lloyd's Rep 455, taking the step which Steyn J felt to be constrained by the authority of *David Taylor Son Ltd v. Barnett Trading Co* [1953] 1 Lloyd's Rep 181.

6 [2004] EWHC 2909 (Comm). See also *Continental Enterprises Limited v. Shandong Zhucheng Foreign Trade Group Co* [2005] EWHC 92 (Comm).

7 *Joseph Finney plc v. Vickers* 2001, unreported; *El Nasharty v. J Sainsbury plc* [2004] 1 Lloyd's Rep 309.

8 *Macepark (Whittlebury) Ltd v. Sargeant* 2002, unreported.

9 [1998] 3 WLR 811.

10 1999, unreported.

11 *Per* Hirst LJ, Sir Christopher Slade concurring.

12 *Per* May LJ, Sir Christopher Slade concurring.

13 [1927] 1 Ch 300.

right to determine jurisdiction and those under which they do not. It might be thought that this analysis is inconsistent with *Halki Shipping* v. *Sopex Oils*[1] in which the Court of Appeal held that the existence of a dispute was to be determined by the arbitrators even though it was clear from the outset that one party was plainly wrong and would have to lose. A more consistent, although arguably less convenient, approach might have been to allow the arbitration to proceed with the arbitrators themselves determining the validity or otherwise of the contract: if the arbitrators ignore statutory illegality or public policy in reaching their award, the award would almost certainly be unenforceable in any event,[2] so that ultimately the right result will be reached.

The recognition of the separability of the arbitration clause leads to the further proposition that the arbitrators are free to determine their own jurisdiction under the main agreement itself, in respect of issues such as the validity of the arbitration clause, the validity of their own appointments and the adequacy of their qualifications. The latter step, which the common law had not been asked to take, is nevertheless taken by section 30 of the Act. However, the Act, consistently with the common law, does not permit the arbitrators to have the final word on their own jurisdiction, and sections 30 to 32 lay down a special procedure, based on art. 16 of the Model Law, for challenges to the arbitrators' assertion or denial of jurisdiction. Separability and the right to determine jurisdiction are distinct concepts[3] in that the former is concerned with the right of the arbitrators to rule on the validity of the main contract whereas the latter is concerned with the right of the arbitrators to determine whether they have any power to sit as arbitrators. However, in many cases, both questions are in issue and to that extent the two notions will be relevant in the same proceedings.

The July 1995 Bill contained an additional provision stating that the principle of severability did not affect the question whether an assignment or transfer of rights under the main agreement had any effect on the right or obligation to submit a dispute to arbitration. The DAC in its July 1995 Report did not think it necessary for the Bill to address matters relating to assignment, given the problems raised by formalities and choice of law. The final version of the 1996 Act has gone even further, and has simply omitted the point completely. The common law position—that in the absence of a clause prohibiting assignment of the agreement,[4] such carries the arbitration clause with it—is thus left untouched.[5] The February 1996 DAC Report, para. 46, set out the DAC's reasons for excluding questions of assignment completely: complex conflict of laws points would arise (flowing from the fact that the assignability of a contract is governed by the law applicable to the contract whereas the effectiveness of the assignment is governed by the law applicable to the assignment itself—these laws may be different in any case, giving rise to possible conflicts) and the distinction drawn in English law between legal and equitable assignments would require the drafting of a complex and probably incomprehensible provision.

The English courts are entitled to apply the principle of severability to a case coming before them where the seat of the arbitration is England and Wales or Northern Ireland, and even

---

1 [1998] 1 Lloyd's Rep 465. See the notes to section 9.

2 See the note to section 103, where public policy is discussed.

3 The DAC Report, para. 43, regarded the two concepts as "quite separate".

4 *Yeandle* v. *Wynn Realisations Ltd* (1995) 47 Con LR 1; *Bawejem* v. *M C Fabrications Ltd* [1999] 1 All ER (Comm) 377.

5 The position is not entirely free from doubt. The proposition in the text is supported by *Shayler* v. *Woolf* [1946] Ch. 320, *Montedipe SpA* v. *JTP-Rojugotanker, The Jordan Nicolov* [1990] 2 Lloyd's Rep 11 and *Eurosteel Ltd* v. *Stinnes* [2000] 1 All ER (Comm) 964, but doubted by *London Steamship Owners Mutual Insurance Association Ltd* v. *Bombay Trading Co Ltd, The Felicie* [1990] 2 Lloyd's Rep 21. The most recent authorities are in favour of allowing an assignee to take over the rights of a party to an arbitration agreement even during the course of the arbitration: *Baytur SA* v. *Finagro Holdings SA* [1992] 1 Lloyd's Rep 134; *Charles M Willie Co (Shipping) Ltd* v. *Ocean Laser Shipping Ltd, The Smaro* [1999] 1 Lloyd's Rep 225.

where the seat is elsewhere provided that the law applicable to the arbitration clause is that of England and Wales or Northern Ireland. Accordingly, in the latter case, if judicial proceedings are commenced in England, and in issue in those proceedings is the question whether there is a valid arbitration clause in existence in the light of, e.g. the termination, illegality or voidness of the main agreement, and it can be shown that the arbitration clause is governed by English law, then English law as contained in section 7 will determine whether the arbitration clause remains or is in existence so that, if appropriate, a stay can be granted (section 2(5)). In this type of case, there may be initial questions as to whether there is an agreement to arbitrate at all and, if so, whether the agreement is governed by English law in order for section 2(5) to bring the Act into play.

## Whether agreement discharged by death of a party

8.—(1) Unless otherwise agreed by the parties, an arbitration agreement is not discharged by the death of a party and may be enforced by or against the personal representatives of that party.

(2) Subsection (1) does not affect the operation of any enactment or rule of law by virtue of which a substantive right or obligation is extinguished by death.

NOTES

Section 8(1) re-enacts section 2(1) of the Arbitration Act 1950,[1] with the sole substantive change that the provision is no longer mandatory and operates subject to any contrary agreement. One linguistic change is the modification of the statement in section 2(1) of the 1950 Act that the death of one party did not discharge the agreement "as respects the deceased or any other party". The phrase "any other party" was, according to the DAC in its July 1995 Report, originally intended to cover the death of a co-party to arbitration proceedings: this was regarded as superfluous, and has been deleted. If a party to an arbitration has died after the proceedings have commenced and he has appointed an arbitrator, the authority of the arbitrator is not revoked by his death.[2]

Section 8(2) re-enacts, without substantive change, section 2(3) of the Arbitration Act 1950. This confirms that any earlier principle bringing a cause of action or obligation to an end on death does not apply to arbitrations. The wider terminology has been used in substitution for the old wording "cause of action".[3]

Both limbs of section 8 apply to an arbitration which does not have its seat in England and Wales or Northern Ireland, but where the arbitration agreement itself is governed by English law (section 2(5)), as in such a case the English courts are free to determine the validity of the arbitration clause.

*Stay of Legal Proceedings*

## Stay of legal proceedings

9.—(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which

1 The DAC in its July 1995 document noted that at common law, prior to the Law Reform (Miscellaneous Provisions) Act 1934, the death of a party had the effect of bringing the arbitration agreement (and, indeed, any cause of action) to an end. The law was altered in 1934, and s. 2(1) of the 1950 Act merely confirmed the 1934 change.
2 Section 23(2), re-enacting s. 2(2) of the Arbitration Act 1950.
3 DAC Report, para. 48.

# Declaration of Susannah Jones

# EX5

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## TWENTY-NINTH EDITION

Volume I

### GENERAL PRINCIPLES

LONDON
SWEET & MAXWELL
2004

2–001                                   CHAP. 2—THE AGREEMENT

In deciding whether the parties have reached agreement, the courts normally apply the objective test,[4] which is further discussed at para.2–002 below. Under this test, once the parties have to all outward appearances agreed in the same terms on the same subject-matter,[5] then neither can, generally,[6] rely on some unexpressed qualification or reservation to show that he had not in fact agreed to the terms to which he had appeared to agree. Such subjective reservations of one party therefore do not prevent the formation of a contract.[7]

## 2. THE OFFER

2–002    **Offer defined.** The offer is an expression of willingness to contract made with the intention (actual or apparent) that it is to become binding on the person making it as soon as it is accepted by the person to whom it is addressed.[8] Under the objective test of agreement,[9] an apparent intention to be bound may suffice, *i.e.* the alleged offeror (A) may be bound if his words or conduct[10] are such as to induce a reasonable person to believe that he intends to be bound, even though in fact he has no such intention. This was, for example, held to be the case where a university had made an offer of a place to an intending student as a result of a clerical error[11]; and where a solicitor who had been instructed by his client to settle a claim for $155,000 by mistake offered to settle it for the higher sum of £150,000.[12] Similarly, if A offers to sell a book to B for £10 and B accepts the offer, A cannot escape liability merely by showing that his actual intention was to offer the book to B for £20, or that he intended the offer to relate to a book different from that specified in the offer.[13]

[4] Howarth (1984) 100 L.Q.R. 265; Vorster (1987) 103 L.Q.R. 247; Howarth, *ibid.*, 547; De Moor (1990) 106 L.Q.R. 632; *Smith v Hughes* (1871) L.R. 6 Q.B. 597, 607; below, para.5–056.

[5] See *Falck v Williams* [1900] A.C. 176; cf. *Thake v Maurice* [1986] Q.B. 644 and *Eyre v Measday* [1986] 1 All E.R. 488 (applying the objective test for the purpose of determining the contents of an admitted contract).

[6] The rule stated in the text does not apply where one party knows that the other does not assent to the terms proposed: *e.g.* where an offer is expressed in a language which the offeree, to the offeror's knowledge, does not understand. See *Geier v Kujawa, Weston and Warne Bros (Transport) Ltd* [1970] 1 Lloyd's Rep. 364; and cf. below, para.2–003; cf., in cases of mistake, below, para.5–063.

[7] See, *e.g. Thoresen Car Ferries Ltd v Weymouth Portland BC* [1977] 2 Lloyd's Rep. 614.

[8] *e.g. Storer v Manchester City Council* [1974] 1 W.L.R. 1403; *First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep. 195, 201; contrast *André & Cie v Cook Industries Inc* [1987] 2 Lloyd's Rep. 463; *Schuldenfrei v Hilton (Inspector of Taxes)* [1998] S.T.C. 404 (statement that something *had* been done not an offer).

[9] Above, para.2–001; *Ignazio Messina & Co v Polskie Linie Oceaniczne* [1995] 2 Lloyd's Rep. 566, 571; *Bowerman v ABTA Ltd* [1995] N.L.J. 1815.

[10] For offers made by conduct, see below, at n.20 *et seq.*; *The Aramis* [1989] 1 Lloyd's Rep. 213 (where the objective test was not satisfied); *G. Percy Trentham Ltd v Archital Luxfer Ltd* [1993] 1 Lloyd's Rep. 25, 27.

[11] *Moran v University College Salford (No.2)*, *The Times*, November 23, 1993.

[12] *O.T. Africa Line Ltd v Vickers plc* [1996] 1 Lloyd's Rep. 700.

[13] cf. *Centrovincial Estates plc v Merchant Investors Assurance Co Ltd* [1983] Com.L.R. 158, cited with approval in *Whittaker v Campbell* [1984] Q.B. 318, 327, in *Food Corp. of India v Antclizo Shipping Corp (The Antclizo)* [1987] 2 Lloyd's Rep. 130, 146, affirmed [1988] 1 W.L.R. 603 and in *O.T. Africa Line Ltd v Vickers plc* [1996] 1 Lloyd's Rep. 700, 702.

[122]

THE ACCEPTANCE

2–025

if any, to allot to any particular applicant.[93] On the other hand a letter informing an existing shareholder of his entitlement under a "rights" issue of new shares is regarded as an offer.[94] This type of communication will set out the precise rights of the persons to whom it is addressed, so that it may be inferred that the company intends to be bound in relation to any shareholder who takes up his rights.

**Place of making an offer.** It may, for a variety of purposes, be important to know exactly *where* an offer has been made: for example, in order to determine whether a contract can be sued on in a particular court.[95] For this purpose it has been held that an offer sent through the post had been made where it was posted.[96] Since requirements of this kind are generally imposed by legislation, it is unsafe to lay down any general rule. The question where an offer was made must, in the last resort, turn on the construction of the relevant legislation.

2–023

**Time of making an offer.** Since an offer may expire by lapse of time,[97] the question *when* it was made may also be of importance, especially if there has been some delay in its transmission. In *Adams v Lindsell*[98] an offer to sell wool was made in a letter which was misdirected by the offerors and consequently delayed by two days. On receipt of the letter, the offeree immediately posted an acceptance. It was held that there was a binding contract as the delay arose entirely from the mistake of the offerors. On the other hand, if the delay had been of such length as to make it clear to the offeree that the offer was "stale," it seems unlikely that the offeree could still have accepted. The emphasis placed in *Adams v Lindsell* on the fault of the offerors also makes it possible to argue that a different rule might apply where the delay is due to some other factor, e.g. to an accident in the post. In such a case the time within which the offer could be accepted might more appropriately run from the moment at which the offer would, but for the accident, have been communicated[99] to the offeree.

2–024

3. THE ACCEPTANCE

(a) *Definition*

**Acceptance defined.** An acceptance is a final and unqualified expression of assent to the terms of an offer. The objective test of agreement applies to an

2–025

[93] e.g. *Hebb's Case* (1867) L.R. 4 Eq. 9; *Harris' Case* (1872) L.R. 7 Ch.App. 587; *Wall's Case* (1872) 42 L.J.Ch. 372; cf. *Wallace's Case* [1900] 2 Ch.671; *National Westminster Bank plc v I.R.C.* [1995] 1 A.C. 119, .126; cf. *Rust v Abbey Life Ins. Co* [1979] 2 Lloyd's Rep. 335 (property bonds).
[94] *Jackson v Turquand* (1869) L.R. 4 H.L. 305.
[95] *Taylor v Jones* (1875) 1 C.P.D. 87; cf. in criminal law, *Treacy v D.P.P.* [1971] A.C. 537 (blackmail); contrast *R. v Baxter* [1972] 1 Q.B. 1 (attempt to obtain by deception).
[96] *Taylor v Jones*, above.
[97] Below, paras 2–093—2–095.
[98] (1818) 1 B. & Ald. 681; Winfield (1939) 55 L.Q.R. at 499, 503–504.
[99] As to the meaning of "communicated" cf. below, paras 2–044, 2–081.

[133]

2–025                 CHAP. 2—THE AGREEMENT

acceptance no less than to an offer.[100] On this test, a mere acknowledgement of
an offer would not be an acceptance; nor would a person to whom an offer to sell
goods had been made accept it merely by replying that it was his "intention to
place an order"[101] or by asking for an invoice.[102] The mere acknowledgement of
an offer, in the sense of a communication stating simply that the offer had been
received, would likewise not be an acceptance. But an "acknowledgement" may
by its express terms or, in a particular context by implication, contain a statement
that the sender agreed to the terms of the offer and that he was therefore
accepting it. In website trading, for example, a customer's order may amount to
an offer,[103] and where this is the case an "acknowledgement" of the order may
indicate the supplier's intention to accept that offer.[104] Where the offer makes
alternative proposals, the acceptance must make it clear to which set of terms the
assent is directed. In *Peter Lind & Co Ltd v Mersey Docks & Harbour Board*[105]
an offer to build a freight terminal was made by a tender quoting in the
alternative a fixed, and a "cost-plus," price. The offeree purported to accept
"your tender," and it was held that there was no contract.

2–026          **Continuing negotiations.** When parties carry on lengthy negotiations, it may
be hard to say exactly when an offer has been made and accepted. As negotia-
tions progress, each party may make concessions or new demands and the parties
may in the end disagree as to whether they had ever agreed at all. The court must
then look at the whole correspondence and decide whether, on its true construc-
tion, the parties had agreed to the same terms. If so, there is a contract even
though both parties, or one of them, had reservations not expressed in the
correspondence.[106] The court will be particularly anxious to hold that continuing
negotiations have resulted in a contract where the performance, which was the
subject-matter of the negotiations has actually been rendered. In one such case a
building sub-contract was held to have come into existence, even though agree-
ment had not been reached when the work was begun, because during its
progress outstanding matters were resolved by further negotiations[107]; and this
contract may then be given retrospective effect to cover work done before the
final agreement was reached.[108]

---

[100] Above, para.2–002; *Inland Revenue Commissioners v Fry* [2001] S.T.C. 1715 at [6], [7].

[101] *O.T.M. Ltd v Hydranautics* [1981] 2 Lloyd's Rep. 211, 214.

[102] *Michael Gerson (Leasing) Ltd v Wilkinson* [2000] Q.B. 514 at 530 (where there was probably
no offer: see above, para.2–006, n.33.

[103] Above, para.2–006.

[104] In the Electronic Commerce (EC Directive) Regulations 2002, (SI 2002/2013, partly imple-
menting Dir.2000/31/EC), reg.11, the words "acknowledge" and "acknowledgement" seem to be
used in this sense.

[105] [1972] 2 Lloyd's Rep. 234.

[106] *Kennedy v Lee* (1817) 3 Mer. 441; *cf. Cie de Commerce, etc. v Parkinson Stove Co* [1953] 2
Lloyd's Rep. 487; B.S.E., 17 M.L.R. 476; *Port Sudan Cotton Co v Govindaswamy Chettiar & Sons*
[1977] 2 Lloyd's Rep. 5; *Thoresen Car Ferries Ltd v Weymouth Portland BC* [1977] 2 Lloyd's Rep.
614; *O.T.M. Ltd v Hydranautics* [1981] 2 Lloyd's Rep. 211, 215; *Manatee Towing Co v Oceanbulk
Maritime S.A. (The Bay Ridge)* [1999] 2 All E.R. (Comm) 306.

[107] *G. Percy Trentham Ltd v Archital Luxfer Ltd* [1993] 1 Lloyd's Rep. 25. *Peter Lind's* case
(above, n.105) shows that the factor of performance of work is not decisive, though it may (as in that
case) give the performing party a restitutionary claim.

[108] *G. Percy Trentham Ltd v Archital Luxfer Ltd*, above at n.107.

**Negotiation after apparent agreement.** Businessmen do not, any more than the courts, find it easy to say precisely when they have reached agreement, and may sometimes continue to negotiate after they appear to have agreed to the same terms. The court will then look at the entire course of negotiations to decide whether an apparently unqualified acceptance did in fact conclude the agreement.[109] If it did, the fact that the parties continued negotiations after this point does not affect the existence of the contract between them,[110] unless the continued correspondence can be construed as an agreement to rescind the contract. A fortiori, the binding force of an oral contract is not affected or altered merely by the fact that, after its conclusion, one party sends to the other a document containing terms significantly different from those which had been orally agreed.[111]

**2–027**

**Acceptance by conduct.** An offer may be accepted by conduct. For example, an offer to buy goods can be accepted by supplying them[112]; an offer to sell goods, made by sending them to the offeree, can be accepted by using them;[113] and an offer contained in a request for services can be accepted by beginning to render them.[114] But conduct will only amount to acceptance if it is clear that the offeree did the act with the intention (ascertained in accordance with the objective principle[115]) of accepting the offer. Thus a buyer's taking delivery of goods after the conclusion of an oral contract of sale will not amount to his acceptance of written terms which differ significantly from those orally agreed and which are sent to him by the seller after the making of that contract but before taking delivery.[116] That conduct is then referable to the oral contract rather than to the attempted later variation. Nor is a company's offer to insure a car accepted by

**2–0:**

---

[109] Hussey v Horne-Payne (1878) 4 App.Cas. 311; Bristol, Cardiff & Swansea Aerated Bread Co v Maggs (1890) 44 Ch.D. 616; British Guiana Credit Corp. v Da Silva [1965] 1 W.L.R. 248; Container Transport International Inc v Oceanus Mutual, etc., Association [1984] 1 Lloyd's Rep. 476; Asty Maritime Co Ltd v Rocco Giuseppe & Figli (The Astyanax) [1985] 2 Lloyd's Rep. 109, 112; Hoffinghouse & Co Ltd v C. Trade SA (The Intra Transporter) [1986] 2 Lloyd's Rep. 132; Pagnan SpA v Granaria B.V. [1986] 1 Lloyd's Rep. 547; Pagnan SpA v Feed Products Ltd [1987] 2 Lloyd's Rep. 601, 619; Ignazio Messina & Co v Polskie Linie Oceaniczne [1995] 2 Lloyd's Rep. 566 (no contract); Frota Oceanica Brasileira SA v Steamship Mutual Underwriting Association (The Frota-norte) [1996] 2 Lloyd's Rep. 461 (no contract as matters of substance remained unresolved).
[110] Perry v Suffields Ltd [1916] 2 Ch.187; Davies v Sweet [1962] 2 Q.B. 300; Cranleigh Precision Engineering Ltd v Bryant [1965] 1 W.L.R. 1293; Harmony Shipping Co SA v Saudi-Europe Line Ltd (The Good Helmsman) [1981] 1 Lloyd's Rep. 377, 409, 416.
[111] Jayaar Impex Ltd v Toaken Group Ltd [1996] 2 Lloyd's Rep. 437.
[112] Harvey v Johnson (1848) 6 C.B. 305; cf. Steven v Bromley & Son [1919] 2 K.B. 722, 728; Greenmast Shipping Co SA v Jean Lion et Cie (The Saronikos) [1986] 2 Lloyd's Rep. 277; cf. Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd [1989] Q.B. 433, 436; Re Charge Card Services [1989] Ch.417 (above, para.2–012); Carlyle Finance Ltd v Pallas Industrial Finance Ltd [1999] 1 All E.R. (Comm) 659 at 670; and see below, para.2–074; contrast Capital Finance Co Ltd v Bray [1964] 1 W.L.R. 323. As to counter-offers, see below, paras 2–090, 2–091.
[113] Weatherby v Banham (1832) 5 C. & P. 228; Brogden v Metropolitan Ry (1877) 2 App.Cas. 666, below, at n.122; cf. Hart v Mills (1846) 15 L.J.Ex. 200; Confetti Records v Warner Music UK Ltd [2003] EWHC 1274, The Times, June 12, 2003. It is assumed that the goods are not "unsolicited" within the legislation against "inertia selling" (above, para 2–004).
[114] Smit International Singapore Pte Ltd v Kurnia Dewi Shipping SA (The Kurnia Dewi) [1997] 1 Lloyd's Rep. 553.
[115] Above, paras 2–001, 2–002.
[116] Jayaar Impex Ltd v Toaken Group Ltd [1996] 2 Lloyd's Rep. 437.

conditions, which differed from those of the sellers in containing no price-escalation clause and also in various other respects.[141] It also contained a tear-off slip to be signed by the sellers and returned to the buyers, stating that the sellers accepted the buyers' order "on the terms and conditions stated therein." The sellers did sign the slip and returned it with a letter saying that they were "entering" the order "in accordance with" the offer. This communication from the sellers was held to be an acceptance of the buyers' counter-offer[142] so that the resulting contract was on the buyers' terms, and the sellers were not entitled to the benefit of the price escalation clause. The sellers' reply to the buyers' order did not prevail (though it was the "last shot" in the series) because the reference in it to the original offer was made, not for the purpose of re-iterating all its terms, but only for the purpose of identifying the subject-matter. It would, however, have been possible for the sellers to have turned their final communication into a counter-offer by explicitly referring in it not only to the subject-matter of the original offer, but also to all its other terms. In that case no contract would have been concluded, since the buyers had made it clear before the machine was delivered that they did not agree to the "price escalation" clause.[143] Thus it is possible by careful draftsmanship to avoid losing the battle of forms, but not (if the other party is equally careful) to win it. In the *Butler Machine Tool* case, for example, sellers' conditions included one by which their terms were to "prevail over any terms and conditions in Buyer's order"; but this failed (in consequence of the terms of the buyers' counter-offer) to produce the effect desired by the sellers.[144] The most that the draftsman can be certain of achieving is the stalemate situation in which there is no contract at all. Such a conclusion will often be inconvenient,[145] though where the goods are nevertheless delivered it may lead to a liability on the part of the buyers to pay a reasonable price.[146]

**Documents sent after contract made.** The above discussion is concerned with the effect of the submission of a document or documents containing terms *before* the alleged contract is made. The submission of such a document by one party *after* the making of the contract will not affect the existence of the contract[147]; nor will the terms of the document form part of the contract unless they are, in turn, accepted as variations of the contract, either expressly or by conduct.    2–036

**Acceptance of tenders.** We have seen that the submission of a tender normally amounts to an offer[148]; and the effect of an "acceptance" of such a tender    2–037

---

[141] Above, para.2–030 at nn.126 and 127.
[142] Per Lawton and Buckley L.JJ.; Lord Denning, M.R. also uses this analysis, but prefers the alternative approach of considering "the documents . . . as a whole": see 405 and *cf.* above, para.2–026.
[143] At 406, per Lawton L.J.
[144] *cf. Matter of Doughboy Industries Inc*, 233 N.Y.S. 2d 488, 490 (1962): "The buyer and seller accomplished a legal equivalent to the irresistible force colliding with the immoveable object."
[145] It seems to have been rejected for this reason in *Johnson Matthey Bankers Ltd v State Trading Corp. of India* [1984] 1 Lloyd's Rep. 427.
[146] *cf. Peter Lind & Co Ltd v Mersey Docks & Harbour Board* [1972] 2 Lloyd's Rep. 234; above, para.2–025; McKendrick (1988) 8 O.J.L.S. 197.
[147] *Jayaar Impex Ltd v Toaken Group Ltd* [1996] 2 Lloyd's Rep. 437; *cf.* below, para.2–114.
[148] Above, para.2–020.

# Declaration of Susannah Jones

# EX6

## HOUSE OF LORDS

Nov. 6, 7, 8, 9, 13, 14, 15 and 16, 1989

---

MOTOR OIL HELLAS (CORINTH)
REFINERIES S.A.
v.

SHIPPING CORPORATION OF INDIA

(THE "KANCHENJUNGA")

Before Lord KEITH OF KINKEL,
Lord BRANDON OF OAKBROOK,
Lord TEMPLEMAN, Lord GRIFFITHS and
Lord GOFF OF CHIEVELEY

**Charter-party (Consecutive Voyage) — Nomination of unsafe port — Charterers ordered vessel to load at Kharg Island — Iran-Iraq war — Whether owners elected not to treat Kharg Island as improper nomination — Whether owners waived right — Whether charterers in repudiatory breach.**

Under a charter-party dated Aug. 8, 1978 the owners let their vessel *Kanchenjunga* to the charterers for four consecutive voyages with an option (which was exercised) to extend the period to cover four further consecutive voyages. The charter was in the Exxonvoy form and the trading option defined the loading ports as 1/2 safe ports Arabian Gulf excluding Fao and Abadan.

On Aug. 8, 1978 the charterers sub-let the vessel on a back to back basis to Varnima Chartering Compania Naviera S.A. On Nov. 19, 1980 Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. (Petronor) for a single voyage from loading ports defined as 1/2 safe ports Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands. The Petronor charter was in the Asbatankvoy form.

Following the making of the Petronor charter the charterers ordered the vessel to load a cargo of crude oil at Kharg Island. The order was given on Nov. 20 and repeated on Nov. 21.

On Nov. 21 the owners instructed the master to proceed to Kharg Island. The vessel arrived on Nov. 23 and gave notice of readiness. By Dec. 1 the vessel had still not berthed and on that day there was an Iraqi raid upon Kharg Island during which bombs were dropped. The master of the vessel promptly weighed anchor and proceeded away from Kharg Island to a point of safety.

On Dec. 2 the owners informed the charterers that Kharg Island had been bombed and that the master had proceeded 25 miles out to sea for safety, and called on the charterers to nominate a safe port. The charterers replied repeating their request that the master proceed to Kharg Island.

There then ensued exchanges between the owners and the charterers under which the owners called upon the charterers to nominate another port which would be safe and the charterers refused to do so insisting that the vessel should load at Kharg Island.

The owners wanted the master to go to Kharg Island and told him to comply with the voyage instructions but the master rejected these instructions.

The dispute was referred to arbitration. The charterers submitted that the owners' conduct between Nov. 21 and Dec. 2 showed that they had elected not to treat Kharg Island as an improper nomination of a loading port under the charter; alternatively if there was not an election there was at least a promissory estoppel which precluded owners from contending that Kharg Island was an unsafe port.

Owners sought to rely on cl. 20(vi)(b) of the charter contending that they were entitled after Dec. 1 to refuse to load at Kharg Island. Clause 20(vi)(b) provided inter alia:

(b) if owing to any war, hostilities warlike operations . . . entry into any such port of loading . . . or the loading . . . of cargo at any such port considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo . . . to be loaded . . . at any other safe port . . .

Since the charterers had not exercised their right, Kharg Island remained the only nominated port and as there was no material change of circumstance the master continued to be entitled to refuse to load at that port and was not at fault in exercising his right to do so.

By their interim award the arbitrators held that it was the charterers who were in repudiatory breach and that the owners were entitled to treat the charter as at an end and recover damages from the charterers. There was an appeal against that award.

———————*Held*, by Q.B. (Com. Ct.) (HOBHOUSE, J.), that (1) under a charter it could not be contended that a shipowner when he received an order was under an obligation to check whether it was a proper order to a safe port and to reject it if it was not; proceeding to a nominated port did not deprive shipowners of any of their rights but the duty to mitigate or avoid loss did require that the master should in order to safeguard the vessel refuse to enter the port or if already within it, leave it; the order did not give rise to any obligation upon the owners to elect and mere compliance did not amount to any election;

(2) in the context of what had passed between the parties previously owners' communication to charterers on Nov. 21 was correctly characterized as an acceptance of the order not a mere compliance with the order; the fact that the owners served a notice of readiness indicated that the owners were saying that they were ready and willing to load at Kharg Island; on Nov. 25 the owners were still saying that the vessel was available to load and called upon charterers to arrange priority berthing; there was nothing equivocal about the owners' conduct and they were dealing with the charterers on the basis that the loading port nomi-

nation had been made and that Kharg Island was that port;

(3) on the facts and evidence the owners did waive their right to say that Kharg Island was not the nominated loading port under the charter;

(4) on the promissory estoppel argument the conduct found by the arbitrators did represent that the owners were willing that the vessel should proceed to Kharg Island and load there under the charter;

(5) on the facts found by the arbitrators the master did have the right to refuse to load the cargo at Kharg Island; this gave rise to an option to charterers to nominate another loading port; they chose not to exercise that option and in circumstances where the master was still bona fide entitled to refuse to load at Kharg Island, the charterers terminated the charter; they could not now complain of any breach on the part of the owners; and the submission that the owners had waived their rights to rely on cl. 20(vi)(b) had not been made out.

The owners appealed and the charterers cross-appealed.

————————*Held*, by C.A. (Fox, Lloyd and Glidewell, L.JJ.), that (1) nowhere in the owners' telex of Nov. 20 or in their two telexes of Nov. 21 did they reserve the right to treat the nomination as non-contractual; and the owners gave notice of readiness after proceeding north of latitude 24 deg. without obtaining the charterers' agreement to pay the additional war risk premium; these two factors showed that the owners' conduct was unequivocal and that the owners were dealing with the charterers on the basis that the loading port nomination had been made and Kharg Island was that port;

(2) it was clear from the arbitrators' findings that the owners knew the facts; if those facts meant that Kharg Island was unsafe then the owners must have known that they were entitled to refuse to accept the nomination; the right to refuse to load at Kharg Island was not specifically stated in the charter but it was implicit as a matter of legal analysis; by accepting the charterers' nomination the owners lost their right to refuse to load at Kharg Island;

(3) the charterers were entitled to insist on the vessel loading at Kharg Island; the owners had by their conduct waived their right to refuse to load at Kharg Island and their claim for damages for repudiation failed;

(4) under cl. 20(vi) the only right expressly given to the owners was the right to discharge cargo at any safe port if the charterers failed to nominate an alternative port of discharge when requested; although the clause gave the owners no express right to sail away in the event of the loading port being considered dangerous or impossible such a right existed by necessary implication;

(5) cl. 20 (vi) conferred a separate and independent discretion on the master of the vessel and nothing the owners did could be construed as a waiver of the master's discretion; the appeal and cross appeal would be dismissed.

The charterers appealed as to the effect of

cl. 20(vi) and the owners cross-appealed on the issue of waiver.

————————*Held*, by H.L. (Lord Keith of Kinkel, Lord Brandon of Oakbrook, Lord Templeman, Lord Griffiths and Lord Goff of Chieveley), that (A) as to the cross-appeal: (1) the situation in which the owners found themselves was one in which they could either have rejected the charterers' nomination of Kharg Island as uncontractual or they could have, nevertheless, elected to accept the order and load at Kharg Island thereby waiving or abandoning their rights to reject nomination but retaining their right to claim damages from the charterers for breach of contract (*see* p. 400, col. 1);

(2) the master gave notice of readiness on arrival at Kharg Island; thereafter the owners were asserting that the vessel was available to load and they called on the charterers to arrange priority berthing and referred to the fact that laytime was running; in these circumstances the owners were asserting a right inconsistent with their right to reject the charterers' orders; the owners must be taken in law to have elected not to reject the charterers' nomination and the owners' cross-appeal would be dismissed (*see* p. 393, cols. 1 and 2; p. 400, cols. 1 and 2).

(B) As to the charterers' appeal: the clause expressly referred to the discretion which the owners and master were entitled to exercise in a situation of danger and must impliedly recognize that in the exercise of that discretion they might decline to load or discharge at the relevant port; the clause did not apply to named ports or ports properly nominated under the charter because in the event of an improper nomination being made by the charterers the owners' acceptance of the nomination would have the effect that all the relevant contractual provisions applied including cl. 20 (vi); and the owners, presented by the charterers with an uncontractual nomination, had to decide whether or not to reject it; they elected not to do so and this election could not have had any effect on cl. 20 (vi); the appeal would be dismissed (*see* p. 393, cols. 1 and 2; p. 401, col. 1).

———————————

The following cases were referred to in the judgment of Lord Goff:

Borrowman Phillips & Co. v. Free & Hollis, (1878) 4 Q.B.D. 500;

China National Foreign Trade Transportation Corporation v. Evlogia Shipping Co. S.A. of Panama (The *Mihalios Xilas*), (H.L.) [1979] 2 Lloyd's Rep. 303; [1979] W.L.R. 1018;

Compania Naviera Maropan S/A v. Bowater's Lloyd Pulp and Paper Mills Ltd. (The *Stork*), (C.A.) [1955] 1 Lloyd's Rep. 349; [1955] 2 Q.B. 68; [1954] 2 Lloyd's Rep. 397, [1955] 2 Q.B. 68;

Hughes v. Metropolitan Railway Co., (1877) 2 App.Cas. 439;

Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd., (H.L.) [1971] A.C. 850;

Kodros Shipping Corporation of Monrovia v. Empresa Cubana de Fletes (The *Evia*), (No. 2), (H.L.) [1982] 2 Lloyd's Rep. 307; [1983] 1 A.C. 736;

Reardon Smith Line Ltd. v. Australian Wheat Board (The *Houston City*), (P.C.) [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266;

Scarf v. Jardine, (H.L.) (1882) 7 App.Cas. 345.

This was an appeal by the charterers Motor Oil (Hellas) Corinth Refineries S.A. and a cross-appeal by the owners, Shipping Corporation of India from the decision of the Court of Appeal ([1989] 1 Lloyd's Rep. 354) dismissing the owners' appeal and the charterers' cross-appeal from the decision of Mr. Justice Hobhouse ([1987] 2 Lloyd's Rep. 509) holding inter alia that the owners had waived their right to treat Kharg Island as non-contractual but that the owners were entitled to the protection of cl. 20(vi) of the charter-party.

Mr. Anthony Clarke, Q.C. and Mr. Charles Haddon-Cave (instructed by Horrocks & Co.) for the charterers; Mr. Michael Collins, Q.C. and Mr. David Mildon (instructed by Messrs. Ince & Co.) for the owners.

The further facts are stated in the judgment of Lord Goff of Chieveley.

Judgment was reserved.

Thursday Feb. 15, 1990

———

**JUDGMENT**

**Lord KEITH OF KINKEL:** My Lords, I agree that this appeal and the cross-appeal should be dismissed for the reasons set out in the speech to be delivered by my noble and learned friend Lord Goff of Chieveley. I also agree with the supplementary observations of my noble and learned friend Lord Brandon of Oakbrook.

**Lord BRANDON OF OAKBROOK:** My Lords, I have had the advantage of considering in draft the speech prepared by my noble and learned friend, Lord Goff of Chieveley. I agree with it and for the reasons which he gives I would dismiss both the appeal and the cross-appeal.

I think it important to observe that, on my noble and learned friend's analysis of the case, the only right which the owners waived was the right to reject the nomination of Kharg Island as uncontractual; and that, if the ship had loaded there and been lost or damaged in a further air raid, the charterers would, despite that waiver, have been liable to the owners for such loss or damage on the ground of their breach of contract in ordering the ship to load at an unsafe port.

It seems to me to follow from this that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the ship's master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable in the eventuality to which I have referred. For what may well have been good reasons, however, no contention of this kind was put forward for the owners at any stage of the proceedings. That being so, your Lordships are not required to deal with such a point in this case.

**Lord TEMPLEMAN:** My Lords, I agree that the appeal and cross-appeal be dismissed.

**Lord GRIFFITHS:** My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Goff of Chieveley. I agree with it and would dismiss both the appeal and the cross-appeal.

**Lord GOFF OF CHIEVELEY:** My Lords, this case is concerned with *Kanchenjunga*, a very large crude carrier of 272,372 tons dead weight. Her owners at all material times were the Shipping Corporation of India of Bombay (whom I shall refer to as "the owners") and she flew the Indian flag. The owners (the shares in which are owned by the Government of India) are a large shipping company, owning a number of other tankers as well as *Kanchenjunga*. The vessel was chartered to Motor Oil (Hellas) Corinth Refineries S.A. of Athens (whom I shall refer to as "the charterers") under a consecutive voyage charter-party dated Aug. 8, 1978, on the Exxonvoy form, for four consecutive voyages with an option for the charterers to extend the period for a further four consecutive voyages. That option was exercised by the charterers, and the present case is concerned with the eighth and last voyage under the charter as so extended. The Exxonvoy standard form of charter contains no safe port warranty in the printed form; however, in completing the form, the loading ports in part I of the charter were agreed to be "1/2 (one/two) safe ports Arabian Gulf excluding Fao and Abadan" in charterers' option. There was a wide range of discharging

ports; these are not material. I shall have later to refer to cl. 20, a substantial printed clause contained in part II of the charter, and in particular to cl. 20 (vi) which is expressed to be concerned with war risks.

On the same date as the above charter, the charterers sub-chartered the vessel on a back-to-back basis to an associated company called Varnima Chartering Compania Naviera S.A. ("Varnima"). Throughout this matter, the charterers and Varnima have been treated as having an identical interest. On Nov. 19, 1980, Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. ("Petronor"). I shall refer to this charter as "the sub-charter", and to the charter between the owners and the charterers as "the head charter". The sub-charter was not on back-to-back terms. It was for a single voyage, on the Asbatankvoy form (for all practical purposes identical to the Exxonvoy form), the loading ports being expressed to be —

. . . one/two safe [ports] Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands.

The rate of freight under the sub-charter was substantially higher than that under the head charter.

The vessel had been waiting at Mina al Fahal in the Arabian Gulf since Oct. 8, 1980 for loading port orders for the final voyage under the head charter. It was following the making of the Petronor fixture, on Nov. 19, that the charterers ordered the vessel to proceed to Kharg Island. The order was given on Nov. 20, and repeated on Nov. 21, on which day the owners instructed the master of the vessel to proceed to Kharg Island. He did so, arriving at Kharg Island on Nov. 23, when notice of readiness was given. On Dec. 1 there occurred an air raid by Iraqi aircraft upon Kharg Island, which caused the master of the vessel to weigh anchor and proceed away from Kharg Island to a place where she could wait in safety. There then followed an exchange of telex messages between the parties which led first to impasse and ultimately to the termination of the charter in early January, 1981.

When the head charter was entered into, in August 1978, Iraq and Iran were not at war. It was not until Sept. 22, 1980 that border hostilities between Iran and Iraq, which had been simmering for some months, erupted into full-scale war. The general position in the vicinity of Kharg Island, and the owners' reaction to it, are described in detail in pars. 7 to 10 of the arbitrators' reasons for their award. It appears that,

following the outbreak of war, among the targets for Iraqi air attack were the oil installations at Kharg Island. The natural reaction of shipowners on the eruption of fighting was to keep their vessels out of areas where they might suffer damage. However, at this time India was very short of crude oil and pressure was put on the owners by the Indian authorities (the Oil Co-ordination Committee — "O.C.C.") to load from Iranian ports, including Kharg Island, in spite of the risks which would be incurred. Paragraphs 9 and 10 of the arbitrators' reasons (in which the owners are referred to as "S.C.I.") read as follows:

9. Up to 19 November, Iran admitted that there had been air raids on Kharg Island on the following dates: 24, 27 September, 5, 10, 13, 14, 15 October. These air raids were not of the concentrated type so familiar in the 1939–45 war; indeed, Iraq did not have the bombers to operate such attacks. Rather they appear to have been of a hit and run type operated by one, two or three fighter-bombers. It is possible that air raids in addition to those admitted by Iran took place. In spite of the risks involved, five tankers belonging to S.C.I. loaded at Kharg in the first half of October. To minimise the risks, the vessels anchored about five miles off until they were called in to berth; a strict black-out was enforced by the Iranian authorities and there were restrictions on the use of radio and V.H.F. The S.C.I. vessels observed that oil tanks had been damaged and were on fire; frequent anti-aircraft firing was observed. The raids would appear to have been directed at the oil storage tanks, rather than at the actual loading installations or at ships. However, on 10 October, two bombs fell in the water in close proximity to S.C.I.'s vessel *B. R. Ambedkar* which was waiting to load (this vessel was diverted to Lavan Island to load). Their *Lok Manya Tilak* also reported heavy attacks on 14 and 15 October; as a result of these reports, S.C.I. decided not to send further tankers to Kharg Island until such time as "reasonably safe conditions for loading" were restored.

10. Towards the end of October and the beginning of November, the Iranian Oil suppliers National Iranian Oil Co. ("N.I.O.C.") were pressing O.C.C. to take up cargo from Kharg and on or about 5 November the Government of India agreed to S.C.I. sending the *C. P. Shivaji* to Kharg "subject to ship's captain local assessment of the situation". At the same time, S.C.I. went into the market with a view to chartering a v.l.c.c.

H.L.]                          The "Kanchenjunga"                          [Lord Goff

to load at Kharg which it could put in under its contract(s) of affreightment with O.C.C. S.C.I. ordered the *C. P. Shivaji* to Kharg on 6 November and the *Barauni* on 8 November. The *C. P. Shivaji* reported that the situation was dangerous with attempted air raids, although she encountered no difficulties in loading. As a result on 9 November the *Barauni* was ordered to stay at Mina al Ahmadi pending further orders. In the meantime, the negotiations for charting in a v.l.c.c. had apparently been proceeding and on or about 15 November the *Venus* was fixed to load some 210,000 metric tons. That vessel was expected to berth on 15 or 16 November and on 17 November S.C.I. decided to order the *Barauni* to sail from Mina al Ahmadi at daybreak on 18 November for Kharg so that she could load immediately after the *Venus*. At or shortly after this time, S.C.I. also ordered the *N. S. Bose* and the *Satyamurti* to Kharg to load.

Meanwhile, in September, October and the first half of November telex exchanges took place between the owners and the charterers about the employment of the vessel on her last voyage under the charter. She completed discharge on her seventh voyage at Brunsbuttel in West Germany, and was ordered by the charterers to proceed at slow speed to the Arabian Gulf for orders. Ultimately, following the fixture with Petronor on Nov. 19, the charterers telexed the owners on Nov. 20 informing them of the fixture and requesting them to instruct the master to proceed to Kharg Island for loading. On Nov. 21, the charterers telexed the owners with detailed voyage instruction, which the owners passed on to the master on the same day, advising him that they were arranging bunkers at Damman on the loaded passage and that, in view of the current situation prevailing in the area, he should proceed with due caution. On the same day the owners consulted with the Government of India as to whether the vessel should go to Kharg Island, pointing out that:

. . . since we have been loading our own as well as inchartered vessels at Kharg Island in recent past and also at this very time our non-compliance [with] the charterers' instructions will lead to breach of charterparty with serious implications.

The response was that the owners should take a commercial view of the situation. The arbitrators understood that to mean that:

. . . the national interest was not concerned and that S.C.I. should weigh against the possible risks of damage to the ship and injury to

the crew the possibility of being liable for heavy damages if it were later held that they were not entitled to refuse to order the ship to Kharg Island.

The master was, however, concerned about the order to proceed to Kharg Island, and when he cabled to the owners with his e.t.a. at Kharg Island, he added a protest against ordering the vessel to Kharg Island which "[we] consider dangerous". The owners did not, however, respond to this protest; and when, on the same day, they telexed the charterers confirming that they had instructed the master to comply with the charterers' instructions to proceed to load at Kharg Island, they stated that they had done so without prejudice to their rights in respect of the very substantial delay by the charterers in giving orders for the loading port (a claim which was later to be upheld by the arbitrators), but made no protest about the orders to proceed to Kharg Island.

The vessel anchored off Kharg Island at 18 06 G.M.T. on Nov. 23, and served notice of readiness. Under the charter-party, laytime began to count six hours thereafter, with a total laytime of 72 running hours. Thereafter the owners, referring to the fact that the laytime was running, repeatedly pressed for priority berthing. When the vessel arrived, there were seven other vessels anchored, presumably waiting to load, including the owners' vessel *Barauni*; shortly afterwards *Satyamurti*, also belonging to the owners, arrived for loading. On Nov. 25, the master of *Satyamurti* radioed to the owners reporting "situation generally satisfactory, no cause for alarm", but that a black-out was being strictly observed and that A.A. firing had been observed on the island during the early hours. Because of the reported A.A. fire, the owners instructed their vessels to proceed 25 miles west of Kharg Island and, on Nov. 25, informed the charterers of this, holding the charterers responsible for sending the vessel to Kharg Island. The arbitrators observed that this was the first occasion on which the owners had raised the possible unsafety of Kharg Island with the charterers since receiving orders to proceed there to load. On Nov. 26, the master of *Satyamurti* informed the owners that he had stayed where he was, thinking the anchorage better there than 25 miles west; he reported further sporadic A.A. fire, but thought this was only routine/practice. However, because of the continued delay in berthing, the vessel left Kharg Island on Nov. 26, and proceeded to Mina al Ahmadi for bunkering, returning to Kharg Island early in the morning of Nov. 28. She did not miss her turn by leaving the port for

this short time, and resumed her position as second in turn. On Nov. 28, the owners kept the charterers informed of the vessel's movements. On Nov. 30, the loading berth became free for the vessel; but she was unable to berth because of bad weather, and before she could berth there was an air raid on Kharg Island at 23 15 hours on Dec. 1. The master promptly weighed anchor and proceeded away from Kharg Island until about 03 00 hours on Dec. 2 when the vessel was stopped pending instructions from the owners.

On Dec. 2 the owners telexed the charterers reporting the air raid and the movement of the vessel to the south, and stating that they considered it self-evident that the port was unsafe. They claimed (incorrectly, as the arbitrators held) that they had expressed reservations about the safety of Kharg Island, and that they had agreed to proceed to Kharg Island without prejudice to their right to claim damages. They asked the charterers to nominate soonest a safe port where they proposed to load cargo. There followed an exchange of telex messages, in which the charterers pressed the owners to instruct the vessel to return to Kharg Island for loading, and the owners protested that the port was unsafe. However, on Dec. 3, the owners cabled the master as follows:

Charterers want vessel to proceed immediately to Kharg. Please comply with our voyage instructions. Acknowledge forthwith.

But the master was unwilling to return to Kharg Island and replied on Dec. 4 to the charterers:

Received your voyage instructions through owners to proceed to Kharg. As situation in Kharg is dangerous and as we witnessed heavy bombing regret unable to comply with your instructions.

Petronor continued to press upon Varnima that the vessel should return to Kharg Island for loading, pointing out that other vessels were doing so. Attempts by them to obtain alternative cargo elsewhere in the area failed. The owners, on the other hand, continued to press the charterers to nominate an alternative safe port, and Varnima pressed Petronor to do likewise. By mid-December, solicitors had been instructed. No alternative port having been nominated, the owners' solicitors informed the charterers' solicitors on Nov. 5 that the owners treated the charterers as having repudiated the contract; and the charterers' solicitors maintained that it was the owners who had repudiated the charter, and that the charterers had treated the owners as being in repudiation. So the battle lines were drawn.

In the arbitration, where jurisdiction was conferred on the arbitrators to deal with both the dispute as between the owners and the charterers and the dispute as between Varnima and Petronor, the arbitrators first held that, when the vessel was ordered to Kharg Island on Nov. 21, Kharg Island was not a prospectively safe port. They stated in their reasons for their award (par. 29):

A full-scale war involving Iran and Iraq had been waging for some two months, air attacks had been made on Kharg and it was but a short flying distance from Iraqi bases. On the other hand, ships as such had not been attacked, there had been a pause in the air attacks, war risk insurance was obtainable and ships were loading. However, the risk of further air attacks still obtained as was realised by all concerned and we find that in the context of the head charter Kharg was not a prospectively safe port when nominated on 21 November.

However, they went on to hold that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. They stated (par. 31):

The possibility of such an air raid was the very fact that made Kharg prospectively unsafe under the charter but was one of the matters which would have been in the contemplation of the parties when the sub-charter was made. The raid was of like character to the earlier ones; the only real change since the date of the sub-charter was that instead of the date of the next attack being uncertain it was ascertained. Thereafter, the date of the succeeding attack became equally uncertain.

Faced with the clear safe port warranty in the head charter, the charterers argued before the arbitrators that the owners had waived their right not to comply with the charterers' orders to proceed to Kharg Island. This argument the arbitrators rejected. They considered that waiver only applied where there were just two alternative courses of action available; here there were at least three courses of action open to the owners, and so they held that the defence must fail. This reasoning was, as is now accepted, erroneous in law. The arbitrators also rejected an alternative argument founded on promissory estoppel, stating that the mere acceptance of orders without protest does not amount to the required clear and unequivocal promise required by the doctrine.

Having rejected both waiver and promissory estoppel, they held that the charterers were in

breach of contract in ordering the vessel to an unsafe port. On the other hand, Varnima was held liable to Petronor under the sub-charter, having expressly agreed that the vessel would proceed to Kharg Island; and the arbitrators held that Varnima could not derive any protection from cl. 20 (vi) in the sub-charter.

The charterers appealed from the award of the arbitrators with leave of the Court. Mr. Justice Hobhouse [1987] 2 Lloyd's Rep. 509 allowed the appeal on the issue of waiver. He held that the owners had accepted the charterers' orders to proceed to Kharg Island; and that by so doing, and by serving notice of readiness at Kharg Island and thereafter continuing to assert that the vessel was available to load, asking the charterers to arrange priority berthing and referring to the running of laytime, the owners' conduct could not be described as equivocal. He said, at p. 516:

There is nothing unequivocal about owners' conduct. They were dealing with charterers on the basis that the loading port nomination had been made and that Kharg Island was that port.

Furthermore, they knew of their right to choose. They knew the facts; they knew what the provisions of the contract were, and what their legal effect was. Therefore both the requirements of waiver, unequivocal conduct and the requisite knowledge, were made out. The Judge did not therefore find it necessary to deal with the alternative argument on promissory estoppel. However he then held that, on a true construction of cl. 20 (vi), the owners were protected from liability to the charterers in damages. The Court of Appeal affirmed the decision of the Judge on both points (see [1981] 1 Lloyd's Rep. 354).

The charterers then obtained leave to appeal to your Lordships' House, and the owners cross-appealed. It was in fact the owners' cross-appeal on the issue of waiver which raised the most substantial issue in the appeal before your Lordships' House, as it had done in the Courts below. To that issue I will first turn.

There is no dispute between the parties as to the nature of their respective rights and obligations under the contract with regard to the charterers' orders to proceed to Kharg Island to load (I put on one side, of course, the effect of cl. 20 (vi), which I will consider later). Since these matters are not in dispute, I can state the position very briefly. The arbitrators' finding that Kharg Island was, at the time of its nomination by the charterers, prospectively an unsafe port was not, and indeed could not be,

challenged. Kharg Island was not therefore a port which, under the terms of the charter, the charterers were entitled to nominate. It followed that the nomination was a tender of performance which did not conform to the terms of the contract; as such, the owners were entitled to reject it. Even so, by their nomination of Kharg Island the charterers impliedly promised that that port was prospectively safe for the vessel to get to, stay at, so far as necessary, and in due course, leave (see *Kodros Shipping Corporation of Monrovia* v. *Embresa Cubana de Fletes (The Evia)* (No. 2), [1982] 2 Lloyd's Rep. 307 at p. 315; [1983] A.C. 736 at p. 757, per Lord Roskill). Accordingly if the owners, notwithstanding their right to reject the nomination, complied with it and their ship suffered loss or damage in consequence, they would be entitled to recover damages from the charterers for breach of contract, though the ordinary principles of remoteness of damage and causation would apply to any such claim: see *Compania Naviera Maropan S/A* v. *Bowaters Lloyd Pulp and Paper Mills Ltd. (The Stork)*, [1955] 1 Lloyd's Rep. 349; [1955] 2 Q.B. 68, and *Reardon Smith Line Ltd.* v. *Australian Wheat Board (The Houston City)*, [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266.

This is not, however, a case in which the owners have complied with an order to proceed to an unsafe port, and their ship has proceeded there and suffered damage in consequence. This is a case in which the owners have complied with the charterers' orders to the extent that the vessel has proceeded to the unsafe port and given notice of readiness there, but then the master, having tasted at first hand the danger inherent in the port's unsafety, has persuaded them not to persist in loading there but to sail away. Here the crucial question is whether, before the vessel sailed away, the owners had, by their words or conduct, precluded themselves from rejecting the charterers' nomination as not complying with the contract. Hence the reliance by the charterers on the principles of waiver and estoppel, unsuccessful before the arbitrators, but successful, so far as waiver is concerned, before the Judge and the Court of Appeal. The question whether the Courts below were correct in their conclusion depends, in my opinion, upon an analysis of these principles, and their proper application to the facts of the present case.

It is a commonplace that the expression "waiver" is one which may, in law, bear different meanings. In particular, it may refer to a forbearance from exercising a right or to an abandonment of a right. Here we are concerned

with waiver in the sense of abandonment of a right which arises by virtue of a party making an election. Election itself is a concept which may be relevant in more that one context. In the present case, we are concerned with an election which may arise in the context of a binding contract, when a state of affairs comes into existence in which one party becomes entitled, either under the terms of the contract or by the general law, to exercise a right, and he has to decide whether or not to do so. His decision, being a matter of choice for him, is called in law an election. Characteristically, this state of affairs arises where the other party has repudiated the contract or has otherwise committed a breach of the contract which entitles the innocent party to bring it to an end, or has made a tender of performance which does not conform to the terms of the contract. But this is not necessarily so. An analogous situation arises where the innocent party becomes entitled to rescind the contract, i.e. to wipe it out altogether, for example because the contract has been induced by a misrepresentation; and one or both parties may become entitled to determine a contract in the event of a wholly extraneous event occurring, as under a war clause in a charter-party. Characteristically, the effect of the new situation is that a party becomes entitled to determine or to rescind the contract, or to reject an uncontractual tender of performance; but, in theory at least, a less drastic course of action might become available to him under the terms of the contract. In all cases, he has in the end to make his election, not as a matter of obligation, but in the sense that, if he does not do so, the time may come when the law takes the decision out of his hands, either by holding him to have elected not to exercise the right which has become available to him, or sometimes by holding him to have elected to exercise it. Instances of this phenomenon are to be found in s. 35 of the Sale of Goods Act, 1979. In particular, where with knowledge of the relevant facts a party has acted in a manner which is consistent only with his having chosen one of the two alternative and inconsistent courses of action then open to him — for example, to determine a contract or alternatively to affirm it — he is held to have made his election accordingly, just as a buyer may be deemed to have accepted uncontractual goods in the circumstances specified in s. 35 of the 1979 Act. This is the aspect of election referred to by Lord Diplock in *Kammins Ballrooms Co. Ltd.* v. *Zenith Investments (Torquay) Ltd.*, [1971] A.C. 850 at p. 883. But of course an election need not be made in this

way. It can be communicated to the other party by words or conduct; though, perhaps because a party who elects not to exercise a right which has become available to him is abandoning that right, he will only be held to have done so if he has so communicated his election to the other party in clear and unequivocal terms (see *Scarf* v. *Jardine*, (1882) 7 App.Cas. 345 at p. 361, per Lod Blackburn, and *China National Foreign Trade Transportation Corporation* v. *Evlogia Shipping Co. S.A. of Panama (The Mihalios Xilas)*, [1979] 2 Lloyd's Rep. 303 at p. 307; [1979] 1 W.L.R. 1018 at p. 1024, per Lord Diplock). Once an election is made, however, it is final and binding (see *Scarf* v. *Jardine*, per Lord Blackburn, at p. 360). Moreover it does not require consideration to support it, and so it is to be distinguished from an express or implied agreement, such as a variation of the relevant contract, which traditionally requires consideration to render it binding in English law.

Generally, however, it is a prerequisite of election that the party making the election must be aware of the facts which have given rise to the existence of his new right. This may not always be so. For example, in the law of sale of goods, where goods have been tendered to the buyer which are not in conformity with the contract, he may, if he has had a reasonable opportunity to examine them, be deemed in certain circumstances to have accepted them, thereby electing not to exercise his right to reject them, even though he has not actually examined the goods and discovered the defect (see s. 34 and 35 of the 1979 Act). This may flow from the fact that he has waived his right to examine them — yet another example of waiver. I add in parenthesis that, for present purposes, it is not necessary for me to consider certain cases in which it has been held that, as a prerequisite of election, the party must be aware not only of the facts giving rise to his rights but also of the rights themselves, because it is not in dispute here that the owners were aware both of the relevant facts and of their relevant rights.

There are numerous examples of the application of this principle of election in English law. Perhaps the most familiar situation is that which arises when one contracting party repudiates the contract. The effect is that the other contracting party then has a choice whether to accept the repudiation (as it is called) and bring the contract to an end; or to affirm the contract, thereby waiving or abandoning his right to terminate it. If, with knowledge of the facts giving rise to the repudiation, the other party to the contract acts (for example) in a manner consistent only with treating that contract as still alive,

he is taken in law to have exercised his election to affirm the contract.

The present case is concerned not so much with repudiation as with an uncontractual tender of performance. Even so, the same principles apply. The other party is entitled to reject the tender of performance as uncontractual; and, subject to the terms of the contract, he can then, if he wishes, call for a fresh tender of performance in its place. But if, with knowledge of the facts giving rise to his right to reject, he nevertheless unequivocally elects not to do so, his election will be final and binding upon him and he will have waived his right to reject the tender as uncontractual.

We can see these principles at work in the law of sale of goods. If goods are tendered which are not in conformity with the contract, the buyer is entitled to reject them. However, as is recognized by s. 11(2) of the 1979 Act, where a contract of sale is subject to a condition to be fulfilled by the seller, the buyer may—

. . . *elect* to treat the breach of the condition as a breach of warranty . . .

Of course, if the buyer rejects the goods as not conforming with the contract, and the time for delivery has expired, the buyer can without more sue the seller for damages for non-delivery. If the time for delivery has not yet expired, the seller is still entitled to make a fresh tender which conforms with the contract, in which event the buyer is bound to accept the goods so tendered: see *Borrowman Phillips & Co. v. Free & Hollis*, (1878) 4 Q.B.D. 500. If the buyer elects to accept non-contractual goods, he is bound by his election and is limited to his right of action for damages for breach of warranty, the exercise of that right being consistent with his having waived his right to reject the goods: see s. 11(4) of the 1979 Act. However, as Mr. Justice Devlin pointed out in *The Stork*, [1954] 2 Lloyd's Rep. 397 at p. 414, col. 1; [1955] 2 Q.B. 68 at pp. 76–77, the principle of election is applicable in every class of contract. He said:

. . . There is a difference between a contractor who does not discharge his obligation at all and one who does so imperfectly. In the latter case, the contract gives the other party the right to elect to treat the imperfect performance as if it were a fulfilment of the contract (even if he knows that in fact it is not), and to claim damages if any result from the imperfection. This is a right which is, I think, common to every class of contract. The general principle is that the other party is entitled to proceed just as he would have done if the contract had been properly fulfilled, and the risk of any damage that flows from that must be borne by the wrongdoer.

Mr. Justice Devlin was there speaking in the context of the nomination of an unsafe port under a charter-party, and there can be no doubt that the principle of election applies in such circumstances, as it does in other cases.

Election is to be contrasted with equitable estoppel, a principle associated with the leading case of *Hughes v. Metropolitan Railway Co.*, (1877) 2 App.Cas. 439. Equitable estoppel occurs where a person, having legal rights against another, unequivocally represents (by words or conduct) that he does not intend to enforce those legal rights; if in such circumstances the other party acts, or desists from acting, in reliance upon that representation, with the effect that it would be inequitable for the representor thereafter to enforce his legal rights inconsistently with his representation, he will to that extent be precluded from doing so.

There is an important similarity between the two principles, election and equitable estoppel, in that each requires an unequivocal representation, perhaps because each may involve a loss, permanent or temporary, of the relevant party's rights. But there are important differences as well. In the context of a contract, the principle of election applies when a state of affairs comes into existence in which one party becomes entitled to exercise a right, and has to choose whether to exercise the right or not. His election has generally to be an informed choice, made with knowledge of the facts giving rise to the right. His election once made is final; it is not dependent upon reliance on it by the other party. On the other hand, equitable estoppel requires an unequivocal representation by one party that he will not insist upon his legal rights against the other party, and such reliance by the representee as will render it inequitable for the representor to go back upon his representation. No question arises of any particular knowledge on the part of the representor, and the estoppel may be suspensory only. Furthermore, the representation itself is different in character in the two cases. The party making his election is communicating his choice whether or not to exercise a right which has become available to him. The party to an equitable estoppel is representing that he will not in future enforce his legal rights. His representation is therefore in the nature of a promise which, though unsupported by consideration, can have legal consequences; hence it is sometimes referred to as promissory estoppel.

These are the principles which fall to be con-

Lord GOFF]                          The "Kanchenjunga"                          [H.L.

sidered in the present case. Here, as I have already indicated, the situation in which the owners found themselves was one in which they could either reject the charterers' nomination of Kharg Island as uncontractual, or could nevertheless elect to accept the order and load at Kharg Island, thereby waiving or abandoning their right to reject the nomination but retaining their right to claim damages from the charterers for breach of contract. Since the owners were in this situation, it is logical first to consider the question of election before considering (if necessary) equitable estoppel.

The arbitrators addressed themselves to the possibility of election, but unfortunately their rejection of it was founded upon a mistaken appreciation of the law. The Judge and the Court of Appeal, however, both held that the owners had elected to waive their right to reject the nomination. In my opinion they were right to reach this conclusion.

Because the arbitrators did not approach the issue of election correctly, they failed to consider the correct questions. In particular, they did not ask themselves whether there had been the necessary unequivocal representation by the owners. It is true that they did ask themselves whether there had been the necessary "clear and unequivocal promise" when considering the alternative principle of equitable estoppel; they held that there was not, on the basis that the mere acceptance of orders without protest does not amount to such a promise. As a general proposition, this is no doubt correct; and it would equally be true if made with reference to the question whether there had been an unequivocal representation by the owners that they were waiving their right to reject the nomination as uncontractual. Moreover, if the relevant evidence had related only to the communications passing between the parties before the vessel arrived at Kharg Island, the question would have arisen whether, on these communications (set of course in their factual context), there had been such an unequivocal representation. But the matter does not stop there, because on arrival at Kharg Island the master proceeded to serve notice of readiness. Thereafter, as the Judge pointed out, the owners were asserting that the vessel was available to load; they were also calling upon the charterers to arrange priority berthing, and referring to the fact that laytime was running. In these circumstances, the owners were asserting a right inconsistent with their right to reject the charterers' orders. The right which they were asserting was that laytime had started to run against the charterers at Kharg Island, with

the effect that the charterers had become bound to load the cargo there within the laytime fixed by the charter and, if they failed to do so, to pay demurrage to the owners at the contractual rate. In these circumstances, on the principle stated by Lord Diplock in the *Kammins Ballrooms* case [1971] A.C. 850, at pp. 882-883, the owners must be taken in law to have thereby elected not to reject the charterers' nomination, and so to have waived their right to do so or to call for another nomination. Accordingly, in my opinion, Mr. Justice Hobhouse and the Court of Appeal were fully entitled in these circumstances to substitute their view of the case on this point for that of the arbitrators. There was no question of their reversing the arbitrators on an issue of fact; they were deciding, and in my opinion rightly deciding, that the arbitrators had failed to draw an inference of law which on their findings of fact they were bound to draw.

No doubt the master was entitled to refuse to endanger his ship and crew in the circumstances in which he found himself; but that did not excuse the owners from their breach of contract, after they had elected not to reject the charterers' nomination of Kharg Island in the knowledge of the facts rendering it prospectively unsafe. Furthermore this is not a case in which a new situation had developed at Kharg Island, or some other danger already existed there. If the known danger had become significantly different; or if a new and different danger had developed; or if some other danger, hitherto unknown, already existed at the port — in such circumstances as these, other questions might have arisen. But your Lordships are not troubled with any such questions in the present case. The arbitrators found as a fact that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. This was a finding which they were fully entitled to make, and which cannot be challenged.

For these reasons, I would dismiss the owners' cross-appeal on this issue. It follows that it is unnecessary for the purposes of the cross-appeal to consider the alternative question of equitable estoppel.

I turn then to the charterers' appeal which related to the effect of cl. 20 (vi) of the charter. Clause 20 (vi) reads, so far as relevant, as follows:

WAR RISKS (a) If any port of loading or of discharge named in this charterparty or to which the vessel may properly be ordered pursuant to the terms of the bills of lading be blockaded, or (b) if owing to any war, hostilities, warlike operations . . . entry to any such port of loading or of discharge or the loading

H.L.]    The "Kanchenjunga"    [Lord Goff

or discharge of cargo at any such port be considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the charterparty (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the master's or owner's discretion dangerous or prohibited) . . .

Both the Judge and the Court of Appeal held that this clause was effective to protect the owners from liability in damages, though it did not render the charterers liable in damages in the events which had happend. With this conclusion I agree; I shall therefore deal with the point briefly.

Three arguments were advanced on behalf of the charterers. The first was that, on its true construction, all that the clause did was to confer an option on them. It was simply a charterers' option clause, which conferred no rights or protection on the owners in the events specified in the clause. This argument was rejected both by the Judge and by the Court of Appeal, on the basis that it would deprive the clause of all meaning and effect if it were held that it did not protect the owners in the event of their deciding, in their discretion, that the port was dangerous or prohibited and that they would not therefore load or discharge cargo there, as the case might be. With this conclusion I agree. The clause expressly refers to the discretion which the owners and master are entitled to exercise in a situation of danger and must, in my opinion, impliedly recognize that in the exercise of that discretion they may decline to load or discharge at the relevant port. This is precisely what happened in the present case. It was next argued that, on its true construction, the clause only applied to named ports or ports properly nominated under the charter-party. This cannot be right because, in the event of an improper nomination being made by the charterers, owners' acceptance of the nomination would have the effect that all the relevant contractual provisions applied, including cl. 20 (vi). Finally, it was suggested that the owners, by waiving their right to reject the charterers' nomination as uncontractual, thereby also waived their right to rely upon cl. 20 (vi). Again, I cannot agree. The owners, presented by the charterers with an uncontractual nomination, had in the end to decide whether or not

to reject it, and they elected not to do so. I cannot see that this election had any effect upon cl. 20 (vi), and indeed in the course of argument the charterers virtually abandoned the point.

For these reasons, which are substantially the same reasons as those given by the Judge and by the Court of Appeal, I would dismiss both the appeal and the cross-appeal.

Finally, I find it necessary to refer to the fact that my noble and learned friend, Lord Brandon of Oakbrook, has suggested that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable if the ship had entered the port and been lost or damaged in a further air raid. This point was not raised in argument, either by Counsel for the owners or indeed by the tribunal, before any of the four tribunals (including your Lordship's House) before which the case has been argued. Having heard no argument on the point, I can express no concluded opinion upon it. Even so, out of fairness to Counsel for the owners, I feel compelled to make the following observations:

(1) The owners, with knowledge of the relevant facts, waived their right to reject the charterers' nomination of Kharg Island as uncontractual, and the arbitrators have found as a fact that there was no material change in the nature of the danger at Kharg Island between the date of the nomination and the date when the owners ultimately refused to load there. In these circumstances, although no doubt the master was entitled to act as he did for the safety of his ship and crew, I find it difficult to see how the owners could, in the absence of any change of circumstances or any hitherto unknown circumstances coming to light which significantly increased the danger of loading at Kharg Island, escape from their contractual obligation to load there by invoking the principle of mitigation of damage.

(2) If it were right that the owners' refusal to load at Kharg Island constituted a reasonable step taken in mitigation of damage, it would follow that, had the ship instead entered Kharg Island and suffered bomb damage while loading there, the charterers could have escaped all liability for such damage on the ground that the owners had failed to mitigate their damage by refusing to enter the port. I have great difficulty in seeing how any tribunal could reach such a conclusion.

(3) In any event, since the owners, while waiving their right not to treat the charterers' nomination as uncontractual, did not waive their rights under cl. 20 (vi), that clause legislated for the circumstances which arose.

For these reasons, quite apart from others which might have been advanced if the point had been argued, as at present advised it seems to me very understandable that Counsel for the owners should not have raised the point.

---

## QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Dec. 13, 14, 15, 18 and 19, 1989

---

### THE "MONTANA"

Before Mr. Justice SHEEN

Carriage by sea — Short delivery — Title to sue — Bulk cargo of barley discharged at Singapore bagged and reloaded for shipment to Jeddah — Plaintiff consignee alleged short delivery — Whether defendants liable in damages for failing to deliver all cargo loaded in Singapore — Whether plaintiff had title to sue.

Bunge (Australia) Pty. Ltd. of Melbourne chartered *Montana* from the disponent owners by a charter-party dated Dec. 14, 1983 at Melbourne. Under the terms of the charter the receivers' stevedores were to be employed at the port of discharge.

A cargo of barley in bulk was carried in *Montana* from the port of shipment, Geelong, to Singapore. At Singapore the cargo was discharged. It was then bagged and reloaded. It was agreed that *Montana* sailed from Singapore laden with 27,500 tonnes of barley in 550,000 bags. Each bag and its contents weighed 50 kgs.

The bill of lading stated that the cargo was to be delivered in the like apparent good order and condition at Jeddah unto the order of the Saudi Cairo Bank or their assigns. The bills of lading incorporated the provisions of the charter-party.

The letter of credit was opened by the Saudi Cairo Bank on Dec. 20, 1983 for the account of Mr. S.H.A. Sharbatly of Jeddah. The beneficiaries were named as Bunge (Australia) Pty. Ltd. of Melbourne and was for about U.S.$10,200,000 (10 per cent. more or less). There was no evidence that that letter of credit referred to the shipment of barley.

*Montana* arrived in Jeddah on Feb. 28, 1984. Discharging commenced at 07 00 hours on Feb. 29 and was completed on Mar. 13. The master sent a telex message to the owners' London agents stating inter alia that 27,464 tonnes had been discharged and only a quantity of about 15 tonnes remained in the holds in bulk from bags torn by the stevedores in the course of discharging. The stevedores refused to discharge this cargo.

On Apr. 28, 1984 a document headed summary of vessel's outturn was issued indicating a shortage of 1108 bags. On Apr. 20, 1984 the Jeddah customs issued a shortage certificate which stated that 550,000 bags were loaded in Montana but only 548,892 bags were discharged.

The plaintiff claimed damages on the ground that 1108 bags of barley were not delivered to him and that 4000 bags were delivered partly empty. After the contents of those 4000 bags were rebagged it was found that they filled only 3442 bags and that there was a further shortage of 558 bags. The total

# Declaration of Susannah Jones

# EX7

# DICEY, MORRIS AND COLLINS

## ON

# THE CONFLICT OF LAWS

*FOURTEENTH EDITION*

UNDER THE GENERAL EDITORSHIP OF

## SIR LAWRENCE COLLINS

LL.D. (Cantab.), F.B.A.

WITH

## SPECIALIST EDITORS

VOLUME 1

LONDON
SWEET & MAXWELL
2006

# CHAPTER 7

# SUBSTANCE AND PROCEDURE

**RULE 17—All matters of procedure are governed by the domestic law of the country to which the court wherein any legal proceedings are taken belongs (lex fori).**    7R–001

## COMMENT

The principle that procedure is governed by the *lex fori* is of general application and universally admitted.[1] In a body of Rules such as those contained in this book, which state the principles enforced by an English court, the maxim that procedure is governed by the *lex fori* means in effect that it is governed by the ordinary law of England without any reference to any foreign law whatever. Thus the English court will always apply its own rules of procedure, and will, moreover, refuse to apply any foreign rule which in its view is procedural.[2] In deciding whether a foreign rule is procedural, the court refers to the foreign law in order to determine whether the rule is of such a nature as to be procedural in the English sense.[3]    7–002

While procedure is governed by the *lex fori*, matters of substance are governed by the law to which the court is directed by its choice of law rule (*lex causae*).[4] Dicey wrote that English lawyers gave "the widest possible extension to the meaning of the term 'procedure.' "[5] As a matter of history, this is true[6]; and a court may, even today, be tempted to extend the meaning of "procedure" in order to evade an unsatisfactory choice of law rule.[7] But in general the attitude expressed by Dicey has fallen into disfavour precisely because it tends to frustrate the purposes of choice of law rules.[8] In *John*    7–003

---

[1] Ailes (1941) 39 Mich.L.Rev. 392. The distinction between substance and procedure is often discussed in and illustrated by reference to cases involving limitation periods; the actual decisions in many of these cases would be different since the Foreign Limitation Periods Act 1984, considered below, paras 7–049 *et seq.*

[2] e.g. *Hansen v Dixon* (1906) 23 T.L.R. 56. Rule 17 was applied and the text was cited with approval in *De Gortari v Smithwick* [2000] 1 I.L.R.M. 463 (Sup Ct).

[3] *Huber v. Steiner* (1835) 2 Bing. N.C. 202; *cf. Société Anonyme Metallurgique de Prayon v Koppel* (1933) 77 S.J. 800; Beckett (1934) 15 B.Y.I.L. 46, 75; Robertson, pp.248–253; Cook, p.224; above, Ch.2.

[4] *Huber v Steiner* (1835) 2 Bing. N.C. 202, 210. This paragraph was cited with approval in *Harding v Wealands* [2004] EWCA Civ. 1735, [2005] 1 W.L.R. 1539, at [87].

[5] 1st ed., p.712.

[6] *cf.* Lorenzen, pp.339–340.

[7] e.g. *Grant v McAuliffe*, 41 Cal. 2d 859, 246 P. 2d 944 (1953); *Kilberg v Northeast Airlines Inc*, 9 N.Y. 2d 34, 172 N.E. 2d 526 (1961); Currie, Ch.3; see below, para.35–042.

[8] "On this basis, a reference to the law of the forum must be the exception", *per* Arden L.J. in *Harding v Wealands* [2004] EWCA Civ. 1735, [2005] 1 W.L.R. 1539, at [52].

RULE 17                        *Procedure*

*Pfeiffer Pty Ltd v Rogerson*[9] the High Court of Australia stated that "matters that affect the existence, extent or enforceability of the rights or duties of the parties to an action are matters that, on their face, appear to be concerned with issues of substance".[10] Thus some questions which were at one time thought of wholly in terms of procedure are now considered to be procedural in some of their aspects only. The development of the law as to damages[11] illustrates this process.

7-004    The difficulty in applying this Rule lies in discriminating between rules of procedure and rules of substance. The distinction is by no means clear-cut. In drawing it, regard should be had in each case to the purpose for which the distinction is being used and to the consequences of the decision in the instant context.[12] The rule under examination must be considered as a whole, without giving undue weight to the verbal formula selected by previous judges or by the draftsman of a statute to introduce the rule. So, the words "where proceedings are taken in any court . . . " have been held to introduce a rule of substance.[13] The mechanistic approach, sometimes found in English cases, of relying on the classification of the introductory verbal formula as used in a quite different statute,[14] or of accepting a classification as procedural or substantive made for some purpose quite unrelated to the conflict of laws,[15] is now discredited. The distinction may have to be drawn in one place for the purpose of this Rule but in another place for the purpose of the rule that statutes affecting procedure are, while statutes affecting substance are not, presumed to have retrospective effect. This is not to say that the distinction may not be drawn in the same place for many purposes: it is merely to deny that it must necessarily be drawn in the same place for all purposes. The primary object of this Rule is to obviate the inconvenience of conducting the trial of a case containing foreign elements in a manner with which the court is unfamiliar. If, therefore, it is possible to apply a foreign rule, or to refrain from applying an English rule, without causing any such inconvenience, those rules should not necessarily, for the purpose of this Rule, be classified as procedural.[16]

---

[9] (2000) 203 C.L.R. 503, 543.

[10] This passage was cited with approval in *Harding v Wealands* [2004] EWCA Civ. 1735, [2005] 1 W.L.R. 1539, at [90], *per* Aldous L.J.

[11] See below, paras 7-035 *et seq.*

[12] Falconbridge, p.304; *Block Bros Realty Ltd v Mollard* (1981) 122 D.L.R. (3d) 323 (BCCA). See Panagopoulos (2005) 1 J. Priv. Int. L. 69.

[13] *Shrichand & Co v Lacon* (1906) 22 T.L.R. 245. Similarly, a rule which provides that a person "may not bring proceedings for the recovery of damages" unless certain conditions are satisfied has been construed as a rule of substance: *Sherwood v Webb* (1992) 28 N.S.W.L.R. 251. See also *James Hardie & Co Pty Ltd v Hall* (1998) 43 N.S.W.L.R. 554.

[14] e.g. *Moulis v Owen* [1907] 1 K.B. 746, 753 (CA); *Hill v William Hill (Park Lane) Ltd* [1949] A.C. 530, 579, where decisions under the Gaming Acts 1845 and 1892 were influenced by the earlier classification of the same formula ("No action shall be brought . . .") in the Statute of Frauds 1677, s.4. *cf. Toronto-Dominion Bank v Martin* [1985] 4 W.W.R. 557 (Sask.); *Horse-shoe Club Operating Co v Bath* [1998] 3 W.W.R. 128 (BC).

[15] e.g. *Leroux v Brown* (1852) 12 C.B. 801, 827. *cf.* Cook, Ch.6.

[16] *Bateman & Litman Real Estate Ltd v Big T Motel Ltd* (1964) 44 D.L.R. (2d) 474, affirmed 49 D.L.R. (2d) 480 (Sask CA), citing the corresponding text in the 7th edition of this work. See also *Shaik Sahied bin Abdullah Bajerai v Sockalingam Chettiar* [1933] A.C. 342, 346 (PC); *The Zollverein* (1856) Swab. 96, 98; *Nhalchand Navalchand v McMullan* [1934] 1 K.B. 171; (CA) as explained in (1935) 16 B.Y.I.L. 210; *Merchants Bank of Canada v Elliot* [1918] 1 (CA).